**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ADAM LAMAR ROBINSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:08cv168-MEF** |
| | ) | **(CR No. 2:06cr00223-MEF-WC-1)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**UNITED STATES'S RESPONSE TO § 2255 MOTION**</u>

COMES NOW the United States of America ("the Government") by and through its

attorneys, Leura G. Canary, United States Attorney, and Sandra J. Stewart, Assistant United

States Attorney, and in compliance with this Court's March 12, 2008 order, responds to

Petitioner Adam Lamar Robinson's Motion Under § 2255 To Vacate, Set Aside, Or Correct

Sentence By A Person In Federal Custody, as follows:

## I.  PROCEDURAL HISTORY AND RELEVANT FACTS

**A.**    <u>**Indictment**</u>

On September 7, 2006, a grand jury for the Middle District of Alabama returned a two-

count indictment against Petitioner Adam Lamar Robinson ("Robinson") and his codefendant

Karen Kilgo Robinson, charging him with being a felon in possession of firearms, silencers, and

destructive devices.  *See* GX 1 (Doc. 1)[1], a copy of the indictment in this case.[2]  Specifically,

---

[1]References to "Doc." are to the docket entries and documents in the criminal record in
this case, criminal case number 2:06cr00223-MEF-WC-1.

[2]All exhibits referenced in this response are attached to the response and are being filed
contemporaneously with the response.

count one of the indictment charged that beginning from an unknown date and continuing up to and including June 15, 2006, in Autauga County, within the Middle District of Alabama, Robinson knowingly possessed, in and affecting commerce, 11 specifically identified firearms, after having been convicted of the following four felonies in Morgan County, Alabama, all crimes punishable under the law of Alabama by imprisonment for terms exceeding one year:  (1) burglary on October 16, 1980 in case number 79-0718; (2) felony possession of a pistol on December 12, 1980 in case number 80-0594; (3) third degree burglary on December 17, 1980 in case number 80-0595; and (4) second degree theft on September 14, 1987 in case number 84-0573, in violation of 18 U.S.C. § 922(g)(1).  *See* GX A at 1-2.  Count two of the indictment charged that, beginning from an unknown date and continuing up to and including June 15, 2006, in Autauga County, within the Middle District of Alabama, Robinson and Karen Kilgo Robinson, while aiding and abetting each other and others known and unknown to the grand jury, knowingly possessed eight specifically identified firearms, firearms silencers, and destructive devices not registered with the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.  *Id*. at 2-3.  The indictment also contained a forfeiture count requiring that, upon conviction, Robinson forfeit 10 of the firearms listed in the indictment. *Id*. at 3-4.  At his arraignment, Robinson, represented by counsel, Thomas M. Goggans, pleaded not guilty.  (Docs. 18, 20)

**B.**     **The Motion To Suppress**

Mr. Goggans filed a motion to suppress on behalf of Robinson.  *See* GX B (Doc. 40), a copy of Defendant Adam Lamar Robinson's Motion To Suppress.  In that motion, counsel argued that the evidence obtained as a result of the searches conducted by government agents on

June 1, 2006 in Chicago, Illinois; on June 15, 2006 in Deatsville, Alabama; and between August 12, 2006 and September 25, 2006 in Chattanooga, Tennessee, should be suppressed.  *See* GX B at 1.  The following issues were raised in that motion:

    a.    Whether a search in Chicago, Illinois of [an] article of mail addressed to Defendant Adam Lamar Robinson at his address in Deatsville, Alabama violated the Fourth Amendment to the United States Constitution and 19 U.S.C. § 482.

    b.    Whether a search of Defendant Adam Lamar Robinson's residence was a fruit of the aforementioned search of the article of mail and, independently, violated the Fourth Amendment to the United States Constitution.

    c.    Whether a search of a personal computer seized from Defendant Adam Lamar Robinson's residence was a fruit of the aforementioned searches and, independently, violated the Fourth Amendment to the United States Constitution.

Id. at 1, ¶ 2.

As to the first issue about the search of a piece of mail addressed to Robinson at his residence in Deatsville, Alabama, Robinson argued that his Fourth Amendment rights were violated when federal agents searched this piece of incoming international mail without reasonable suspicion and without having first obtained a search warrant.  *Id*. at 2, ¶¶ 3-5.  As to the second issue, Robinson argued that law enforcement agents in Montgomery, Alabama, then obtained an anticipatory search warrant to search Robinson's residence in Deatsville, Alabama, based on the illegally obtained evidence from the search of the piece of mail.  *Id*. at 3, ¶¶ 6-8. This subsequent search was also a violation of Robinson's Fourth Amendment rights because it was based on the previous illegal warrantless search of his mail.  As to the second issue, Robinson also argued that the search warrant affidavit was insufficient to provide the issuing

3

authority with a "substantial basis" for determining whether probable cause existed to believe that contraband or evidence of a crime would be found at Robinson's residence.  *Id*. at 3, ¶ 9. And as to the third issue, Robinson argued that the computer that was seized from his residence and searched was illegally searched for two reasons:  (1) it was based on the illegal warrantless search of his mail in Chicago and on the illegal search of his residence in Deatsville; and (2) the search warrant affidavit presented in support of the warrant to search the computer did not provide the issuing authority with a "substantial basis" for determining probable cause to believe that contraband or evidence of a crime would be found on the computer.  *Id*. at 4, ¶¶ 13-15.

After the Government filed a response, *see* GX C (Doc. 47), a copy of Response To Adam Lamar Robinson's Motion To Suppress, the Court set the case for a suppression hearing, which was held on January 16, 2006, *see* GX D (Doc. 137), a copy of the January 16, 2006 suppression hearing in this case.  The following facts were established at that hearing:

> ... On June 1, 2006, United States Customs and Border Protection (hereinafter Customs) Inspector Daniel Nugent (Inspector Nugent) intercepted a package from Malburg, Germany while examining international mail on an x-ray machine at the Port of Chicago in Chicago, Illinois.  ...  The package was addressed to Adam Robinson at 1708 Formosa Court, Deatsville, Alabama, 36022 USA (hereinafter Defendants' residence) and contained six Euros of postage. ... Inspector Nugent testified that the postage indicated that the package contained merchandise that had some weight.  ...  The package was marked "CO-2-Set."  ... Inspector Nugent observed the x-ray image of the package, which displayed a metal sphere that he suspected was a firearm silencer.  ...  He testified at the hearing that in his 3-years of experience, he had seen four or five silencers previously.  ...  Inspector Nugent then opened the package.  ...  He testified that he opened the package because the contents of the package on the x-ray screen looked similar to silencers he had seen come through the mail in the past. ... Specifically, Inspector Nugent indicated that a silencer appears "almost black" on the x-ray screen whereas a CO-2 set appears "much lighter blue."  ...  Upon opening the package, Inspector Nugent found a hollow, black spherical piece of light metal wrapped in a piece of paper with a "L-wrench," which he believed was a silencer.  ...  Inspector Nugent forwarded photographs of the metal object to an

4

inspector with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) in Chicago who confirmed Inspector Nugent's belief. ...

Inspector Nugent forwarded the Weihrauch silencer to Immigration and Customs Enforcement Special Agent David Henderson (Agent Henderson) in Montgomery, Alabama. ... Agent Henderson transferred the package to Special Agent Timothy Fitzpatrick (Special Agent Fitzpatrick), ATF, in the Montgomery Field Office, who, in turn, forwarded the package to the ATF Firearms Technology Branch in Washington, D.C. ... Personnel at the ATF Firearms Technology Branch confirmed that the Weihrauch silencer was an item that required registration with the National Firearms Registration and Transfer Record. ... No silencers, however, were registered to Adam Robinson. ...

On June 14, 2006, Chief United States Magistrate Judge Charles S. Coody authorized an anticipatory search warrant for Adam Robinson's residence. ... The following day, federal agents conducted a controlled delivery of the Weihrauch silencer. ... Once Karen Robinson took the package inside the residence, federal agents executed the search warrant. ... The agents seized the Weihrauch silencer as well as pipe bombs, improvised explosive devices, and homemade firearm silencers. ... None of the items seized was registered with the National Firearms Registration and Transfer Record. ...

The agents also seized personal computers believed to contain evidence relating to the illegal possession or manufacture of firearm silencers or destructive devices. ... On August 8, 2006, United States Magistrate Judge Susan Russ Walker authorized the Government to search Adam Robinson's computer, which contained evidence of Adam Robinson's possession or manufacture of illegal firearms or destructive devices. ...

*See* GX E (Doc. 61), a copy of the Recommendation Of The Magistrate Judge, at 1-4 (footnotes, transcript references, and other references omitted).

The Magistrate Judge assigned to hear the suppression issue rejected all of Robinson's arguments in his Recommendation Of The Magistrate Judge. *See* GX E. First, after reviewing the applicable law, the Court found that "it is well established that warrantless searches at international borders of the United States may be performed even without a suspicion of criminal activity." *Id*. at 8. It then concluded with regard to Robinson's first issue that, "[b]ecause the

Weihrauch silencer was contained in a package originating from outside the United States and

was addressed to a residence within the United States, Inspector Nugent was statutorily

authorized under 19 U.S.C. § 1582 to search the package without reasonable suspicion to suspect

that it contained contraband." *Id*. at 10.  The Court also concluded with regard to that issue that

"the search of the package was also valid under the Fourth Amendment", because the search was,

in fact, reasonable. *Id*. at 10-11.

After rejecting the argument that the search of the package with the silencer in it was a

violation of the Fourth Amendment, the Court also rejected the arguments that the searches of the

residence and the computer were unconstitutional.  *Id*. at 11.  The Court found that the evidence

seized from the Robinson residence and the computer in that residence were not fruits of the

poisonous tree because the initial search of the package "was constitutionally authorized."  *Id*.

The Court also addressed whether the affidavits in support of the search warrants for the

residence and the computer provided a substantial basis on which the issuing magistrate could

find the necessary probable cause for the issuance of the search warrants.  *Id*. at 11-16.  With

regard to the affidavit in support of the search warrant for Robinson's residence, the Court

concluded that "the warrant issued for the search of Defendants' residence was supported by

probable cause.  The detailed information presented in the affidavit would warrant a person of

reasonable caution to believe that a search of Defendants' residence would uncover the

Weihrauch silencer as well as other firearms." *Id*. at 13.  With regard to the affidavit in support

of the search warrant for Robinson's computer, the Court again found that the affidavit provided

the necessary probable cause in that "it would warrant a person of reasonable caution to believe

that a search of his computer would uncover evidence of the possession or manufacture of

firearms, silencers, and explosives in electronic digital media form." *Id*. at 15.

After the Court issued its recommendation, Robinson filed a motion to extend the time for filing his objections to that recommendation and asked for the Court to accept his objections out of time. *See* GX F (Doc. 66), a copy of Defendant Adam Lamar Robinson's Unopposed Motion For Three Day Extension Of Time To File Objections To Recommendation. The Court granted Robinson's motion, *see* GX G (Doc. 67), a copy of the order granting Robinson an extension of time to file his objections, and Robinson filed his objections to the magistrate's recommendation, *see* GX H (Doc. 68), Defendant Adam Lamar Robinson's Objection To Recommendation of Magistrate Judge. Thereafter, the district court entered an order in which it adopted the Recommendation Of The Magistrate Judge; overruled Robinson's objections; and denied his motion to suppress. *See* GX I (Doc. 76).

## C.    **The Plea**

After his motion to suppress was denied, Robinson entered into a Rule 11(c)(1)(C), Fed. R. Crim. P., plea agreement with the Government. *See* GX J (Doc. 107), a copy of Robinson's plea agreement. In return for Robinson's agreement to plead guilty to the two charges in the indictment, the Government agreed: (1) a two-level reduction in the applicable offense level was appropriate pursuant to U.S.S.G.[3] § 3E1.1(a) for Robinson's's acceptance of responsibility and that, if Robinson otherwise qualified for the third level reduction pursuant to U.S.S.G. § 3E1.1(b), the Government would move for that third-level reduction at sentencing; (2) that should Robinson qualify as an Armed Career Criminal pursuant to 18 U.S.C. § 924(e), he would have the right to withdraw his guilty plea and negotiate a new plea agreement; and (3) that upon

---

[3]"U.S.S.G." is a reference to the United States Sentencing Guidelines.

7

Robinson's sentencing, it would move to dismiss all pending charges against Karen Robinson (Robinson's wife) arising from the September 7, 2006 indictment.  *See* GX J at 2-5.  In addition to pleading guilty to the two charges in the indictment, Robinson also agreed to forfeit all firearms, mufflers, silencers, and ammunition in his possession; to forfeit all other equipment, tools, and substances used in the manufacture or construction of firearms, silencers, and destructive devices in his possession that he was prohibited from possessing under the National Firearms Registration and Transfer Record; and not to commit any other state, local, or federal offenses.  *Id*. at 5.  Robinson also agreed to waive "any and all rights conferred by 18 U.S.C. § 3742 to appeal the sentence", to waive "the right to appeal the sentence on any other ground" and to waive "the right to attack the sentence in any post-conviction proceeding."  *Id*. at 7.

With Robinson's consent, *see* Doc. 106, a change of plea hearing was held before this court on July 25, 2007.  *See* GX K (Doc. 138), a copy of the transcript of the July 25, 2007 Change of Plea hearing.   At that hearing, a brief factual basis for the plea was given as follows:

THE COURT:  Mr. Urech, could you inquire of your client what it is that he feels he did that makes him guilty of these offenses?

MR. URECH [DEFENSE COUNSEL]:  Yes, sir.  Yes.

Mr. Robinson, concerning Count 1 of the indictment, did you have these felonies as listed in the indictment?

THE DEFENDANT:  Did I have them?

MR. URECH:  Yes.

THE DEFENDANT:  Yes.

MR. URECH:  Okay.  And did you possess the – did you knowingly – in other words, did you know that you possessed the firearms and articles described in Count 1 of the indictment?

THE DEFENDANT:  Yes.

MR. URECH:  All right.  And on Count 2 –

MR. SPEIRS [AUSA]:  Your Honor, before we move to Count 2, the government would prove at trial that the 11 firearms listed in the indictment traveled in interstate commerce.  That would be an essential element of the crime.

THE COURT:  Okay.

MR. URECH:  And do you agree that those firearms would have traveled in interstate commerce?

THE DEFENDANT:  I don't – I don't –

THE COURT:  In other words, that those firearms had not been manufactured in Alabama, and they probably would have had to travel –

THE DEFENDANT:  I don't know where they were manufactured.

MR. URECH:  Do you –

THE COURT:  Do you agree that the government could probably establish that they weren't?

THE DEFENDANT:  I don't know that.

MR. URECH:  Well–

THE DEFENDANT:  I can't tell you where they were made.  I didn't make them.

THE COURT:  That's not what I'm asking, Mr. Robinson.  The government is saying that they would be able to move – that in order to establish it, they would have to show that these firearms moved in interstate commerce.  They would be able – they would present that evidence at trial if there was a trial.  Do you agree that they would probably be able to establish that at trial, yes or no?

THE DEFENDANT:  I guess so.  Yes, sir.

MR. URECH:  All right.  On Count 2, did you knowingly possess the firearms and firearm silencers and destructive devices described in the indictment in Count 2?

THE DEFENDANT:  Yes.

MR. URECH:  And did you know that those devices that you possessed were not registered in the National Firearms Register and Transfer Record?

THE DEFENDANT:  Correct.

MR. URECH:  And did you –

I think that's – that would be all.

THE COURT:  All right.  Mr. Robinson, did all this take place in the Middle District of Alabama, sir?

THE DEFENDANT:  Correct.

*Id*. at 13-15.  At the conclusion of the hearing, the Court found that Robinson was "fully competent and capable of entering an informed plea," that he was "aware of the nature of the charges and the consequences of the plea," and that his plea was "a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense." *Id*. at 16.  It then accepted Robinson's guilty plea.  *Id*.

A sentencing hearing was held before United States District Judge Mark E. Fuller on October 30, 2007.  *See* GX L (Doc. 139), a copy of the transcript of the October 30, 2007 sentencing hearing.  After determining that the Armed Career Criminal Act did not apply in this case because Robinson's Alabama youthful offender conviction did not qualify as a prior offense under the Act,  *see* GX L at 4-9, the Court found that Robinson's offense level was 25 and his criminal history category was I, resulting in a sentencing imprisonment range of from 57 to 71 months; a supervised release period of from three to five years; and a fine range of from $10,000 to $100,000.  *Id*. at 9.  Robinson was then sentenced to 64 months in prison to be followed by three years of supervised release on his release from prison, subject to mandatory, standard, and

special conditions. *Id*. at 9-11. He was also ordered to pay a special assessment of $200, but any fine was waived due to Robinson's inability to pay. *Id*. at 9-10. All firearms and other items seized were to be forfeited. *Id*. at 12.

A final judgment was entered in the case on November 1, 2007. *See* GX M (Doc. 121) Robinson did not appeal his conviction or sentence. While the Government filed a notice of appeal (Doc. 127), it later moved to dismiss that appeal, with prejudice, and that motion was granted by the Eleventh Circuit Court of Appeals (Doc. 141).

## II. CLAIMS RAISED IN THE § 2255 MOTION

In his § 2255 motion, Robinson seems to raise the following three claims:

1.     His counsel, Mr. Goggans, was ineffective because he failed to argue in the motion to suppress that the search warrant to search Robinson's residence was defective because it failed to describe the person or property to be seized or give a specific address to be searched.

2.     The search warrant to search Robinson's residence was defective because it did not describe the person or property to be seized or give a specific address to be searched.

3.     He was not guilty of count two of his indictment because he never possessed the silencer listed in that count of the indictment. (See page 4 of Robinson's Affidavit.)

Robinson's second and third claims for relief are not properly before this Court because they could have been raised in a direct appeal, but they were not, and Robinson has not presented any cause or prejudice to overcome those defaults. Nor has he argued actual factual innocence of the crimes. As to the first claim – the ineffective assistance of counsel claim – Robinson has demonstrated neither deficient performance or prejudice. Therefore, all three of his claims should be rejected.

## III.  RESPONSE TO CLAIMS FOR RELIEF

**A.**     **Robinson Has Met The One-Year Statute of Limitations Under 28 U.S.C. § 2255.**

Robinson has filed his § 2255 motion in a timely manner under paragraph six of 28

U.S.C. § 2255, which provides a one-year period of time to seek relief under the rule.  Section

2255 states that a motion be filed within one year from

> (1)  the date on which the judgment of conviction becomes final;
>
> (2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution and laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255 ¶ 6.  The relevant date for purposes of Robinson's § 2255 motion is paragraph

(1), the date on which the judgment of conviction became final.

The final judgment in Robinson's criminal case was entered on November 1, 2007.  *See*

GX M.  He did not appeal his conviction or sentence to the United States Court of Appeals for

the Eleventh Circuit.  His sentence became final when the time for filing an appeal to the

Eleventh Circuit expired.  Although not specifically addressing the application of the statute of

limitations to the 10-day notice of appeal requirement in a holding in a published opinion, the

Eleventh Circuit has held that a judgment of conviction becomes final for someone who appeals

to an appellate court when the time for seeking certiorari review in the Supreme Court expires.

*See Kaufman v. United States*, 282 F.3d 1336, 1337-39 (11th Cir. 2002).  Likewise, a judgment

12

of conviction becomes final for someone who does not appeal when the time for seeking that appeal expires.  *See*, *e.g.*, *Mederos v. United States*, 218 F.3d 1252, 1253 (11th Cir. 2000) (citing Fed. R. App. P. 4(b)(1), judgment became final ten days after it was entered where defendant did not file appeal); *Ramirez v. United States*, No. 05-10010, 2005 WL 1706142, at *1 (11th Cir. July 22, 2005) (unpub.).  Robinson had 10 days from the November 1, 2007 entry of judgment by this Court to seek review by the Eleventh Circuit, *see* Fed. R. App. P. 4(b)(1)(A)(i); his conviction and sentence became final, therefore, on November 11, 2007.  Under § 2255, Robinson then had until November 11, 2008 – one year after November 11, 2007 – to file his motion.  He filed the instant motion on March 6, 2008.  It is, therefore, timely under the limitation period in § 2255 ¶ 6(1).

**B.    Claims 2 And 3 Of Robinson's § 2255 Motion Could Have Been Raised On Direct Appeal, But They Were Not, Therefore They Are Procedurally Defaulted And Not Properly Reviewed In This § 2255 Proceeding.**

In his §2255 motion, Robinson raises the following two substantive claims for relief:

2.    The search warrant to search Robinson's residence was defective because it did not describe the person or property to be seized or give a specific address to be searched.

3.    He was not guilty of count two of his indictment because he never possessed the silencer listed in that count of the indictment.  (See page 4 of Robinson's Affidavit.)

These two arguments were properly raised in a direct appeal, not in a § 2255 proceeding.  Because they could have been raised on direct appeal, but they were not, and because Robinson has not presented this Court with any cause or prejudice to overcome his procedural defaults, or claimed he was factually innocent of the crimes, the claims should be rejected.

13

1.        **The Identified Claims Are Procedurally Defaulted.**

The two arguments listed above that Robinson raises in his § 2255 motion could have been raised on direct appeal of his conviction and sentence, but they were not.  A motion under § 2255 cannot be used as a substitute for appeal, *see Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998), and claims not raised on direct appeal that could have been are generally barred from review in § 2255 proceedings, *see Massaro v. United States*, 538 U.S. 500, 504 (2003); *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001).  In *Mills v. United States*, 36 F.3d 1052 (11th Cir. 1994), the Eleventh Circuit succinctly summarized the law concerning procedural default as follows:

> Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a [Section] 2255 proceeding....  A ground of error is usually "available" on direct appeal when its merits can be reviewed without further factual development....  When a defendant fails to pursue an available claim on direct appeal, it will not be considered in a motion for [Section] 2255 relief unless he can establish  cause for the default and actual prejudice resulting from the alleged error....  Alternatively, under the fundamental miscarriage of justice exception, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default....

*Id*. at 1055-56 (internal citations omitted).  *See also McCoy v. United States*, 266 F.3d at 1258 ("A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal.").  The burden of demonstrating cause and prejudice or a miscarriage of justice is on the movant.  *See*, *e.g.*, *Bousley v. United States*, 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if

14

the defendant can first demonstrate either 'cause' and actual 'prejudice,'... or that he is 'actually innocent[.]' ").

As noted, Robinson offers nothing to support a cause and prejudice, or actual innocence, analysis, and the burden to establish those things is on him. Because he has failed in his burden, this Court should reject these two substantive claims for relief.[4]

### 2.    The Identified Claims Have No Merit.

Neither of Robinson's two substantive claims for relief has any merit, either. They should be rejected for this additional reason as well.

#### a.    The particularity of the search warrant

As for the particularity of the warrant issue – claim 2 – the warrant specifically described the place to be searched as follows:

DESCRIPTION OF THINGS TO BE SEARCHED

*The Premises*

The Premises of Adam Lamar Robinson
Address:  1708 Formosa Court
including all outbuildings and appurtenances thereto
in the City of Deatsville
in the County of Autauga
in the Middle District of Alabama

---

[4]Robinson has also raised one claim of ineffective assistance of counsel in his § 2255 motion related to the search warrant particularity issue, but he has not asserted ineffective assistance of counsel to overcome his procedural default of that claim.  To the extent that he does rely on that ineffective assistance of counsel claim to overcome his procedural default, for the reasons outlined below, his counsel was not ineffective and, therefore, Robinson has failed to demonstrate the necessary cause and prejudice to overcome his procedural default.  *See*, *e.g.*, *Black v. United States*, 373 F.3d 1140, 1146 (11th Cir. 2004) ("As [the defendant] cannot show that his ... counsel's performance was deficient, he cannot show that he received ineffective assistance of counsel as to overcome his procedural default for not raising this issue on direct appeal.").

. . .

***Premises' Physical Description***

Stories - 1
Construction Type – Brick
Color - Red with green shutters
Garage/Carport – Attached carport on right side of residence.  Shed in the rear
yard of the residence, tan in color

*See* GX B, Attachments A and B, a copy of the application and affidavit for search warrant and

search warrant.  It also particularly described the items to be seized, as follows.

DESCRIPTION OF EVIDENCE TO BE SEARCHED FOR AND SEIZED

***FIREARMS***

One Weihrauch Silencer, no serial number
Any firearms and/or ammunition as defined in Title 18, Chapter 44, Section 921.

***DOCUMENTS***

All documents and/or data relating to the possession, transfer or purchase of
firearms, to include computer equipment and or phone records.

***INDICIA OF CONTROL OF THE PREMISES***

Records that establish the persons who have control, possession, custody or
dominion over the property and vehicles searched and from which evidence
seized, such as:  personal mail, checkbooks, personal identification, notes, other
correspondence, utility bills, rent receipts, payment receipts, financial documents,
keys, photographs (developed or undeveloped), leases, mortgage bills, and vehicle
registration information or ownership warranties, receipts for vehicle parts and
repairs and telephone answering machine introductions and fingerprints.

*Id*.  These descriptions in the attachments to the warrant were more than sufficient to meet Fourth

Amendment requirements.

"The Fourth Amendment requires that warrants 'particularly describ(e) the place to be

searched, and the persons or things to be seized.' "  *United States v. Wuagneux*, 683 F.2d 1343,

16

1348 (11th Cir. 1982).

> When evaluating a warrant, "[i]t is enough if the description is such that the officer with a search warrant can, with reasonable effort[,] ascertain and identify the place intended." ... More specifically, "[a] warrant's description of the place to be searched is not required to meet technical requirements or have the specificity sought by conveyancers. The warrant need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority."

*United States v. Ellis*, 971 F.2d 701, 703 (11th Cir. 1992) (internal citations omitted).

"A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Wuagneux*, 683 F.2d at 1348; *accord, United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985).

In this case, the residence to be searched was identified by the exact address and a description of the house itself. That description was sufficiently particular such that the officers could with reasonable effort ascertain the place authorized to be searched. Further, the items to be seized were also described such that the searchers knew what items they were authorized to seize. Therefore, the search warrant met Fourth Amendment requirements, and Robinson's arguments to the contrary are without merit.

### b.    Aiding and abetting possession of the silencer

In claim 3 of his § 2255 motion, Robinson argues that he never actually possessed the silencer listed in count two of his indictment and that, therefore, he should not have been convicted of that count of the indictment. Robinson's argument should be rejected because he admitted as a part of his plea agreement that he aided and abetted possession of the silencer, which was the charge in count two of his indictment, see GX J at 6-7, and at his change of plea hearing, he admitted that he possessed the silencer, *see* GX K at 14-15. Because Robinson

admitted he was guilty of the crimes charged in the indictment, the Government was not required to prove his actual possession of the silencer.

Moreover, to prove aiding and abetting possession of the silencer, the Government was not required to prove that Robinson himself personally possessed the silencer. All it would have had to prove if the case went to trial was that the substantive 26 U.S.C. §§ 5841, 5861 offense occurred and that Robinson associated himself with the criminal venture, and that Robinson committed some act that furthered the crime. *See, e.g., United States v. Perez*, 922 F.2d 782, 785 (11th Cir. 1991). Actual possession is not a prerequisite to a finding of guilt of the crime of aiding and abetting in the context of count two of Robinson's indictment. Therefore, his argument is without merit and should be rejected.

**C.**     **Robinson's Ineffective Assistance Of Counsel Claim Should Also Be Rejected Because He Has Failed To Establish That His Counsel's Performance Was Deficient And That He Was Prejudiced As A Result.**

In addition to the substantive claims addressed above and which are barred from this Court's review, Robinson raises the following claim of ineffective assistance of counsel:

1.     His counsel, Mr. Goggans, was ineffective because he failed to argue in the motion to suppress that the search warrant to search Robinson's residence was defective because it failed to describe the person or property to be seized or give a specific address to be searched.

As demonstrated below, counsel's performance was not deficient with respect to this claim of ineffective assistance of counsel. Further, Robinson has also wholly failed to meet his burden of demonstrating prejudice.

**1.     The *Strickland* Test For Ineffective Assistance Of Counsel Claims**

To succeed on a claim of ineffective assistance of counsel, a petitioner must prove both that his counsel's performance was deficient and that that deficient performance prejudiced his

case.  *Strickland v. Washington,* 466 U.S. 668, 694 (1984); *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005) ("Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice.").  More specifically, Robinson must show that: "(1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense."  *Stewart v. Sec'y, Dep't. Of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007).

In reviewing counsel's performance to determine whether it meets constitutional requirements, a reviewing court must engage in a " 'highly deferential' review of counsel's performance and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' "  *Jennings v. McDonough*, 490 F.3d 1230, 1243 (11th Cir. 2007), *citing Strickland v. Washington*, 466 U.S. at 689.  "As a result of this presumption, a petitioner must show that no competent counsel would have taken the action that his counsel did take," and where the record is incomplete or unclear about why counsel acted as he did, the reviewing court must "presume that he did what he should have done, and that he exercised reasonable professional judgment."  *Jennings v. McDonough*, 490 F.3d at 1243 (internal quotation marks and citations omitted).

The standard for judging counsel's performance is "reasonableness under prevailing professional norms."  *Stewart v. Sec'y, Dep't. of Corr.*, 476 F.3d at 1209 (internal quotation marks and citations omitted); *see also Rompilla v. Beard*, 545 U.S. at 380.  Moreover, the test for whether counsel's actions or inactions were reasonable "is not whether counsel could have done something different; instead, [the court] must consider whether the performance fell within the

broad range of reasonable assistance... ." *Id*. "The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Id*.

The Eleventh Circuit has described a petitioner's burden with regard to the deficient performance prong of an ineffective assistance of counsel claim as follows:

> Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden:
>
>> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. ... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.
>
> ... Thus, in order to show that counsel's performance was unreasonable, the petitioner must establish that *no competent counsel would have taken the action that his counsel did take....*

*Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citations omitted); *accord Grossman v. McDonough*, 466 F.3d 1325, 1345 (11th Cir. 2006).

To succeed on an ineffective assistance of counsel claim, the petitioner must not only show deficient performance, but must also show that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *See Jennings v. McDonough*, 490 F.3d at 1243. The Eleventh Circuit has described a petitioner's burden in demonstrating that his counsel's deficient performance prejudiced his case as also "high," noting that it is not enough to show that any errors had some conceivable effect on the outcome of the proceeding. *See Stewart v. Sec'y, Dep't. of Corr.*, 476 F.3d at 1209; *Robinson v. Moore*, 300 F.3d 1320, 1343-44 (11th Cir. 2002).

Finally, as the Eleventh Circuit has noted, "[i]t is well established that a habeas petitioner

20

must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." *Bottoson v. Moore*, 234 F.3d 526, 532 (11th Cir. 2000); *accord, Robinson v. Moore*, 300 F.3d at 1343. The reviewing court "can evaluate either the prejudice or the performance prong first and, if either one cannot be met, [the petitioner's] claim must fail." *Dingle v. Sec'y for Dep't. of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007).

> **2.    The Claim That Counsel Was Ineffective Because He Did Not Challenge The Search Warrant For The Residence On The Grounds That It Was Defective Because It Failed To Describe The Person Or Property To Be Seized Or Give A Specific Address To Be Searched**

In his single claim of ineffective assistance of counsel, Robinson claims Mr. Goggans was ineffective because he did not challenge the search warrant for the residence on the grounds that it was defective because it failed to describe the person or property to be seized or give a specific address to be searched. Mr. Goggans's decision not to attack the search warrant on the grounds of particularity was a reasonably competent decision. Moreover, Robinson has not demonstrated he was prejudiced by Mr. Goggans's failure to raise the issue.

In his affidavit supplied to this Court in connection with Robinson's § 2255 motion, Mr. Goggans explained that he did file a motion to suppress in this case, but he "did not assert all of the grounds urged by Mr. Robinson inasmuch as they were inapposite, meritless or frivolous. I explained my reasoning to Mr. Robinson in face-to-face meetings and in correspondence." *See* Affidavit Of Thomas M. Goggans at 2. Mr. Goggans's assessment of the particularity of the warrant issue was accurate – it had no merit, as discussed in part III.B.2.a., above. Therefore, the decision of this highly experienced criminal defense lawyer not to object to the warrant on that grounds was reasonable. *See*, *generally*, *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209

21

n.25 ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.") (internal citation and quotation marks omitted).

Further, because there is no likelihood that, if Goggans had raised the issue, he would have succeeded in having the evidence suppressed, there was no prejudice to Robinson from counsel's failure to raise the issue. Therefore, Robinson's ineffective assistance of counsel claim must fail. He has not met his burden of proof establishing both deficient performance and prejudice.

## IV.  MISCELLANEOUS

Robinson has failed to plead facts or present sufficient evidence or argument demonstrating that he is entitled to an evidentiary hearing, and his claims for relief should be denied without such a hearing. *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977); *see also Gordon v. United States*, 496 F.3d 1270, 1281 (11th Cir. 2007) ("An evidentiary hearing is not required when 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.' "), *citing* 28 U.S.C. § 2255.; *Chandler v. McDonough*, 471 F.3d 1360, 1363 (11th Cir. 2006) (Where a defendant fails to proffer any evidence that he would seek to introduce at a hearing, he is not entitled to an evidentiary hearing). Should this Court determine that Robinson has made any arguments not addressed in this response, the Government would request the opportunity to further respond to those arguments.

Any facts not specifically admitted in this response are denied, and the arguments made as to each claim raised are asserted in the alternative.

22

## V.  CONCLUSION

For the above reasons, Petitioner Adam Lamar Robinson has failed to demonstrate that he is entitled to any relief from this Court, and his § 2255 motion should be denied without an evidentiary hearing.

Respectfully submitted this 14th day of April, 2008.

LEURA G. CANARY
UNITED STATES ATTORNEY


/s/  Sandra J. Stewart
SANDRA J. STEWART
Assistant United States Attorney
131 Clayton Street
Montgomery, AL  36104
(334) 551-1764
(334) 223-7135

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **ADAM LAMAR ROBINSON,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 2:08cv168-MEF** |
| | )       **(CR No. 2:06cr00223-MEF-WC-1)** |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 14, 2008, I electronically filed the foregoing response and

attachments with the Clerk of the Court using the CM/ECF system and mailed, postage prepaid, a

copy of this response to the *pro se* Defendant/Petitioner as follows:

> Adam Lamar Robinson
> Rg. #12040-002
> FCI–Yazoo City Low
> P. O. Box 5000
> Yazoo City, MS  39194

> Respectfully submitted,
>
> LEURA G. CANARY
> UNITED STATES ATTORNEY
>
> /s/  Sandra J. Stewart
> SANDRA J. STEWART
> Assistant United States Attorney
> 131 Clayton Street
> Montgomery, AL  36104
> (334) 551-1764
> (334) 223-7135

FILED

SEP - 7 2006

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. __2:06cr223-MEF__ |
| | ) | [18 USC 922(g)(1); |
| ADAM LAMAR ROBINSON | ) | 26 USC 5841; |
| and KAREN KILGO ROBINSON | ) | 26 USC 5861(d); |
| | ) | 26 USC 5871; |
| | ) | 18 USC 2] |
| | ) | |
| | ) | INDICTMENT |

The Grand Jury charges:

## COUNT 1

Beginning from an unknown date continuing and up to and including June 15, 2006, in

Autauga County, within the Middle District of Alabama,

### ADAM LAMAR ROBINSON,

defendant herein, having been convicted of the following felonies, crimes punishable by

imprisonment for terms exceeding one year under the laws of the Alabama, to-wit:

1)    October 16, 1980, Burglary, in the Circuit Court of Morgan County, Alabama - Case
      Number 79-0718;

2)    December 12, 1980, Felony Possession of a Pistol, in the Circuit Court of Morgan
      County, Alabama - Case Number 80-0594;

3)    December 17, 1980, Burglary 3rd Degree, in the Circuit Court of Morgan County,
      Alabama - Case Number 80-0595;

4)    September 14, 1987, Theft 2nd Degree, in the Circuit Court of Morgan County,
      Alabama - Case Number 84-0573;

did knowingly possess in and affecting commerce firearms, to-wit:

1)    Norinco, model Mak-90, 7.62mm rifle;

AO386-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.     A

2)      Mossberg, 28 Inch Accu-Choke 12 gauge shotgun;

3)      Lorcin, model L-380, .380 caliber pistol;

4)      Remington, model 510, .22 caliber rifle;

5)      Marlin, model 110M, .22 caliber rifle;

6)      Ithaca, 12 gauge shotgun;

7)      Mossberg, model 500 AG, 12 gauge shotgun;

8)      Marlin, model 60W, .22 caliber rifle;

9)      Smith and Wesson, model 442, .38 caliber revolver

10)     SWD Derringer, model DD45, .45 caliber firearm;

11)     A Weihrauch-Sport silencer - Nur fur "F".

All in violation of Title 18, United States Code, Section 922(g)(1).

## COUNT 2

Beginning from an unknown date and continuing up to and including June 15, 2006, in Autauga County, within the Middle District of Alabama,

ADAM LAMAR ROBINSON,
and KAREN KILGO ROBINSON

defendants herein, while aiding and abetting each other and others known and unknown to the grand jury, did knowingly possess firearms, firearm silencers and destructive devices, to-wit:

1)      A Weihrauch-Sport silencer - Nur fur "F";

2)      A metal cylindrical device approximately 12 inches x 1 3/4 inches designed as a firearm muffler or silencer;

3)      A metal cylindrical device approximately 6 1/4 inches x 2 inches designed as a firearm muffler or silencer;

2

4)    A metal cylindrical device approximately 4 ½ inches x 1 ½ inches designed as a firearm muffler or silencer;

5)    A 1 ½ inch nominal diameter metal pipe measuring 6 inches in length containing a mixture of Hodgdon brand Pyrodex P and disc-shaped double base smokeless powder designed as a destructive device;

6)    A 2 inch nominal diameter metal pipe measuring 6 inches in length containing 148 grams of zinc plated BBs and approximately 189 grams of 3/8 inch steel hunting shot and a mixture of Hodgdon brand Pyrodex P and disc-shaped double base smokeless powder designed as a destructive device;

7)    A 2 inch plastic shell containing a primer and twelve 3/8 inch diameter steel hunting shot pellets and a mixture of Hodgdon brand Pyrodex P and disc-shaped double base smokeless powder designed as a destructive device;

8)    A 2 inch plastic shell containing a primer one hundred grams of zinc-plated BBs and a mixture of Hodgdon brand Pyrodex P and disc-shaped double base smokeless powder designed as a destructive device;

all not registered in the National Firearms Registration and Transfer Record. All in violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

## FORFEITURE ALLEGATION

A.    Counts 1 and 2 of this indictment are hereby repeated and incorporated herein by reference.

B.    Upon conviction for the violation alleged in Count 1 of this indictment, the defendant,

### ADAM LAMAR ROBINSON,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924, and Title 28, United States Code, Section 2461(c), all firearms and ammunition involved in the commission of this offense, including but not limited to the following:

1)    Norinco, model Mak-90, 7.62mm rifle;

2)    Mossberg, 28 Inch Accu-Choke 12 gauge shotgun;

3

3)      Lorcin, model L-380, .380 caliber pistol;

4)      Remington, model 510, .22 caliber rifle;

5)      Marlin, model 110M, .22 caliber rifle;

6)      Ithaca, 12 gauge shotgun;

7)      Mossberg, model 500 AG, 12 gauge shotgun;

8)      Marlin, model 60W, .22 caliber rifle;

9)      Smith and Wesson, model 442, .38 caliber revolver;

10)     SWD Derringer, model DD45, .45 caliber firearm.

C.      If any of the property described in this forfeiture allegation, as a result of any act or omission of the defendant:

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred, sold to, or deposited with a third person;

(3)     has been placed beyond the jurisdiction of the court;

(4)     has been substantially diminished in value; or,

(5)     has been commingled with other property which cannot be divided without difficulty, the United States, pursuant to Title 21, United States Code, Section 853, as incorporated by Title 28, United States Code, Section 2461(c), intends to seek an Order of this Court forfeiting any other property of said defendant up to the value of the property described in the above paragraphs.

All in violation of Title 18, United States Code, Section 922.

4

A TRUE BILL:

_Janice Davis Williams_
Foreperson

_Leura G. Canary_
LEURA G. CANARY
United States Attorney

_John T. H_
JOHN T. HARMON
Assistant United States Attorney

_[signature]_
VERNE H. SPEIRS
Assistant Untied States Attorney

5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | CASE NO. 2:06cr223-MEF |
| | ) | |
| ADAM LAMAR ROBINSON | ) | |

**DEFENDANT ADAM LAMAR ROBINSON'S MOTION TO SUPPRESS**

Comes now Defendant Adam Lamar Robinson, by and through counsel, and shows as follows:

**Issues Presented**

1. This motion to suppress relates to searches conducted by government agents on June 1, 2006 in Chicago, Illinois; on June 15, 2006 in Deatsville, Alabama; and between August 12, 2006 and September 25, 2006 in Chattanooga, Tennessee.

2. This motion involves the following issues:

a. Whether a search in Chicago, Illinois of article of mail addressed to Defendant Adam Lamar Robinson at his address in Deatsville, Alabama violated the Fourth Amendment to the United States Constitution and 19 U.S.C. § 482.

b. Whether a search of Defendant Adam Lamar Robinson's residence was a fruit of the aforementioned search of the article of mail and, independently, violated the Fourth Amendment to the United States Constitution.

c. Whether a search of a personal computer seized from Defendant Adam Lamar Robinson's residence was a fruit of the aforementioned searches and, independently, violated the Fourth Amendment to the United States Constitution.

1



AO88-C
**GOVERNMENT EXHIBIT**

CASE
NO.

EXHIBIT
NO. 6

### Factual Background and Incorporated Memorandum of Law

3.  To pass muster under the Fourth Amendment and 19 U.S.C. § 482, a warrantless search of incoming international mail must be based upon reasonable suspicion of criminality.  United States v. Ramsey, 431 U.S. 606, 612, 97 S.Ct. 1972, 1977, 52 L.Ed.2d 617 (1977).  See also, 19 U.S.C. § 482 ("Any of the officers or persons or persons authorized to board or search vessels may ... search any trunk or envelope, wherever found, in which he may have reasonable cause to suspect that there is merchandise which was imported contrary to law....")

4.  According to an affidavit, (Attachment A), used to obtain a search warrant for Defendant Adam Lamar Robinson's residence,

> On June 1, 2006, U.S. Customs and Border Protection (CBP) Inspector D. Nugent in Chicago, Illinois was assigned to work foreign mail when he intercepted a parcel coming from Maulberg, Germany.  The package was destined for Adam ROBINSON at 1708 Formosa Court, Deatsville, Alabama, 36022 USA.  The parcel was also marked declaring it as a "CO-2-Set".  Upon further investigation, Officer Nugent discovered the parcel contained an item which he believed to be a silencer for a firearm.  A "firearm silencer" or "firearm muffler" means any device for silencing or muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.  (See Title 18, United States Code, Section 921(a)(24)).  The parcel also contained a document in the English and German language stating that the item was a Weihrauch-silencer.  The documentation included installation instructions.

5.  As may be gleaned from this, federal agents searched the article of mail addressed to Defendant Adam Lamar Robinson without first having obtained a search warrant.  However, there was not reasonable suspicion of criminality to support the warrantless search of the article of mail addressed to Defendant Adam Lamar Robinson.

2

6.   After this search, the article of mail was sent by federal agents in Chicago, Illinois to federal agents in Montgomery, Alabama.

7.   On June 14, 2006, federal agents in Montgomery, Alabama procured an anticipatory search warrant, (Attachment B), to search Defendant Adam Lamar Robinson's residence. The search warrant affidavit, (Attachment A), referenced the aforementioned search in Chicago, Illinois, which was done without a warrant and without reasonable suspicion of criminality.

8.   Thus, the warrant to search Defendant Adam Lamar Robinson's residence was a fruit of the aforementioned warrantless search in Chicago, Illinois.  As such, its own fruits are likewise excludable.  Wong Sun v. United States, 371 U.S. 471 (1963).

9.   Apart from information derived from the aforementioned search, the search warrant affidavit information did not provide the issuing authority with a "substantial basis" for determining probable cause to believe that contraband or evidence of a crime would be found at Defendant Adam Lamar Robinson's residence.  See, Illinois v. Gates, 462 U.S. 213, 238-239 (1983)(evidence presented in support of an application for a search warrant must provide issuing authority with a "substantial basis" for determining probable cause). Accordingly, the warrant does not pass muster under the Fourth Amendment.

10. Upon executing the search warrant at Defendant Adam Lamar Robinson's residence, federal agents and other government agents seized numerous items of evidence which the government contends are incriminating and some of which serve as the basis for the charges against Defendant Adam Lamar Robinson in this case.

11. Among the items seized was a personal computer.

3

12. On August 8, 2006, federal agents procured a search warrant, (Attachment D), for the personal computer seized from Defendant Adam Lamar Robinson's residence. The search warrant affidavit, (Attachment C), referenced the aforementioned search in Chicago, Illinois and the aforementioned search of Defendant Adam Lamar Robinson's residence.   Thus, the warrant to search the personal computer was a fruit of the aforementioned warrantless search in Chicago, Illinois and the search of Defendant Adam Lamar Robinson's residence.  As such, its own fruits are likewise excludable. Wong Sun v. United States, 371 U.S. 471 (1963).

13. Apart from information derived from the aforementioned searches, the search warrant affidavit information did not provide the issuing authority with a "substantial basis" for determining probable cause to believe that contraband or evidence of a crime would be found in the personal computer. See, Illinois v. Gates, 462 U.S. 213, 238-239 (1983)(evidence presented in support of an application for a search warrant must provide issuing authority with a "substantial basis" for determining probable cause). Accordingly, the warrant does not pass muster under the Fourth Amendment.

14. The personal computer was sent by federal agents in Montgomery, Alabama to federal agents in Chattanooga, Tennessee.  Upon executing the warrant to search the personal computer between August 12, 2006 and September 25, 2006, federal agents obtained information which the government contends is incriminating.

15.  Based upon the foregoing, Defendant Adam Lamar Robinson contends that the aforementioned searches were violative of the Fourth Amendment to the United States Constitution and 19 U.S.C. § 482.

4

WHEREFORE, Defendant Adam Lamar Robinson moves this Court to st this

motion for a hearing and after taking evidence and arguments to enter an order

suppressing the fruits of the searches complained of herein.

**s/ Thomas M. Goggans**
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery AL 36106
PH; 334.834.2511
FX: 334.834.2512
e-mail tgoggans@tgoggans.com

Attorney for Defendant
Adam Lamar Robinson

CERTIFICATE OF SERVICE

I hereby certify that I have on this the 6th day of November, 2006, electronically

filed this document with the Clerk of the Court using the CM/ECF system which will

send notification to each of the following: Verne H. Speirs, John T. Harmon, and Richard

K. Keith.

**s/ Thomas M. Goggans**
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery AL 36106
PH; 334.834.2511
FX: 334.834.2512
e-mail tgoggans@tgoggans.com

Attorney for Defendant
Adam Lamar Robinson

Case 2:06-cr-00223-MEF-WC    Document 40-2    Filed 11/06/2006    Page 1 of 9

# United States District Court

JUN 2 8 2006

_____MIDDLE_____ DISTRICT OF _____ALABAMA_____

CLERK
U. S. DISTRICT COUF
MIDDLE DIST. OF AL.

In the matter of the Search of
(Name, address or brief description of person, property or premises
to be searched)

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

See Attachment A

CASE NUMBER:  2:06mj66-CSC

I _____Timothy Fitzpatrick_____ being duly sworn depose and say:

I am a(n) _agent with the Bureau of Alcohol, Tobacco, Firearms, & Explosives_ and have reason to

believe that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

**See Attachment A,**

in the _____Middle_____ District of ____Alabama____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See Attachment B**

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

**property that constitutes evidence of the commission of a criminal offense,**

concerning a violation of Title _26_ United States Code, Section(s) _5861_

The facts to support the issuance of a Search Warrant are as follows:

**See Attached Affidavit**

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Signature of Affiant

Sworn to before me and subscribed in my presence,

_JUNE 14, 2006_
Date

at _Montgomery, Alabama_
City and State

CHARLES S. COODY
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

ATTACHMENT A

58

## ATTACHMENT A

### DESCRIPTIONS OF THINGS TO BE SEARCHED

*The Premises*

The Premises of Adam Lamar Robinson
Address: 1708 Formosa Court
including all outbuildings and appurtenances thereto
in the City of Deatsville
in the County of Autauga
in the Middle District of Alabama

*The Vehicle*

N/A

*Premises' Physical Description*

Stories - 1
Construction Type – Brick
Color - Red with green shutters
Garage/Carport – Attached carport on right side of residence.  Shed in the rear yard of the residence, tan in color

*ATTACHMENT B*

### DESCRIPTION OF EVIDENCE TO BE SEARCHED FOR AND SEIZED

*FIREARMS*

One Weihrauch Silencer, no serial number

Any firearms and/or ammunition as defined in Title 18, Chapter 44, Section 921.

*DOCUMENTS*

All documents and/or data relating to the possession, transfer or purchase of firearms, to include computer equipment and or phone records.

*INDICIA OF CONTROL OF THE PREMESES*

Records that establish the persons who have control, possession, custody or dominion over the property and vehicles searched and from which evidence is seized, such as: personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs (developed or undeveloped), leases, mortgage bills, and vehicle registration information or ownership warranties, receipts for vehicle parts and repairs and telephone answering machine introductions and fingerprints.

*AFFIDAVIT*

I, the undersigned affiant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. My name is Timothy C. Fitzpatrick. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I am presently assigned to the Montgomery, Alabama Field Office. The Montgomery Field Office is one of several ATF offices supervised by the Nashville Field Division, which encompasses Alabama and Tennessee. The Montgomery Field Office's area of operation is the Middle Federal Judicial District of Alabama.

In 1992, I graduated from the New Orleans Police Department Academy and served as a police officer until 1997. During my tenure with the New Orleans Police Department I served as an investigator for approximately three years. In 1997, I graduated from the Louisiana State Police Academy and served as a State Trooper until 2004. During my tenure with the Louisiana State Police I served as a narcotics investigator for approximately four years. In 1999, I received an Associate of Arts Degree in Criminal Justice from Delgado Community College in New Orleans and in 2001, I received a Bachelor of Criminal Justice Degree from Loyola University in New Orleans. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and a graduate of Special Agent Basic Training at the ATF National Academy. I have been a Special Agent with ATF since August 2004.

My duty as a Special Agent is to enforce federal law. As an ATF Special Agent, I investigate violations of federal firearms and explosive laws. As a result of my training and experience as an ATF Special Agent, I am familiar with Federal criminal laws and know that it is a violation of Title 26 U.S.C. Chapter 53 Section 5861(d) to receive or possess a firearm which is not registered to him in the Nation Firearms Registration and Transfer Record

61

or (i) to receive or possess a firearm which is not identified by a serial number as required by this chapter or (k) to receive or possess a firearm which has been imported or brought into the United States in violation of section 5844.

Based on my experience in conducting and participating in search warrants, the experience and knowledge of conducting search warrants to which I have been exposed, and my instruction at the ATF academy, I know:

1.    That persons possess in their residences, businesses, other real property and vehicles over which they have dominion and control, documents which indicate their occupancy and/or ownership such as: personal mail, checkbooks, identification, notes, correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, receipts for vehicle parts and repairs, telephone answering machine introductions, that persons often have containers of undeveloped photographic film, containing photographs (when developed) of themselves occupying the property and vehicles and that these containers of film are usually located within the property and/or vehicles which are under their dominion and control.

2.    That most people store their firearms in their homes; and

3.    That persons who possess firearms usually possess other items related to firearms, such as: gun cases, ammunition, ammunition magazines, holsters, spare parts, cleaning equipment, photographs of firearms and receipts for the purchase of these items.

4.    This affidavit is being made in support of an application for an **anticipatory warrant** to search the
      entire premises located at 1708 Formosa Court, Deatsville, Alabama. The premises to be searched are
      more particularly described in Attachment "A" of this affidavit.

5.    The factual information contained in this application and affidavit is based upon my investigation and
      upon information provided to me orally and in written form by other law enforcement officers. Because
      this affidavit is being submitted for the purpose of securing an anticipatory search warrant, it does not
      contain all the information from the investigation, but only those facts deemed necessary to establish
      probable cause for the requested anticipatory search warrant.

6.    I have probable cause to believe that evidence in violation of Title 26, United States Code, Chapter 53,
      Section 5861 involving the importation of firearms and prohibited parts into the United States as well as
      the unregistered possession or transfer of firearms and prohibited firearm parts by individual(s), will be
      located on and within the premises of 1708 Formosa Court. Based upon the following information,
      there is probable cause to believe that the above identified premises will contain contraband upon
      delivery of the requested item, described as a silencer, as defined in Title 18 United States Code, Section
      921. A silencer is further classified as a firearm in Title 26, United States Code, Section 5845.
      Additionally, it is believed the premises will contain evidence, fruits, and instrumentalities of receipt
      and possession of firearms and firearm parts, as described below and in Attachment B.

7.    On June 1, 2006, U.S. Customs and Border Protection (CBP) Inspector D. Nugent in Chicago, Illinois
      was assigned to work foreign mail when he intercepted a parcel coming from Maulburg, Germany. The

package was destined for Adam ROBINSON at 1708 Formosa Court, Deatsville, Alabama, 36022 USA. The parcel was also marked declaring it as a "CO-2-Set". Upon further investigation, Officer Nugent discovered the parcel contained an item which he believed to be a silencer for a firearm. A "firearm silencer" or "firearm muffler" means any device for silencing or muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication. (See Title 18, United States Code, Section 921(a)(24)). The parcel also contained a document in the English and German language stating the item was a Weihrauch-Silencer. The documentation included installation instructions.

8.    On June 2, 2006, Immigration and Customs Enforcement (ICE) Special Agent David Henderson transferred the mail package containing the silencer to your Affiant. The silencer did not have an identifying serial number stamped on it as required by federal law. Your Affiant subsequently forwarded the silencer to the ATF Firearms Technology Branch (FTB) for an official determination of the silencer.

9.    On June 6, 2006, Ed Turner of the ATF Firearm Technology Branch contacted your Affiant and provided me with a verbal confirmation that the product was classified as a silencer based on it characteristics and his physical evaluation of the item. On June 9, 2006, your Affiant faxed information regarding ROBINSON to the National Firearms Registration and Transfer Record and requested a check for any lawful possession or registration of the silencer. On June 14, 2006, the National Firearms Registration and Transfer Record personnel reported to your Affiant that ROBINSON has no firearms, to include silencers, registered to him in the National Firearms Registration and Transfer Record.

10.   Between the dates of June 14, 2006, and June 21, 2006, ATF agents in conjunction with the United

States Postal Inspection Service will initiate a controlled delivery of the mail package containing the

silencer to ROBINSON's residence. At the residence, a United States Postal Inspector will act as a mail

carrier. Once the package is delivered to 1708 Formosa Court, ATF agents will await and verify the

package has moved into the residence by hand delivery from the undercover mail carrier or the retrieval

of the mail by the resident at 1708 Formosa Court. Prior to initiating the search, agents will allow

reasonable time for the package to be opened inside the residence. After waiting a reasonable time,

federal agents will then execute the anticipatory search warrant.


11.   Criminal History checks indicate that ROBINSON is a multi-convicted felon in the state of Alabama.

According to criminal records, ROBINSON was convicted in 1981 for felony possession of a pistol and

Burglary III. Furthermore, in 1987, ROBINSON was convicted of Theft 2nd Degree. The criminal

record check also indicates ROBINSON is currently on parole until 2012. However, according to the

Alabama Department of Pardon and Parole, ROBINSON may have been pardoned in 1997 for these

crimes. To date, no certificate of pardon for ROBINSON has been located by the Alabama Department

of Pardon and Parole.


Based on the foregoing facts, my knowledge and experience, I believe there is probable cause to believe that the

items requested in this search warrant application will be found at the place to be searched and will constitute

evidence of violations of Title 26, United States Code, Section 5861. Therefore, I respectfully request that this

honorable court issue the requested anticipatory search warrant for 1708 Formosa Court, Deatsville, Alabama

36022.

65

Timothy Fitzpatrick, Special Agent, ATF

Sworn to and subscribed by me this /4ᵗʰ day of June, 2006.

U.S. MAGISTRATE JUDGE

Case 2:06-cr-00223-MEF-WC    Document 40-3    Filed 11/06/2006    Page 1 of 1

# United States District Court

_____ MIDDLE _____ DISTRICT OF _____ ALABAMA _____

In the matter of the Search of                                    **SEARCH WARRANT**
(Name, address or brief description of person, property or premises
to be searched)

                                                                  CASE NUMBER:   2:06mj66-CSC

See Attachment A

TO: _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by  Timothy Fitzpatrick, Bureau of Alcohol, Tobacco, Firearms,
                                            Affiant

& Explosives, who has reason to  believe that ☐ on the person of or ☒ on the property or premises known
as (name, description and/or location)

See Attachment A

in the _____ Middle _____ District of _____ Alabama _____ there is now

concealed a certain person or property, namely (describe the person or property)

_:e Attachment B

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the
person or property so described is now concealed on the person or premises above-described and establish
grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ June 24, 2006 _____
                                                           Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this
warrant and making the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) (at any time in the day or night
as I find reasonable cause has been established) and if the person or property be found there to seize same,
leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory
of the person or property seized and promptly return this warrant to __ Charles S. Coody _____
as required by law.                                                    U. S. Judge or Magistrate Judge

JUNE 14, 2006   @ 2:24 p.m.          at      Montgomery, Alabama
Date and Time Issued                         City and State
CHARLES S. COODY
United States Magistrate Judge
Name & Title of Judicial Officer                    Signature of Judicial Officer

ATTACHMENT B

FILED

# *United States District Court*

AUG 1 4 2006

_____MIDDLE_____ DISTRICT OF _____ALABAMA_____

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

### In the matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

HP Pavilion personal computer,
serial number CNH5380NN8

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

CASE NUMBER: $2:06mj80-SRW$

I, __Timothy C. Fitzpatrick_____ being duly sworn depose and say:

I am a(n) _____Special Agent_____ and have reason to believe
that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

HP Pavilion  personal computer, serial number CNH5380NN8

in the _____Middle_____ District of ____Alabama____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

SEE AFFIDAVIT

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

**property that constitutes evidence of the commission of a criminal offense, contraband, and property that
has been used as a means of committing a criminal offense**

concerning violations of Title 26 United States Code, Sections 5822, 5841, 5861(d) & 5871   .

The facts to support the issuance of a Search Warrant are as follows:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Signature of Affiant

Sworn to before me and subscribed in my presence,

August 8, 2006                                          at    Montgomery, Alabama

Date                                                              City and State

Susan Russ Walker. U.S. Magistrate Judge

Name and Title of Judicial Officer                         Signature of Judicial Officer

ATTACHMENT  C

## SEARCH WARRANT AFFIDAVIT

I, Timothy C. Fitzpatrick, being duly sworn, depose and state:

I am a Special Agent of the United States Justice Department's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since August 2004. I am currently assigned to the Montgomery Field Office and have participated in numerous investigations that fall under the investigative jurisdiction of ATF including, but not limited to, violations involving the unlawful manufacture and possession of firearms, explosives and destructive devices.

I am a graduate of the New Orleans Police Academy and served as a New Orleans Police Officer from 1992 to 1997. I am also a graduate of the Louisiana State Police Academy and served as a Louisiana State Trooper from 1997 until 2004. Additionally, I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the ATF National Academy's Special Agent Basic Training program. I also have a Bachelor's degree in Criminal Justice from Loyola University in New Orleans.

I make this affidavit in support of a warrant to search a HP Pavilion personal computer serial number CNH5380NN8 and any hard disk drives (HDD) contained within for hardware, software, hard drives, files, directories, subdirectories, data banks, magnetic, optical and electronic data storage, records, documentation, materials, information, images and data pertaining to the unlawful manufacture and possession of firearms, explosives or destructive devices and related violations. The listed items are currently located at the ATF Field Office in Chattanooga, Tennessee.

Recently, I conferred with ATF Special Agent and Digital Investigator Neil Harper of the Chattanooga Field Office. SA Harper has special training and knowledge regarding computer

1

forensic examinations and has more than 250 classroom hours of computer forensic related training. SA Harper said that he knows that electronic digital media may be utilized by one engaging in criminal activity in two distinct and important respects: (1) as instrumentalities for the violations of Federal laws enumerated herein and (2) as devices used in conjunction with the collection and storage of electronic data and records. Specifically, according to SA Neil Harper, the Internet has numerous sites dedicated to explaining and detailing the construction of homemade silencers. Many of these sites detail the use of common household items that can be fashioned into devices to silence firearms. These items range from common soda bottles to lengths of metal containing steel wool or other substances. In addition, the Internet contains information on the design and construction of homemade destructive devices, pipe bombs and improvised explosive devices. These sites often detail specific types of explosive powder to achieve maximum explosive effect and suggests items suited for shrapnel. Shrapnel is often found inside homemade destructive devices and/or pipe bombs to inflict maximum injury to life and property.

Finally, I am aware that the search and seizure of electronic digital media, hardware, software, documentation, passwords and data security devices, both as instrumentalities of criminal activity or as storage devices for evidence thereof, is contemplated in and permitted by Rule 41 of the Federal Rules of Criminal Procedure.

<u>Items to be seized as instrumentalities</u>

Electronic digital media is described as any and all computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing or transmitting electronic, magnetic, optical or similar computer impulses or data.

2

84

The item specifically described herein is the HP Pavilion personal computer serial number CNH5380NN8 and any hard disk drives contained within which were found at 1708 Formosa Court Deatsville, Alabama, on June 21, 2006, and seized as evidence pursuant to the Federal search warrant which was issued in the Middle District of Alabama case number 2:06mj66-CSC. It is believed that the electronic digital media described above was used prior to and in relation to the commission of certain Federal criminal offenses.

As a result of the previous search warrant executed on June 21, 2006, ATF Agents seized, among other items, multiple firearms and ammunition, as well as:

Three homemade firearm silencers;

One envelope (US Mail) containing a Weihrauch German firearm silencer;

Six bottles of Tannerite Binary Explosive;

Two suspected homemade pipe bombs, one containing shrapnel;

Two suspected 37mm improvised explosive devices;

One container of Pyrodex black powder;

One box of homemade firework devices.

Additionally, inside of the box which contained the Weihrauch silencer, there were instructions which included the Uniform Resource Locator (URL) http://www.weihrauch-sport.de/. On July 12, 2006, I accessed this web site which is the domain for "Weihrauch Sport" which advertises silencers for sale and indicates they are made in Germany. In addition, your Affiant secured evidence that ADAM ROBINSON has previously had access to the Internet because documents recovered from the initial search warrant at 1708 Formosa Court, Deatsville, Alabama, show access to an Internet site belonging to Alabama Department of Public Safety. According to the recovered documents, the site was accessed on 6/10/2006. The recovered documents include the

3

following Internet website address: http://www.dps.state.al.us/public.highwaypatrol/mc.points.asp. According to my investigation, this website is used to calculate points accrued against an individual driver's license for various traffic infractions. Your Affiant knows that ADAM ROBINSON is a truck driver and as such would have cause to access the Internet to calculate points against his driver's license. Finally, the HP Pavilion personal computer serial number CNH5380NN8 was recovered in an area of 1708 Formosa Court, Deatsville, Alabama, surrounded by ADAM ROBINSON's personal belongings. These items included various bills, check registers and documents showing his access and use of the HP Pavilion personal computer serial number CNH5380NN8. During the search of 1708 Formosa Court, Deatsville, Alabama, another personal computer was located however there was minimal evidence of use or access by ADAM ROBINSON.

Based upon the recovery of the homemade silencers, the homemade pipe bombs, two suspected improvised explosive devices, documentation containing a Uniform Resource Locator for a German company that manufactures firearm silencers and evidence of ROBINSON's Internet usage, your Affiant believes there is probable cause that the previously seized HP Pavilion personal computer serial number CNH5380NN8 and any hard disk drives contained within, contain evidence supporting a violation of Title 26, United States Code, Sections 5822, 5841, 5861(d), and 5871. These federal statutes criminalize the possession and/or unlawful manufacture of silencers, firearms, destructive devices and improvised explosive devices that have not been registered in the National Firearms Registration and Transfer Record. Probable cause exists to believe that the HP Pavilion personal computer serial number CNH5380NN8 was used to access Internet sites that contain instructions and design specifications to aid manufacturing homemade silencers, pipe bombs and improvised explosive devices similar to those recovered on June 21, 2006, and that the HP Pavilion

4

personal computer serial number CNH53S0NNS was used to order, via the Internet, the Weihrauch
German firearms silencer.

Finally, based upon the my knowledge and experience, I know that it is common for
people who possess firearms and explosives and who manufacture firearms and explosives to
keep publications about firearms and also to research and purchase related items on the Internet
using a computer.

<div align="center">Items to be seized as evidence</div>

This data may be more fully described as any information stored in the form of electronic,
magnetic, optical or other coding capable of being read by a computer or computer-related
equipment. The terms "records, documents and materials, including those used to facilitate
communications" as used above and includes all of the foregoing items of evidence in whatever
form and by whatever means such records or their modifications may have been created or stored
including, but not limited to, items identified in the following definitions. Because such information
is believed to have been used to facilitate the unlawful activities of Mr. Robinson, probable cause
exists to search such media as property that constitutes evidence of the commission of a criminal offense.

The following definitions are applicable herein;

Hardware. Computer hardware consists of all equipment that can collect, analyze, create,
display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer
impulses or data. Hardware includes, but is not limited to, any data-processing devices such as
central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers;
internal and peripheral storage devices such as fixed disks, external hard disks, floppy disk drives
and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other

<div align="center">5</div>

memory storage devices; peripheral input output devices such as keyboards, printers, scanners, plotters, video display monitors, and optical readers; and related communication devices such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices; as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as physical keys and locks.

Software.  Computer software is digital information that can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs to run operating system applications like work processing, graphics, or spreadsheet programs, utilities, source code, object code, compilers, interpreters, and communications programs.

Documentation.  Computer related documentation consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, software, or other related items.

Passwords and Data Security Devices.  Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

6

Forms of Information.  The terms "record". "documents" and "materials" include all of the foregoing items of evidence in whatever form and by whatever means such records. documents. or materials. their drafts. or their modifications may have been created or stored, including, but not limited to. any handmade form (such as writing, drawing, with any implement on any surface, directly or indirectly); any photographic form, such as microfilm. microfiche, photocopies; any mechanical form such as printing or typing; any electrical, electronic or magnetic form such as cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, backup tapes, CD-ROMS, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as printouts or readouts from any magnetic storage device.

### Seizure of equipment and data

Based upon the information provided to me by SA Harper who has special knowledge and experience in the field of computer forensics, I know that in order to completely and accurately retrieve data maintained in electronic digital media, to insure accuracy and completeness of such data and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that the digital media seized be forensically copied and the evidence copy be subsequently processed by a qualified computer specialist all in a laboratory setting.

### Analysis of electronic data

The analysis of electronically stored data may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain. This is analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files; "opening" or reading the first few "pages" of such files in order to determine their precise contents;

"scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

Therefore, based on the information contained within this affidavit, I believe there is probable cause that evidence of Federal firearms and explosives violations currently exists within the electronic digital media heretofore described.

Timothy C. Fitzpatrick, Affiant
ATF Special Agent

Sworn before me this
8th day of August 2006

Susan Russ Walker
United States Magistrate Judge

8

FILED

# United States District Court

AUG 1 4 2006

_____ MIDDLE _____ DISTRICT OF _____ ALABAMA

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

**In the matter of the Search of**
(Name, address or brief description of
person, property or premises to be
searched)

**SEARCH WARRANT**

CASE NUMBER: 2:06mj81-SRW

HP Pavilion personal computer,
serial number CNH5380NN8

TO: __ SA Timothy C. Fitzpatrick _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____ SA Timothy C. Fitzpatrick _____ who
Affiant

has reason to believe that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

HP Pavilion personal computer, serial number CNH5380NN8

in the _____ Middle _____ District of _____ Alabama _____ there is now

concealed a certain person or property, namely (describe the person or property)

**SEE AFFIDAVIT**

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _ August 18, 2006 _ SR
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to _ the undersigned _ as required by law.
U. S. Judge or Magistrate Judge

August 8, 2006 _____ at   Montgomery, Alabama

Date                                    City and State

Susan Russ Walker, U.S. Magistrate Judge _____

Name and Title of Judicial Officer          Signature of Judicial Officer

ATTACHMENT D

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 02:06cr223-MEF |
| | ) | |
| ADAM LAMAR ROBINSON | ) | |

### RESPONSE TO ADAM LAMAR ROBINSON'S MOTION TO SUPPRESS

Comes now the United States of America, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and hereby requests that this Honorable Court deny Defendant's Motion to Suppress. As grounds in support of this Response, the United States sets forth the following:

### FACTS

On June 1, 2006, United States Customs and Border Protection (CBP) Inspector D. Nugent was working foreign mail in Chicago, Illinois. Chicago is a port-of-entry for incoming international mail. While using an x-ray machine, Nugent intercepted a package from Malburg, Germany[1]. The package was addressed to Adam Robinson at 1708 Formosa Court, Deatsville, Alabama, 36022 USA. The package also had a marking that read: "CO-2-Set."[2] Despite the marking, the x-ray image displayed a suspected firearms silencer - not a "CO-2-Set." Understandably suspicious of a

---

[1]According to Investigator Nugent, all international mail is processed through an x-ray machine. On the date in question, as the package from Germany was being x-rayed, Nugent saw what appeared to be a firearms silencer. Based upon his observation and the markings on the package, Investigator Nugent was naturally suspicious.

[2]CO2 generally stands for carbon dioxide. It is a chemical compound composed of one carbon and two oxygen atoms. Carbon dioxide is often used as an inexpensive, nonflammable pressurized gas. Steel capsules containing carbon dioxide are widely sold in the United States as sources of compressed gas for air-guns, paint-ball markers, bicycle tires and seltzer.

AO88-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    C

suspected firearms silencer (mislabeled as a "CO-2-Set") sent via international mail from Malburg, Germany, to Deatsville, Alabama, Inspector Nugent searched the package. Upon opening the package, Inspector Nugent discovered a suspected firearm silencer and instructions detailing how the item should be attached to a firearm.

Immediately, the suspected silencer was sent to Immigration and Customs Enforcement Special Agent David Henderson in Montgomery, Alabama. After Agent Henderson received the package, he transferred it to Special Agent Timothy Fitzpatrick of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Montgomery Field Office. From Montgomery, Special Agent Fitzpatrick sent the suspected silencer to the ATF Firearms Technology Branch in Washington, D.C. Once in Washington, the suspected silencer was confirmed to be an item that required registration with the National Firearms Registration and Transfer Record. A check of the National Firearms Registration and Transfer Record indicated no silencers registered to Adam Robinson.

On June 14, 2006, Chief United States Magistrate Judge Charles S. Coody authorized an anticipatory search warrant for 1708 Formosa Court, Deatsville, Alabama, 36022. On June 15, 2006, federal agents conducted a controlled delivery of the silencer to 1708 Formosa Court, Deatsville, Alabama, 36022. Once the silencer was inside the residence, agents executed the anticipatory search warrant. In addition to recovering the silencer, agents also recovered pipe bombs, improvised explosive devices, and home-made firearm silencers. None of these items were registered with the National Firearms Registration and Transfer Record as required by federal law.

During the course of the search, agents also seized personal computers believed to contain evidence relating to the illegal possession or manufacture of firearm silencers or destructive devices. On August 8, 2006, United States Magistrate Judge Susan Russ Walker authorized the United States

2

to search the contents of Adam Robinson's computer. As anticipated, the computer contained evidence of Adam Robinson's possession or manufacture of illegal firearms or destructive devices.

Currently, Adam Robinson seeks to suppress all the evidence against him because he mistakenly believes Inspectors Nugent needed "reasonable suspicion" to search foreign mail as it entered the United States at a port-of-entry. Adam Robinson hopes the suppression of the border search will lead to suppression of all other evidence secured against him. Adam Robinson's hopes are misplaced.

<div align="center">ANALYSIS</div>

## I. INSPECTION OF INTERNATIONAL MAIL

Customs officials are authorized "to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law." See 19 U.S.C. § 482(a). Likewise, 19 U.S.C. § 1582 grants authority to certain officers and agents of the government to search "persons and baggage . . .coming into the United States from foreign countries . . .." Furthermore, "Property may be seized, if available, by any Customs officer who has reasonable cause to believe that any law or regulation enforced by the Customs service has been violated, by reason of which the property has become subject to seizure or forfeiture." See 19 C.F.R. § 162.21. Finally, except for diplomatic correspondence, "All mail arriving from outside the Customs territory of the United States which is to be delivered within the Customs territory of the United States and all mail arriving from outside the U.S. Virgin Islands which is to be delivered within the U.S. Virgin Islands, **is subject to Customs examination** . . ." See 19 C.F.R. § 145.2(b). (Emphasis added.)

<div align="center">3</div>

In addition to the aforementioned statutory authorization to search international mail, numerous courts have examined the constitutionality of searching and seizing suspicious international parcels.

For example, in United States v. King, 517 F.2d 350 (5th Cir. 1975)[3], Customs agents examined multiple envelopes sent from overseas. Their examination was not conducted at a port-of-entry. After tapping on the envelopes, agents discovered a "distinct pocket or cushion of powdery material." See id. at 351. The agent immediately opened the envelopes and discovered that each contained a Christmas card with inner packets of white powder. The white powder proved to be opium derivatives. See id. In upholding the search of the package, the Fifth Circuit held:

> Whether the government inspector had the required "reasonable cause to suspect" is likewise a question which need not detain us long. Case law emphatically demonstrates that much less than probable cause will suffice. See id. at 352.

Specifically, the court noted that the Customs agent had "reasonable cause" to open the envelopes because: 1) the pattern of mail deliveries (numerous card size envelopes from a small group of senders with identical overseas addresses) is itself somewhat suspicious; and, 2) the envelopes' unusual thickness and the powdery cushion which appeared as the packages were tapped. According to the Court, these two factors were sufficient "reasonable cause." See id.

Likewise, in disposing of the appellant's Fourth Amendment argument, the Court specifically noted the Sixth Circuit's determination that the "Fourth Amendment's standards applicable to mail matter moving entirely within the country are not applicable to mail matter coming in from outside the country at least where it appears that a customs determination must be made." See King at 352,

---

[3]Decisions of the Fifth Circuit, rendered prior to October 1, 1981, are binding precedent in the Eleventh Circuit until overruled by the Eleventh Circuit sitting en banc. See Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981).

4

*quoting* United States v. Beckley, 335 F.2d 86, 88 (6th Cir. 1964), cert. denied, sub nom. Stone v. United States, 380 U.S. 922.

In a case similar to Robinson's, the Ninth Circuit upheld the search and seizure of an international package containing controlled substances and upheld the subsequent search of the residence based upon the initial Customs seizure. See United States v. Sahanaja, 430 F.3d 1049 (9th Cir. 2005).[4]

In Sahanaja, the Postal Service attempted to deliver a Canadian package sent to Duarte, California. After failed attempts to deliver the package to the addressee and reports that mail carriers had become ill after handling it, Customs officials searched the package. The search was not conducted at a port-of-entry. Upon opening the package, agents discovered two one-gallon plastic containers labeled "hair-tonic." Rather than hair-tonic, the packages contained gamma-hydroxybutyrate ("GHB"), a schedule I controlled substance. See Sahanaja at 1050. After discovering the contraband, agents initiated a controlled delivery to Sahanaja's residence. Soon after he accepted the package, agents executed a search warrant on the residence and recovered additional controlled substances. See id.

On appeal, Sahanaja asserted the warrantless search of the package and subsequent search of his residence violated the Fourth Amendment. See id. at 1052. In upholding the mail search under § 482, the Ninth Circuit considered the package's labeling discrepancy, its foul odor, illness caused by the package, and the suspicious activity of individuals seeking to claim the package. See

---

[4]The Sahanaja Court draws a clear distinction between § 482 searches and § 1582 searches. According to the Ninth Circuit, a § 1582 search applies to searches of incoming international mail, at the border, and **has no suspicion requirement**. By contrast, a § 482 search occurs far from the border and requires "reasonable cause to search." See id. at 1052.

id. Based upon these factors, the Ninth Circuit found no constitutional infirmities and refused to suppress any of the evidence, including evidence secured via search of Sahanaja's residence.

Finally, and most importantly, in United States v. Pringle, 576 F.2d 1114 (5th Cir. 1978), the Fifth Circuit established a clear line between international mail searches conducted at a port-of-entry and international mail searches conducted at other locations. In so doing, the Court also drew a clear distinction between searches conducted pursuant to 19 U.S.C. § 482(a) and 19 U.S.C. § 1582. According to the Court, only searches conducted pursuant to 19 U.S.C. § 482(a) mandate any "reasonable cause to suspect" that the item contains contraband. See Pringle at 1116. Unlike § 482(a), 19 U.S.C. § 1582, "authorize[s] searches of all persons, baggage, merchandise, and mail entering the United States. No 'probable cause' or 'reasonable cause to suspect' is needed under [19 U.S.C. § 1582]." See id. at 1116.

After finding that the search of international mail conducted at a port-of-entry requires no "reasonable cause to suspect" any illegality whatsoever, the Court then examined these searches against the Fourth Amendment. Quoting the Supreme Court's decision in United States v. Ramsey, 431 U.S. 606 (1977), the Fifth Circuit applied the Supreme Court's teaching that:

> Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be reasonable by the single fact that the person or item in question had entered into our country from outside. See Pringle at 1117, *quoting* United States v. Ramsey, 431 U.S. 606, 619 (1977).

Ultimately, the Fifth Circuit found no constitutional infirmity whatsoever in searching international mail at a port-of-entry. According to the Court, port-of-entry searches of international mail have no "probable cause" or "reasonable cause to suspect" requirements. See Pringle at 1118.

6

Applying both the aforementioned statutes and case law, Robinson's argument fails. Upon arriving at a port-of-entry, nothing prohibited the search of international mail sent from Malburg, Germany, to Adam Robinson in Deatsville, Alabama. First, 19 U.S.C. § 1582 grants Customs agents statutory authority to conduct unlimited searches of international mail at the border. Furthermore, according to the Firth Circuit and the Supreme Court's teaching in United States v. Ramsey, the Fourth Amendment finds reasonable the search of international items upon their arrival into the United States.

In the alternative, "reasonable cause to suspect" Robinson's package of contraband is not difficult to find. First, the package itself is suspect because $CO_2$ gas is readily available in the United States and need not be imported from Germany. Second, if $CO_2$ gas was a rarity in the United States, one would expect a shipment of more than a single small container. Finally, a "CO-2-Set" could easily be mislabeled to secrete some other noxious substance.

## II.    SEARCH OF ROBINSON'S HOME

Robinson's failure to establish any legal deficiency with the search of his mail necessarily undermines his "fruit of the poisonous tree" argument. Despite citing Wong Sun v. United States, 371 U.S. 471 (1963), Robinson cannot suppress evidence secured against him via two duly authorized search warrants. In the case at bar, Customs agents had clear legal authority to search and seize contraband at a port-of-entry. As such, there is no prior illegality to trigger suppression of evidence seized via search warrants issued by this Honorable Court.

For the reasons stated above, the defendant's motion should be DENIED.

7

Respectfully submitted this 27th day of November, 2006.

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Verne H. Speirs
VERNE H. SPEIRS
Assistant United States Attorney
1 Court Square, Suite 201
Montgomery, Alabama 36104
(334) 223-7280
(334) 223-7135 Fax
verne.speirs@usdoj.gov

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 02:06cr223-MEF |
| | ) | |
| ADAM LAMAR ROBINSON | ) | |

CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Thomas Goggans.

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Verne H. Speirs
VERNE H. SPEIRS
Assistant United States Attorney
1 Court Square, Suite 201
Montgomery, Alabama 36104
(334) 223-7280
(334) 223-7135 Fax
verne.speirs@usdoj.gov

9

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

UNITED STATES OF AMERICA

5

     vs.                      CR NO:  06cr-223-MEF

6

ADAM LAMAR ROBINSON and
7   KAREN KILGO ROBINSON

8                * * * * * * * * * *

9                  SUPPRESSION HEARING

10               * * * * * * * * * *

11     Before the Honorable Wallace Capel, Jr., United States

12   Magistrate Judge, at Montgomery, Alabama, on January 16, 2006.

13               * * * * * * * * * *

14                      APPEARANCES

15   FOR THE GOVERNMENT:      Mr. Verne H. Speirs
                              Assistant United States Attorney
16                            OFFICE OF THE UNITED STATES ATTORNEY
                              131 Clayton Street
17                            Montgomery, Alabama   36104

18   FOR THE DEFENDANT        Mr. Richard K. Keith
     KAREN ROBINSON:          22 Scott Street
19                            Montgomery, Alabama

20   FOR THE DEFENDANT        Mr. Tommy Goggans
     ADAM ROBINSON:           2030 East Second Street
21                            Montgomery, Alabama

22

23

24        Proceedings reported stenographically,

25           transcript produced by computer

AO88-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.      D

2

1                        EXAMINATION INDEX

2                         DANIEL NUGENT

3         DIRECT BY MR. SPEIRS . . . . . . . . . .    5

4         CROSS BY MR. GOGGANS  . . . . . . . . . .   16

5         CROSS BY MR. KEITH  . . . . . . . . . . .   17

6         REDIRECT BY MR. SPEIRS  . . . . . . . . .   18

7              (The above case coming on for hearing at Montgomery,

8   Alabama, on January 16, 2006, before the Honorable Wallace

9   Capel, Jr., United States Magistrate Judge, the following

10  proceedings were had commencing at 9:00 a.m.:)

11             THE COURT:  Good morning.  All right.  Calling case

12  number 06-223, United States of America versus Karen Robinson

13  and Adam Robinson.  May I have the parties' names for the

14  record, please, counselors?  The government, please?

15             MR. SPEIRS:  Your Honor, Verne Speirs for the

16  government.

17             THE COURT:  Mr. Speirs, how are you, sir?

18             MR. SPEIRS:  Good morning, sir.

19             THE COURT:  On behalf of the Defendants?

20             MR. KEITH:  Your Honor, Richard Keith on behalf of

21  Karen Robinson.

22             THE COURT:  Good morning, Mr. Keith.

23             MR. KEITH:  Good morning, Judge.

24             MR. GOGGANS:  Thomas Goggans on behalf of Adam

25  Robinson.

3

1       THE COURT:  Good morning.  Are we ready to proceed with
2  this suppression hearing?
3       MR. SPEIRS:  The government is prepared, Your Honor.
4       THE COURT:  All right.  Does the defense have any
5  witnesses they intend to call?
6       MR. KEITH:  Not for Defendant Karen Robinson, Your
7  Honor.
8       THE COURT:  Mr. Speirs?
9       MR. SPEIRS:  Yes, the government does have witnesses.
10      Your Honor, as a first issue, the government would
11  argue that Ms. Robinson, in fact, has no standing to argue that
12  the search of the silencer that was found that came into a port
13  of entry in Chicago; that she has failed to establish any
14  standing to challenge that search and any subsequent search.
15      THE COURT:  The package?
16      MR. SPEIRS:  The package, yes, sir.
17      With regard to Mr. Robinson, the government does have
18  witnesses that would go on and explain how the search of the
19  package transpired, international mail.  But for Mrs. Robinson,
20  it's the government's position that she has no standing and
21  she's failed to establish standing.
22      THE COURT:  Well, she lives at the house, correct,
23  Mr. Speirs?  And in terms of the search of the house by the
24  search warrant, if they're claiming that the search warrant is
25  defective, are you claiming she has no standing to challenge

4

1    that?

2          MR. SPEIRS:  No, Your Honor, she may have standing to

3    challenge that.  But the way that I have read their particular

4    motion, they would like to suppress everything from the first

5    instance, which would be the search that happened in Chicago at

6    the very beginning, and then kind of use a fruit of the

7    poisonous tree approach to kind of cascade down.  And it's the

8    government's position if that's the theory that she wants to

9    travel under, she doesn't have any standing to challenge that

10   search.

11         THE COURT:  All right.

12         MR. SPEIRS:  But our first witness, we would call Dan

13   Nugent with Customs.

14         THE COURT:  Before we call witnesses, are the

15   defense -- is defense counsel asking for sequestration of the

16   other witnesses during the time of the testimony?

17         MR. GOGGANS:  Yes, Your Honor.

18         THE COURT:  All right.  Mr. Speirs?

19         MR. SPEIRS:  Your Honor, this is my case agent, if he

20   could stay in, Your Honor.

21         THE COURT:  Your case agent can stay.

22         MR. SPEIRS:  Thank you, Your Honor.

23         THE COURT:  All right.  Mr. Speirs, why don't you call

24   your first witness, and let's have him sworn in.

25         MR. SPEIRS:  Yes, sir.  Dan Nugent.  The government

5

1    calls Dan Nugent, Customs, Border Protection officer.

2            THE CLERK:  Do you solemnly swear or affirm that the

3    testimony you are about to give in this cause is the truth, the

4    whole truth, and nothing but the truth, so help you God?

5            THE WITNESS:  Yes.

6            **DANIEL NUGENT**, witness for the Government, having been

7    duly sworn or affirmed, testified as follows:

8                        DIRECT EXAMINATION

9    BY MR. SPEIRS:

10           THE COURT:  Be seated, sir.

11   Q.  Good morning, sir.

12   A.  Good morning.

13   Q.  Would you please state your full name for the record.

14   A.  Daniel Nugent.

15   Q.  And sir, how are you employed?

16   A.  I am employed by the government, with U.S. Customs and

17   Border Protection as an officer.

18   Q.  And sir, where are you employed?

19   A.  I'm employed at the Port of Chicago, Chicago International

20   Mail Branch.

21   Q.  And if you would, would you briefly describe your duties.

22   A.  I go through mail that enters into Chicago from other

23   countries and I x-ray it, make sure it doesn't contain any

24   contraband.

25   Q.  And sir, how long have you had this particular job?

6

1  A.  Three and a half years.

2  Q.  And sir, could you tell the Court any training that you've

3  had for this job?

4  A.  Nine weeks at Glencoe, Georgia, Federal Law Enforcement

5  Training Center, and some annual x-ray training.

6  Q.  Okay.  Sir, if you would, I think you used the term port of

7  entry.  Did you use that term?

8  A.  Yes, sir.

9  Q.  If you would, would you describe or tell the Court what port

10 of entry means to you in your official capacity.

11 A.  In regards to mail, the port of entry would be the first --

12 the first place that the mail enters the country at.

13 Q.  Sir, in your three years, how many different parcels have

14 you inspected?

15 A.  It would have to be over a million.

16 Q.  All right.  And sir, in the last three years, how many other

17 silencers have you come across in your official capacity as an

18 inspector?

19 A.  Probably about four or five.

20 Q.  Okay.  Sir, if you would, would you describe for the Court

21 the process of when mail first arrives to Chicago, the process

22 that it goes through until it reaches you.

23 A.  The mail comes in on commercial airlines and is taken off

24 the plane by ramp workers from the airline usually and presented

25 to the United States Postal Service.  And once the Postal

7

1    Service takes it, they present it to Customs, and that's when we

2    x-ray it.

3    Q.   Okay.   Now, is there any type of separation that goes on

4    between different pieces of mail before it comes to you?

5    A.   Yes.   Letter class is put separate from parcel post, and all

6    parcel post is presented to Customs for inspection.

7    Q.   Okay.   When you say letter class, what does that mean?

8    A.   That generally refers to letters of correspondence and

9    letters that usually does not contain merchandise.

10   Q.   And what does parcel post mean?

11   A.   Parcel post is mail that would contain merchandise, bulk

12   mail; usually costs more than regular letter class mail would

13   cost to send.

14   Q.   Okay.   And why are these two different types of items

15   treated differently, if you know?

16   A.   Individuals have a different right to privacy in regards to

17   letter class mail than they do to parcel post.

18   Q.   Sir, when a parcel post comes to you, how is it brought to

19   you, if you will?

20   A.   The workers for the United States Postal Service will put

21   mail onto a conveyor belt.   Then once we get it on the conveyor

22   belt, we put it onto an x-ray machine.

23   Q.   Now, let's be very specific in the terms that we use.   When

24   you say mail, are you talking about letter class mail that --

25   A.   No.

8

1  Q.   Okay.

2  A.   We're talking parcel post mail.

3  Q.   Parcel post mail.  So walk us through the process, if you

4  will, sir, once that parcel post is brought into your area of

5  responsibility.

6  A.   Once it comes down the conveyor belt to where I would be

7  standing at an x-ray machine, I would put the piece of mail onto

8  the x-ray machine and read the x-ray and see if there's anything

9  that would look out of the ordinary or suspicious.

10 Q.   Let's go back a little bit.  Now, are we talking about in

11 these things that you're going to x-ray things that are domestic

12 or things that originated from within the United States?

13 A.   That's presented to us?

14 Q.   Yes.

15 A.   The only thing that's presented to us is foreign mail,

16 international mail.

17 Q.   All right.  And do you have a particular responsibility for

18 mail coming from other countries?

19 A.   Do we have a responsibility?

20 Q.   Like are you assigned a country, if you will?

21 A.   No.

22 Q.   Okay.

23 A.   No.  We go through what the United States Postal Service

24 decides to put on the belt during that time.

25 Q.   All right.  Now, is everything x-rayed that comes through

9

1    your conveyor belt?

2    A.    Yes.    Every parcel -- every piece of parcel post is x-rayed.

3    Q.    And why is that done?

4    A.    Why is that done?    Because we have the authority to do that.

5    Q.    Can you tell me about June 1st of 2006?

6    A.    I was working in x-ray, and a parcel from Germany came

7    through that looked like it possibly contained a silencer.

8    Q.    Okay.    Tell us how you made that determination.

9    A.    Just looking on the x-ray, it looked like something that I

10   had seen in the past that looked very similar to a silencer.

11   Q.    Tell us -- if you could, describe for the Court exactly what

12   it is that you saw.

13   A.    It looked like a metal sphere on the x-ray image.

14   Q.    And I believe you testified, sir, that you had seen this

15   kind of thing before; is that correct?

16   A.    Yes, sir.

17   Q.    So what did you do once you identified this particular piece

18   of international parcel?

19   A.    Once I, you know, found the piece of parcel post, I opened

20   it and saw what I thought may very well be a silencer.

21   Q.    Can you describe for the Court what it looked like to the

22   best of your ability?

23   A.    From what I remember, it was a black spherical piece of

24   light metal with a piece of paper around it, and I think it had

25   an L-wrench with it.

10

1          MR. SPEIRS:  May I approach, Your Honor?

2          THE COURT:  You may.

3   Q.  Sir, I will show you what has been marked for identification

4   as Government's Exhibit A.  Would you please take a look at

5   that.  Do you recognize that particular package?

6   A.  Yes, I do.

7   Q.  Okay.  And how do you recognize it, sir?

8   A.  I recognize it as the package that had what I thought was

9   the silencer in it.

10  Q.  Okay.  Is that in the same or substantially the same

11  condition as it was on June 1st of '06?

12  A.  Yes.

13  Q.  Are there any markings on this particular package?  Could

14  you detail for the Court what the markings are on this package?

15  A.  It's Deutsche post, coming from Germany.  Postage was six

16  Euros, which would generally mean that it would contain some

17  merchandise that had some weight to it.

18  Q.  Okay.  And who is it addressed to, sir?

19  A.  Adam Robinson, Deatsville, Alabama.

20  Q.  Sir, if you would, could you compare -- when you talk about

21  letter class mail, right, something that contains -- is this

22  different from what you would describe as letter class mail?

23  A.  Absolutely.

24  Q.  Okay.  Tell us what the difference is.

25  A.  Letter class mail is generally a small envelope containing

1  only correspondence.

2  Q.  Okay.  Would this qualify in the classic international

3  parcel post?

4  A.  Absolutely.

5  Q.  Okay.  Could I see it for a second?

6  A.  Sure.

7  Q.  Now, sir, there's a green sticker on here.  Can you tell the

8  Court what that green sticker is?

9  A.  That is a Customs declaration.

10  Q.  And what is a Customs declaration?

11  A.  It's usually a piece of paper or sticker that they attach to

12  a parcel that declares what it is -- what the merchandise inside

13  is.

14  Q.  And does this particular sticker have a declaration on it?

15  A.  Yes, it does.

16  Q.  And what does it declare itself to be?

17  A.  Co2 set.

18  Q.  Do you know what a Co2 set is?

19  A.  Pretty much I'd know what a Co2 set is, yes.

20  Q.  If you know, what is a Co2 set?

21  A.  It's a little air cartridge that you use for an air gun or

22  something like that.

23  Q.  Was the item that you removed from that package a Co2 set?

24  A.  No.

25  Q.  How do you know that?

12

1    A.    Because there was no -- there was nowhere to put Co2 in it.

2    Q.    Okay.

3    A.    It was hollowed out.

4    Q.    So, sir, what did you do once you opened this package?    What

5    did you do next?

6    A.    I took a couple of pictures of it and e-mailed it to an

7    inspector with ATF out of Chicago.

8    Q.    Okay.    And why did you do that?

9    A.    To see if it possibly could be a silencer.

10    Q.    And what happened?

11    A.    The inspector said that it did look like a silencer from the

12    pictures, and so we decided that it might be worth doing a

13    little more investigating to confirm that.

14    Q.    If you would, would you explain to the Court once your

15    attention has been drawn to this silencer, what happens to your

16    job?    Who is now doing the x-raying and that kind of thing?

17    A.    Somebody would take my place.    Another officer would take my

18    place.

19    Q.    Okay.    So you stayed with this particular package.

20    A.    Absolutely.

21    Q.    Okay.    Let me ask you this.    At some point did any

22    supervisors get involved, your supervisors, that kind of thing?

23    A.    No.

24    Q.    Okay.    After you got the confirmation from the ATF agent

25    that this was perhaps a silencer, what happened next?

13

```
 1   A.   I called our duty agent from ICE out of RAC O'Hare.

 2   Q.   When you say ICE, what is that?

 3   A.   Immigration and Customs Enforcement.

 4   Q.   Okay.  And why did you call that person?

 5   A.   It's up to them whether or not they want to open an

 6   investigation and look into who it's going to and why.

 7        MR. SPEIRS:  May I approach again, Your Honor?

 8        THE COURT:  You may, Mr. Speirs.

 9   Q.   I will show you what has been marked for identification as

10   Government's Exhibit 1.  Would you take a look at this

11   particular document.  Do you recognize it, sir?

12   A.   Yes, sir.

13   Q.   And what is it?

14   A.   This is the seizure report that I put into our database.

15   Q.   And sir, what is a seizure report?

16   A.   Any time we make a seizure, we need to write it up on a

17   chain of custody form and input it into the computer system so

18   that it can be tracked as to where it's been.

19   Q.   Okay.  And how was that seizure report used in this

20   particular case?

21   A.   It was used as a way to track, you know, who's got ahold of

22   the merchandise, the seizure, who it's been going to.  That's

23   about it.  It's a case tracking system.

24   Q.   Okay.

25   A.   Also identifies the violator.
```

1    Q.   Sir, as I look at the first page, it says parcel post.   Why

2    does the report say parcel post?

3    A.   The report says parcel post because if we do get something

4    out of letter class mail, we need to put L for letter class mail

5    because we need probable cause to open letter class mail.

6    Q.   Okay.   Now, sir, if I look at this document, it also says

7    dog alert or x-ray, and there's an X next to the x-ray.   Can you

8    describe or tell us what the significance of that is?

9    A.   Generally speaking, we either use a dog or an x-ray to find

10   contraband in the mail or any illegal importations, and in this

11   case we used an x-ray.

12   Q.   All right.   And then finally, sir, there's a summary on the

13   last page of this particular document.   Who authored that

14   summary?

15   A.   I did.

16   Q.   Okay.   And why did you do that?

17   A.   It's just a general narrative citing what we've done and

18   what we found and where it was coming from.

19   Q.   Sir, if you could, could you describe for the Court really

20   the physical location of your office and where these inspections

21   take place.

22          MR. SPEIRS:   And Your Honor, the government would move

23   to admit 1.

24          THE COURT:   Any objection?

25          MR. KEITH:   No objection.

15

1          MR. GOGGANS:  No objection.

2          THE COURT:  It will be admitted.

3          MR. SPEIRS:  Thank you, Your Honor.

4    Q.   Can you tell us where exactly these x-rays are taken?  Are

5    you at the airport or how does it -- where are you physically

6    when you are --

7    A.   We are -- physically we're on the airport field, but, you

8    know, mail needs to be taken off the plane and driven to our

9    facility.  And inside there's a Customs area where only Customs

10   employees can be at, and it's a secure area where we have x-rays

11   and go through the mail there.

12   Q.   So you're actually -- when you get up in the morning and go

13   to work, you have to go to O'Hare International Airport; is that

14   correct?

15   A.   Right.

16   Q.   Okay.  Physically once the silencer left your hands, who got

17   it after you, if you recall?

18   A.   I turned it over to Special Agent Ebony Penn, Penn at the

19   time.  She's since got married, so Ebony Plessell from

20   Immigration Customs Enforcement RAC O'Hare office.

21   Q.   When you say "RAC," what does this mean?

22   A.   It's a resident agent office.

23   Q.   Do you know, is she some kind of supervisor or something?

24   A.   She's just a special agent.

25   Q.   Okay.  Have you ever seen that silencer after this?

16

1   A.   Once I turned it over to her, I never saw it again.

2           MR. SPEIRS:   Your Honor, that's all the questions I

3   have for this witness.

4                           CROSS-EXAMINATION

5   BY MR. GOGGANS:

6   Q.   Mr. Nugent, is it correct that in performing your job, you

7   do not open all parcels that are coming in through international

8   mail?

9   A.   No, we do not open all.

10  Q.   When you opened the package that is before you right now,

11  did you know anything at all about Adam Robinson in Deatsville,

12  Alabama?

13  A.   No, I didn't.

14  Q.   You mentioned that that package had marked on it Co2 set.

15  Is it correct that a Co2 comes in a metal cylindrical object?

16  A.   Is it correct?

17  Q.   Yeah.

18  A.   Sure.

19  Q.   Okay.

20          MR. GOGGANS:   That's all.

21          THE COURT:   Mr. Richards, do you have any questions?

22          MR. SPEIRS:   Your Honor, I have no questions.

23          THE COURT:   All right.   Mr. Richards, do you have any

24  cross-examination?

25          MR. KEITH:   Yes, Your Honor.

17

1        THE COURT:  All right.  Please.

2                    CROSS-EXAMINATION

3   BY MR. KEITH:

4   Q.  Mr. Nugent, does Immigrations and Customs have search

5   warrant capabilities?

6   A.  I don't work for Immigration and Customs Enforcement.

7   Q.  Would you be able to get someone in your office or at the

8   airport to get a search warrant if needed to open a package?

9   A.  I don't understand the question.

10  Q.  You seem to -- your testimony is you have authority to open

11  up various suspicious looking packages that come in the

12  international mail.

13  A.  Yes.

14  Q.  Have you ever had a need or anyone in your office to get a

15  search warrant to open up a package that may not have been as

16  suspicious in nature as it maybe should have been?

17      You know what a search warrant is, right?

18  A.  Yes, I know what a search warrant is.

19  Q.  Has any -- have you or anybody ever --

20  A.  I have never gotten a search warrant, no, I have not.

21  Q.  Do y'all have the capability to get one?  Have some

22  Magistrate Judge or someone that can authorize a warrant?

23  A.  That would be our Office of Investigations that would have

24  to do that.

25  Q.  Okay.  So y'all can get them?

18

1   A.   Our agents can get them.

2   Q.   Correct.  And have your agents ever obtained a search

3   warrant for an international package?

4   A.   I can't speak on their behalf for that.

5   Q.   You could have gotten a search warrant, correct, if you had

6   wanted to?

7   A.   Could I have personally gotten one?

8   Q.   Well, you or someone on your behalf to inspect a package

9   such as the one we've been talking about today.

10  A.   I'm not sure, sir.

11  Q.   Thank you.

12          MR. KEITH:   No further questions.

13          THE COURT:   Redirect?

14                       REDIRECT EXAMINATION

15  BY MR. SPEIRS:

16  Q.   Sir, why is it -- in three years, have you ever had to go

17  and get a search warrant for anything?

18  A.   No, sir.

19  Q.   Why not?

20  A.   Because I have the authority at the border to open parcel

21  post.

22  Q.   When you talk about authority under our -- what type of

23  authority are you talking about?  From the training that you

24  have, can you tell us what you mean by that?

25  A.   When I was at FLETC, our chief counsel told us that for

19

1  parcel post we need zero -- there's zero cause for us to open

2  it, we can open whatever we want.

3  Q.  Now, let's break that down.  Parcel post, are we talking

4  about parcel post that just is -- may come to you that

5  originated from within the United States?

6  A.  It has to originate from overseas.

7  Q.  It has to come from overseas.

8  A.  Yes.

9  Q.  Okay.  And you in your job can look at anything you want to

10  look at; is that right?

11  A.  Yes.

12  Q.  Okay.  Have you ever had to have any type of reasonable

13  suspicion or a hunch or a guess that something inside a package

14  may be contraband?

15  A.  No.

16  Q.  Okay.  I want to make sure I understand.  Everything that

17  comes along the conveyor belt is x-rayed; is that correct?

18  A.  Yes, sir.

19  Q.  So as it comes along, you get to look at a monitor and see

20  what is in it; is that right?

21  A.  Yes, sir.

22  Q.  Now, why don't you open every single thing that comes along

23  on the conveyor belt?

24  A.  Because there's too many pieces, too many pieces of mail,

25  and the majority of it is legitimate.

20

1  Q.  Okay.  Why in this case did you open this particular piece?

2  A.  Because I have seen silencers come through the mail before,

3  and this looked very similar to that.

4  Q.  Okay.  I believe Mr. Goggans asked you about whether a Co2

5  set could fit inside this thing?  Was that the question?

6  A.  I believe if it was made of something other than metal.

7  Q.  Have you seen a Co2 set before in your life?

8  A.  Yes.

9  Q.  Was there a difference between what you have seen before in

10 your life as a Co2 set and what you saw on your x-ray machine?

11 A.  Yes.

12 Q.  Okay.  What was the difference?

13 A.  The difference is that a Co2 cartridge would be a lot

14 lighter on the screen.  It would be a much lighter blue when

15 portraying metal than a silencer would be.  A silencer is almost

16 black.

17 Q.  Okay.  When you pulled that object out of that package, did

18 it look like a Co2 set would go in there or somehow affix itself

19 to it?

20 A.  It didn't appear that way.

21         MR. SPEIRS:  No further questions, Your Honor.

22         THE COURT:  May this witness be excused?

23         MR. KEITH:  Yes, Your Honor.

24         MR. GOGGANS:  Yes, sir.

25         THE COURT:  All right.  Thank you, sir.  You may call

21

1  your next witness

2        MR. SPEIRS:  Your Honor, just from a procedural

3  question, in that we have two duly authorized search warrants,

4  it would be the government's contention that those warrants are

5  valid on their face in that they were authorized by

6  Magistrates.  In other occasions we've had the defendants argue

7  that -- something defective about those warrants.  And from

8  their particular motions, Your Honor, it's very difficult to

9  discern what exactly their argument is with regard to any

10 defective qualities of those warrants.

11       THE COURT:  All right.  Mr. Goggans, do you have an

12 answer to that, sir?  What is the defense's position as far as

13 the warrants?

14       MR. GOGGANS:  Your Honor, if I may speak on behalf of

15 Adam Robinson first.  I think our contention is very clearly set

16 forth in our Motion to Suppress, in particular paragraphs four

17 and five.  Paragraph four quotes from the search warrant

18 affidavit as to what was relayed to the issuing authority by the

19 affiant relating to this warrantless search in Chicago.

20 Paragraph five clearly states, "As may be gleaned from this,

21 federal agents searched the article of mail addressed to

22 Defendant Adam Lamar Robinson without first having obtained a

23 search warrant.  However, there was not reasonable suspicion of

24 criminality to support the warrantless search of the article of

25 mail addressed to Defendant Adam Lamar Robinson."  And then

1   following that, of course, is the chain of events that followed
2   from this search.  I think our position is very clearly set
3   forth in our motion.

4           THE COURT:  Let me ask you something, counsel.  Neither
5   party -- none of the parties have set forth what the standard
6   for a reasonable suspicion would be.  What is your understanding
7   of what reasonable suspicion would be?  And secondly, do you --
8   on behalf of the government, I would like to know what is the
9   case law as far as the reasonable suspicion of the package was
10  created by the x-ray; what he saw based upon the x-ray.  Does he
11  have the authority under -- what does the case law say as his
12  authority to x-ray the packages?  That's creating -- it seems to
13  me that if he had the right to x-ray the packages and he sees
14  something that raised that suspicion and he opens the package
15  and he has it, then it seems to me then there is reasonable
16  suspicion there.

17          MR. SPEIRS:  Yes, sir.

18          THE COURT:  That's what the standard would be.

19          MR. SPEIRS:  Yes, sir.  And what we're looking at,
20  there's a statutory authorization, which is 19 U.S.C. 1582.  And
21  *United States v. Pringle*, which is a Fifth Circuit case, draws a
22  distinction between two different types of border searches.  One
23  is a 1582 search which takes place at a port of entry.  And
24  according to the Fifth Circuit, which is binding precedent
25  under -- because it was prior to 1981 -- it's a 1979 case --

23

1   that the government and a border inspector need absolutely no
2   suspicion whatsoever.

3           THE COURT:  To open a package, a parcel post package
4   coming from -- internationally being shipped into the country?

5           MR. SPEIRS:  That's correct, Your Honor.  They can look
6   at anything they want to.  Okay.  That is the statutory
7   authority.  *Pringle* then upholds that and interprets 1582.  But
8   there's a separate statute, which would be a 482 search, and
9   that's not applicable in this case.  482 searches do require
10  some type of reasonable suspicion, but that's only if it's not
11  examined at a port of entry.  And what we have in this case, a
12  piece of international mail that was taken off the plane,
13  searched at a port of entry -- and, again, it's international --
14  that alone by itself gives these agents the right to examine and
15  open anything they want.  And indeed, that is the teaching of
16  *United States v. Pringle*.

17          THE COURT:  You're saying 482 would come into effect if
18  the package had been let into the country and hadn't been
19  examined at all, and then later at some point within the flow of
20  the mail system they wanted to examine that package, then that
21  standard would kick in?

22          MR. SPEIRS:  That's correct, Your Honor.

23          THE COURT:  But from your understanding of *Pringle* and
24  the statute, at the point that it came into the port of entry
25  into Chicago, they didn't have to have any suspicion at all.

1  They could simply open that package if they wanted to.

2          MR. SPEIRS: That is absolutely correct, Your Honor.

3          THE COURT:  All right.  Mr. Goggans?

4          MR. GOGGANS:  Your Honor, if I could respond to

5  Mr. Speirs' argument about these two separate statutes.  He has

6  mentioned a 1582 search.  Actually, 19 U.S.C. 1582 merely

7  relates to an authorization by the Secretary of the Treasury to

8  prescribe regulations.  Of course, I don't think they're

9  authorized to prescribe something that is unconstitutional.  The

10 statute merely says this:  The Secretary of the Treasury may

11 prescribe regulations in the search of persons and baggage, and

12 he is authorize to employ female inspectors for the examination

13 and search of persons of their own sex, and all persons coming

14 into the United States from foreign countries shall be liable to

15 detention and search by authorized officers or agents of the

16 government under search regulations.

17          This is merely an authorization-type statute.

18          THE COURT:  All right.  But what is your answer to the

19 *Pringle* -- the holding in *Pringle*?  Because *Pringle* does seem to

20 say, does it not, that they would have the authority to look at

21 the package?

22          MR. GOGGANS:  There are a number of lower courts -- and

23 when I say lower court, I mean courts other than the United

24 States Supreme Court -- which seem to indicate that.  However,

25 in the case we have cited in our motion, *United States v.*

1    *Ramsey*, a United States Supreme Court case, 97 Supreme Court

2    1972, a 1977 case, the Defendant in that case was contending

3    that there had to be probable cause.  That contention was

4    rejected; however, the Supreme Court said that there still had

5    to be a reasonable cause to suspect test.  The Court said this:

6    The reasonable cause to suspect test adopted by the statute,

7    referring to Section -- 19 U.S.C. Section 482, is we think a

8    practical test which we --

9            THE COURT:  But again, that's 482.  That's not the

10    other statute, correct?

11            MR. GOGGANS:  That's not the 1582 statute.

12            THE COURT:  That's right.  And we're talking about

13    1582.  The government is directly relying on 1582.  What -- and

14    that's the issue here.  What law do you have that they don't

15    have the authority to search the packages or to x-ray the

16    packages upon entry into the United States?

17            MR. GOGGANS:  Because any regulations that they write

18    still have to comply with the constitutional requirements, which

19    would be reasonable cause.

20            THE COURT:  Well, no.  *Pringle* says specifically when

21    those -- when -- those packages that are coming in, they have

22    the authority to look at them.  The appeals court's binding

23    decision has been ruled on in that.  So what case law do you

24    have other than that?

25            MR. GOGGANS:  The Supreme Court case *United States*

26

1   *versus* --

2           THE COURT:  Which doesn't apply to the particular

3   statute in issue; would you agree?

4           MR. GOGGANS:  It was not directly addressed in that,

5   Your Honor.

6           THE COURT:  All right.  There's no authority that you

7   have that says that they can't x-ray it, correct?  A package?

8           MR. GOGGANS:  No, sir.

9           THE COURT:  Is there anything -- all right.  So

10  assuming they have to have the authority and the treasury gives

11  them the authority to x-ray the package, are you saying that

12  there wouldn't -- even if you said that there has to be

13  reasonable suspicion, are you saying reasonable suspicion would

14  not be created by them looking at the x-ray and seeing what --

15  based upon this inspector's authority and his prior experience,

16  what looks to be a silencer and then having that confirmed upon

17  opening the package?  Isn't reasonable suspicion created by the

18  very fact that when he looked at that, he sees an object that

19  looks different than what is marked on the package, and upon

20  examining it, it appears what appears to be a silencer based

21  upon his previous inspections and has that confirmed?  Doesn't

22  he have reasonable suspicion here?

23          MR. GOGGANS:  No, Your Honor.  And the reason we submit

24  that he did not is because the package was marked -- it had the

25  Customs declaration on it, it was marked Co2 set, and the

27

1    testimony was that the Co2 likewise is a metal cylindrical

2    object.

3            THE COURT:  Right.  But upon examination of the object,

4    it appeared to him not to be that.  And upon sending the picture

5    to the ICE -- the ATF agent, he confirms that it doesn't appear

6    to be that; it appears to be a silencer.

7            MR. GOGGANS:  But that was only after it was opened.

8            THE COURT:  He had the authority to open the package.

9    You haven't shown me anything that says he has no authority to

10   open the package upon entry, correct?

11           MR. GOGGANS:  We may agree to disagree, Your Honor, but

12   I think *United States versus Ramsey* --

13           THE COURT:  Again, if we're looking at *Ramsey*, you have

14   to admit the statute -- do you have anything directly on case

15   law that goes to the statute that we're talking about -- not

16   482 -- that has been spoken to by any other court other than the

17   appeals courts, which have held the right to search the package

18   under those circumstances?

19           MR. GOGGANS:  I do not have any additional authority

20   other than *Ramsey*, Your Honor.

21           THE COURT:  All right.  And you agree with *Ramsey* that

22   that doesn't speak directly to the statute?

23           MR. GOGGANS:  *Ramsey* did not address 1582.

24           THE COURT:  All right.

25           All right.  Mr. Keith, do you have any argument as far

28

1    as the reasonable suspicion on which your argument is --

2            And I'd also like addressed at this point in time, if

3    you could, what standing does she have to address the package at

4    all?  The package was not addressed to her.  What right does she

5    have to contest the search of the package at all?

6            MR. KEITH:  Your Honor, in response to your first

7    question, we have no case law to rebut Title 19 U.S. Code

8    Section 1582.

9            THE COURT:  You would agree, then, that they have the

10   authority to search the package?

11           MR. KEITH:  Judge, based on the fact that we have no

12   case law to rebut 1582, without conceding, we have no case law

13   to rebut it other than the arguments previously made before.

14           THE COURT:  All right, sir.  Thank you.

15           MR. KEITH:  Judge, on the standing of Ms. Karen

16   Robinson to contest the search of the package at the Chicago

17   O'Hare Airport, Judge, I'm going to at this point assume that

18   the government is not claiming that Ms. Karen Robinson had any

19   possessory interest or any involvement with the particular

20   package that arrived in the mail that contained what apparently

21   was a silencer.  Based on that, I would probably concede we

22   would have no standing.

23           If they, in effect, aren't prosecuting her as they are

24   otherwise doing, Judge -- and this is where the real standing

25   comes from -- Count 2, Karen Robinson is charged with aiding and

29

1   abetting Adam Robinson in possessing firearms and silencers, et

2   cetera.  And number one, a Weihrauch-Sport silencer, the one

3   that's at issue before the Court, I think would be her best

4   position to gain standing since she's being charged with the

5   silencer, aiding and abetting her husband in obtaining it.

6   Otherwise, Judge, the package wasn't addressed to her.  She --

7   there's no evidence and testimony where she claims involvement

8   otherwise of the package.

9       THE COURT:  Mr. Speirs, what's the government's

10  argument as far as that?

11      MR. SPEIRS:  Your Honor, what the government's position

12  is, is we do not allege here today that when she brought that

13  piece of mail into her house that she knew the Weihrauch

14  silencer was in there.  However, Your Honor, the government at

15  trial may -- would likely prove that she was aware of the fact

16  that her husband was on-line, perhaps ordering these silencers.

17  The government expects to prove that there's at least a check

18  register or a check that was used to perhaps pay for this

19  particular silencer.  That on the day in question she may not

20  have been cognizant of the fact that the silencer was in the

21  house, but the fact of the matter is she was aiding and abetting

22  in the possession, manufacture, and -- of the other items that

23  were recovered, Your Honor.

24      THE COURT.  But not the particular silencer at issue.

25      MR. SPEIRS:  I want to be very careful, Your Honor.

1  The government is not saying that she doesn't have criminal
2  liability for that silencer; the fact that, though, she may not
3  have known that that silencer was in that particular parcel.
4          THE COURT:  Okay.  All right.  Now let's go --
5          You're not contesting that she doesn't -- the
6  government is not quite clear on whether or not she has the
7  standing to contest the search warrant?
8          MR. SPEIRS:  Our position is, Your Honor, that she does
9  not have standing to contest the search.
10         THE COURT:  All right.  And you don't feel that you
11 need any witnesses as far as the warrant, because you feel that
12 the warrants were valid search warrants issued by the United
13 States Magistrate Judges, correct?
14         MR. SPEIRS:  That's right, Your Honor, and that it is
15 incumbent upon the defendants to point up some type of
16 deficiency with those warrants, and they haven't done that.
17 What I gleaned from their motion is they want a fruit of the
18 poisonous tree.  They want to, if you would, cut off what
19 happened in Chicago, and then under their theory everything
20 falls apart.  But the government has shown that this was a 1582
21 search; that everything was -- there was no reasonable suspicion
22 that was necessary.  As a result from that, everything that's
23 contained within the warrant affidavits is valid; was secured
24 validly.  And they cite *Wong Sun* in an attempt to have a fruit
25 of the poisonous tree, and it's just not applicable in this

1    case, Your Honor.

2          THE COURT:  Okay.  Mr. Keith, do you wish to present

3    any witnesses as far as the search warrants themselves or point

4    to the Court what defects that you're seeing in them?

5          MR. KEITH:  No, Your Honor.

6          THE COURT:  Mr. Goggans?

7          MR. GOGGANS:  Your Honor, we will rest on our motion

8    and the testimony that is before the Court --

9          THE COURT:  All right.

10         MR. GOGGANS:  -- already.

11         THE COURT:  The Court will take it under advisement,

12   then, and will issue a recommendation shortly on it.  Thank

13   you.

14         MR. SPEIRS:  Thank you, Your Honor.

15         THE CLERK:  Court is in recess.

16         (At which time, 9:39 a.m., the hearing was adjourned.)

17               TRANSCRIBER'S CERTIFICATE

18         I certify that the foregoing is a true and correct

19   transcript, to the best of my ability, from the stenographic

20   notes provided to me by Official Court Reporter James Dickens.

21         This 26th day of December, 2007

22

23                                    /s/ Patricia G. Starkie
                                      Registered Diplomate Reporter
24                                    Certified Realtime Reporter
                                      Official Court Reporter
25

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:06cr223-MEF [WO] |
| | ) | |
| KAREN KILGO ROBINSON, *et. al*, | ) | |
| | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

The case is currently pending on a motion to suppress evidence filed by Defendants

Karen Kilgo Robinson (Karen Robinson) and Adam Lamar Robinson (Adam Robinson).

They seek suppression of evidence, specifically a Weihrauch Sport German Silencer (the

Weihrauch Silencer), a personal computer, pipe bombs, improvised explosive devices, and

homemade firearm silencers.[1]  Upon consideration of the motion and the testimony at the

evidentiary hearing, the Magistrate Judge RECOMMENDS that the motion be DENIED.

## FACTS

Based on the parties' briefs and testimony at the hearing held on January 16, 2007,

and to a preponderance of the evidence,[2] the Court finds as follows:  On June 1, 2006,

United States Customs and Border Protection (hereinafter Customs) Inspector Daniel

---

[1] Federal law defines a "firearm silencer" or "firearm muffler" as "any device for silencing or muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication. 18 U.S.C. § 921(a)(24) (2000).

[2] The Court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. United States v. Beechum, 582 F.2d 898, 913 n.16 (5th Cir. 1978), citing Lego v. Twomey, 404 U.S. 477, 489 (1972).

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.      E

Nugent (Inspector Nugent)[3] intercepted a package from Malburg, Germany while examining international mail on an x-ray machine at the Port of Chicago in Chicago, Illinois.[4]  Tr. at 5, 9; Pl.'s Response to Adam Lamar Robinson's Motion to Suppress at 1. The package was addressed to Adam Robinson at 1708 Formosa Court, Deatsville, Alabama, 36022 USA (hereinafter Defendants' residence) and contained six Euros of postage.  Tr. at 10; Pl.'s Response to Adam Lamar Robinson's Motion to Suppress at 1. Inspector Nugent testified that the postage indicated that the package contained merchandise that had some weight.  Tr. at 10.  The package was marked "CO-2-Set."[5]  Tr. at 11.  Inspector Nugent observed the x-ray image of the package, which displayed a metal sphere that he suspected was a firearms silencer.[6]  Tr. at 9.  He testified at the hearing that in his 3-years of experience, he had seen four or five silencers previously.

---

[3]At the hearing, Inspector Nugent testified that he has served in this position for three and a half years.  Tr. at 5.  He indicated that he has inspected over millions of parcels at the Port of Chicago, a port-of-entry.  Tr. at 6.  Inspector Nugent defined a port-of-entry in his official capacity as "the first place that the mail enters the country."  Id.

[4]During the suppression hearing, Inspector Nugent indicated that all international mail first arrives at the Port of Chicago on commercial airlines.  The mail is then taken off the plane by ramp workers from the airline and presented to the United States Postal Service.  The Postal Service separates international mail into "letter class" mail or "parcel post" mail and forwards "parcel post" mail to Customs on a conveyor belt for inspection.  Tr. at 6-8.  He defined "letter class" mail as "letters of correspondence and letters that usually does (sic) not contain merchandise."  Tr. at 7.  Letter class mail is generally contained in small envelopes.  Tr. at 10.  He defined "parcel post" mail as "mail that would contain merchandise, bulk mail, (sic) usually costs more than regular letter class mail would cost to send."  Tr. at 7.

[5]$CO_2$ generally represents carbon dioxide, a chemical compound composed of one carbon and two oxygen atoms.  See Pl.'s Response to Adam Lamar Robinson's Motion to Suppress at 1 n.1. Inspector Nugent testified that a CO-2-Set is "a little air cartridge that you use for an air gun."  Tr. at 11.

[6]Inspector Nugent indicated that all international "parcel post" mail is inspected on an x-ray machine.  Tr. at 7, 8, 18-19.

2

Tr. at 6. Inspector Nugent then opened the package. Tr. at 9. He testified that he opened

the package because the contents of the package on the x-ray screen looked similar to

silencers he had seen come through the mail in the past. Tr. at 19-20. Specifically,

Inspector Nugent indicated that a silencer appears "almost black" on the x-ray screen

whereas a CO-2 set appears "much lighter blue." Tr. at 20. Upon opening the package,

Inspector Nugent found a hollow, black spherical piece of light metal wrapped in a piece

of paper with a "L-wrench," which he believed was a silencer. Tr. at 9-11; Pl.'s Exh. A.

Inspector Nugent forwarded photographs of the metal object to an inspector with the

Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) in Chicago who confirmed

Inspector Nugent's belief. See Tr. at 9-10, 12.

Inspector Nugent forwarded the Weihrauch silencer to Immigration and Customs

Enforcement Special Agent David Henderson (Agent Henderson) in Montgomery,

Alabama. Pl.'s Response to Adam Lamar Robinson's Motion to Suppress at 2. Agent

Henderson transferred the package to Special Agent Timothy Fitzpatrick (Special Agent

Fitzpatrick), ATF, in the Montgomery Field Office, who, in turn, forwarded the package

to the ATF Firearms Technology Branch in Washington, D.C. Id. Personnel at the ATF

Firearms Technology Branch confirmed that the Weihrauch silencer was an item that

required registration with the National Firearms Registration and Transfer Record. Id.

No silencers, however, were registered to Adam Robinson. Id.

On June 14, 2006, Chief United States Magistrate Judge Charles S. Coody

3

authorized an anticipatory search warrant for Adam Robinson's residence. Id. The
following day, federal agents conducted a controlled delivery of the Weihrauch silencer.
Id.; Adam Robinson's Motion to Suppress at Attach. A-B. Once Karen Robinson took
the package inside the residence, federal agents executed the search warrant. Pl.'s
Response to Adam Lamar Robinson's Motion to Suppress at 2; Karen Robinson's Motion
to Suppress at 2. The agents seized the Weihrauch silencer as well as pipe bombs,
improvised explosive devices, and homemade firearm silencers. Pl.'s Response to Adam
Lamar Robinson's Motion to Suppress at 2. None of the items seized was registered with
the National Firearms Registration and Transfer Record. Id.

The agents also seized personal computers believed to contain evidence relating to
the illegal possession or manufacture of firearm silencers or destructive devices. Id. On
August 8, 2006, United States Magistrate Judge Susan Russ Walker authorized the
Government to search Adam Robinson's computer, which contained evidence of Adam
Robinson's possession or manufacture of illegal firearms or destructive devices. Id.;
Adam Robinson's Motion to Suppress at Attach. C-D.

## DISCUSSION

Both Karen Robinson and Adam Robinson argue that Inspector Nugent did not
have a reasonable suspicion of criminality to support the warrantless search of the
package addressed to Adam Robinson, violating the Fourth Amendment and 19 U.S.C. §
482. Thus, they maintain that the Court should suppress the Weihrauch silencer from

4

evidence. Adam Robinson's Motion to Suppress at 2, 4; Karen Robinson's Motion to Suppress at 2-3, 7. Consequently, the items searched and seized from their residence were fruits of the warrantless search of the package, which the Court also should exclude. They further argue that once the Court excludes the Weihrauch silencer, the warrant to search their residence lacked a substantial basis for determining probable cause. Adam Robinson's Motion to Suppress at 2-4 (citing Wong Sun v. United States, 371 U.S. 471 (1963); Illinois v. Gates, 462 U.S. 213, 238-39 (1983)); see Karen Robinson's Motion to Suppress at 3-4.

Individually, Adam Robinson further argues that the Court should also suppress the computer's evidence, because that evidence was also a fruit of the unconstitutional searches and seizures of the package and his home. Once the Court suppresses the Weihrauch silencer and the items from his home, Adam Robinson maintains that the affidavit in support of the computer's search warrant also lacked a substantial basis for determining probable cause. Adam Robinson's Motion to Suppress at 4-5 (citations omitted). Karen Robinson asserts that the good faith exception created in United States v. Leon, 468 U.S. 897, 922 (1984), does not permit admission of the evidence seized from Defendants' residence for two reasons: (1) the warrant for the search of Defendants' residence failed to particularize the items the officers intended to seize during their search; and (2) the warrant, containing only conclusory allegations, was so devoid of probable cause that the officer unreasonably believed in its validity to conduct the search.

5

See Karen Robinson's Motion to Suppress at 4-7 (citations omitted).

The Government counter argues that Karen Robinson does not have standing to contest the search of the package. Pl.'s Response to Karen Kilgo Robinson's Motion to Suppress at 3. It also argues that because the Weihrauch silencer entered the United States through a port-of-entry, the Customs official was not required to have probable cause or a reasonable suspicion of criminality to search the package. Rather, Customs officials are statutorily authorized to conduct unlimited searches of international mail at the border. See Pl.'s Response to Adam Lamar Robinson's Motion to Suppress at 7 (citing 19 U.S.C. § 1582; United States v. Pringle, 576 F.2d 1114, 1117 (5th Cir. 1978)); see Pl.'s Response to Karen Kilgo Robinson's Motion to Suppress at 8 (citations omitted). The Government further argues that because the Customs official had the authority to search and seize the Weihrauch silencer at the port-of-entry, the two search warrants were duly authorized. Thus, the search and seizure of evidence from Defendants' residence was proper. See Pl.'s Response to Adam Lamar Robinson's Motion to Suppress at 7. With respect to Karen Robinson's warrant argument, the Government responds that the warrant sufficiently described the items the agents sought to search under the facts of this case and that Karen Robinson has failed to show any intentional or false misrepresentations in the warrant affidavits. Pl.'s Response to Karen Kilgo Robinson's Motion to Suppress at 9-10 (citations omitted).

**A.    The Weihrauch Silencer**

6

The Fourth Amendment protects " [t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. CONST. AMEND. IV.[7] " The Amendment protects persons against unreasonable

searches of " their persons [and] houses." Minnesota v. Carter, 525 U.S. 83, 88

(1998). Evidence seized as the result of an illegal search may not be used by the

government in a subsequent criminal prosecution. United States v. Martin, 297 F.3d

1308, 1312 (11th Cir. 2002).

Here, the Customs official found the Weihrauch silencer contained in a package

addressed to Adam Robinson from Germany. The initial search and seizure of the

package, a piece of international mail, took place at the Port of Chicago, a border area.

See United States v. Pringle, 576 F.2d 1114, 1117 (11th Cir. 1978) (holding that a port

of entry constitutes border areas) (citations omitted). Two different statutes govern– 19

U.S.C. §§ 482, 1582 – Customs' searches of incoming international mail. Section 482

deals with Customs searches of envelopes " wherever found" in which agents

reasonably suspect there is contraband or dutiable goods that " [were] imported

contrary to law." 19 U.S.C. § 482; United States v. Ramsey, 431 U.S. 606, 612-13

---

[7]The entire t^xt of the Amendment provides:

[T]he right of the people to be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures, shall not be violated, and no Warrants shall
issue, but upon probable cause, supported by Oath or affirmation, and particularly
describing the place to be searched, and the persons or things to be seized.
U.S. CONST. AMEND. IV.

7

(1977).[8]  Section 1582, however, deals with Customs searches at the border; it provides

"for the search of persons and baggage" and authorizes the Secretary of Treasury to

promulgate regulations for searching international mail.[9]  The regulations applicable to

international mail searches are contained in 19 C.F.R. §§ 145, *et seq*.  In particular,

section 145.2(b) provides that "all mail originating outside the Customs territory of the

United States, whether sealed or unsealed, is subject to Customs examination" (with no

suspicion requirement).  19 C.F.R. § 145.2(b).  Thus, it is well established that

warrantless searches at international borders of the United States may be performed even

without a suspicion of criminal activity.  United States v. Ramsey, 431 U.S. 606 (1977);

United States v. Haley, 743 F.2d 862, 864 (11th Cir. 1984); United States v. Hernandez-

Cuartas, 717 F.2d 552, 555 (11th Cir. 1983); United States v. Pringle, 576 F.2d 1114,

---

[8]Section 482 reads: "[a]ny of the officers or persons authorized to board or search vessels may . . . search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law."  19 U.S.C. § 482.

[9] Section 1582 reads in its entirety that
The Secretary of the Treasury may prescribe regulations for the search of persons and baggage and he is authorized to employ female inspectors for the examination and search of persons of their own sex; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations.
19 U.S.C. § 1582.

1116 (5th Cir. 1978).[10] [11]

At the hearing, counsel for Karen Robinson essentially conceded that she does not have standing to contest the Weihrauch silencer's entry into evidence. Tr. at 28-29. Even if counsel did not concede the issue, there is no dispute that the package was not addressed to Karen Robinson. She therefore would not have standing to contest the search and seizure of the Weihrauch silencer, because she lacked a legitimate expectation of privacy in the package when it entered the United States. Cf. United States v. Richards, 638 F.2d 765, 769-70 (5th Cir. 1981) (finding that Defendant had standing to contest the search of a package because it was sealed and addressed only to him although under a fictitious name); United States v. Villarreal, 963 F.2d 770, 774-75 (5th Cir. 1992) (holding individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names). The Court now turns to Adam Robinson's arguments concerning the Weihrauch silencer.

Inspector Nugent testified that the package entered the United States at the Port

---

[10]Other circuits also have uniformly held that customs officials have unlimited discretion to search incoming international packages. United States v. Glasser, 750 F.2d 1197, 1200-05 (3d Cir. 1984), cert. denied, 471 U.S. 1018 (1985); United States v. Emery, 541 F.2d 887, 889 (1st Cir. 1976); United States v. Odland, 502 F.2d 148, 150-51 (7th Cir. 1974), cert. denied, 419 U.S. 1088 (1974).

[11]Section 145.3(a), however, provides that Customs officers may open and examine "sealed letter class mail" only if they "have reasonable cause to suspect the presence of merchandise or contraband." 19 C.F.R. § 145.3(a). "Sealed letter class mail" means "letter class mail sealed against postal inspection by the sender." 19 C.F.R. § 145.1©. "Letter class mail," in turn, means "any mail article, including packages, post cards, and aerogrammes, mailed at the letter rate or equivalent class or category of postage." 19 C.F.R. § 145.1(b). It is unconverted that the Weihrauch silencer was found in a mail package, rather than" letter class mail."

9

of Chicago from Germany and was addressed to Adam Robinson at his residence in

Alabama. Because the Weihrauch silencer was contained in a package originating from

outside the United States and was addressed to a residence within the United States,

Inspector Nugent was statutorily authorized under 19 U.S.C. § 1582 to search the

package without reasonable suspicion to suspect that it contained contraband.

The Court also must test whether the search was constitutionally reasonable

under the Fourth Amendment. Under the circumstances presented, the Court finds that

the search was reasonable. Inspector Nugent intercepted the package after its arrival at

the Port of Chicago, a border area, and noticed that it contained merchandise of some

weight. He also observed that the package was destined for Adam Robinson in

Alabama from Germany and declared to contain a CO-2 Set. He examined the x-ray

image of the contents, which displayed an almost black image of a metal sphere.

Having observed the x-ray image of at least 4 silencers previously, Inspector Nugent

suspected that the contents contained a silencer and opened the package. These facts

indicate that it was reasonable for Inspector Nugent to search the package. United

States v. Pringle, 576 F.2d at 1117 (finding the warrantless search of incoming

international mail at a port of entry reasonable and upholding the constitutionality of

section 1582) (citing United States v. Odland, 502 F.2d 148, 151 (7th Cir. 1974)); see

also United States v. Ramsey, 431 U.S. at 616-25 (" Border searches[] . . . have been

considered to be 'reasonable' by the single fact that the . . . item in question had

10

entered into our country from outside."); United States v. King, 517 F.2d at 352-53.
Therefore, the Court concludes that the search of the package was also valid under the
Fourth Amendment. Adam Robinson' s arguments to suppress the Weihrauch silencer
fail.[12]

**B.    Defendants' Fruits Arguments**

As presented above, Defendants maintain that the items searched and seized from
their residence were fruits of the warrantless search of the package. Adam Robinson
extends this argument further to include the computer. The Court does not agree that
the evidence seized from their residence and the computer were fruits of the warrantless
search of the package, because the Customs official's search and seizure of the
Weihrauch silencer was constitutionally authorized. Cf. Wong Sun v. United States, 371
U.S. 471, 488 (1963) (excluding narcotics and statements which resulted from an
unlawful invasion of a defendant' s bedroom).

**C.    The Search Warrants**

The Fourth Amendment also provides that " no Warrants shall issue, but upon
probable cause, supported by Oath or affirmation, and particularly describing the place
to be searched, and the persons or things to be seized." Probable cause to support a
search warrant exists when " there is a fair probability that contraband or evidence of a

---

[12]The Government further argues that the facts presented demonstrate that the Customs official had reasonable cause to suspect the package contained contraband. Pl.'s Response to Adam Lamar Robinson's Motion to Suppress at 7; Pl.'s Response to Karen Kilgo Robinson's Motion to Suppress at 8. The Court need not reach this argument.

crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983);

United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).

A court reviewing the issuance of a search warrant by a Magistrate Judge is not

to conduct a de novo probable cause determination, but is merely to decide whether the

evidence viewed as a whole provided a " substantial basis" for the finding of probable

cause at the time the warrant was issued. Massachusetts v. Upton, 466 U.S. 727, 732-

33 (1984) (per curiam).

> The task of the issuing [judge] is simply to make a practical, common-
> sense decision whether, given all the circumstances set forth in the
> affidavit before him, including the " veracity" and " basis of knowledge"
> of persons supplying hearsay information, there is a fair probability that
> contraband or evidence of a crime will be found in a particular place.
> And the duty of a reviewing court is simply to ensure that the [judge] had
> a " substantial basis for . . . conclud[ing]" that probable cause existed.

Gates, 462 U.S. at 238-239 (internal citation omitted). The reviewing court must

decide whether there was a " substantial basis" to find probable cause solely upon

consideration of the information presented to the issuing judicial officer. United States

v. Lockett, 674 F.2d 843, 845 (11th Cir. 1982).

" The nexus between the objects to be seized and the premises searched can be

established from the particular circumstances involved and need not rest on direct

observation." United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990) (quoting

Lockett, 674 F.2d at 846). To find probable cause, a judge is " entitled to draw

reasonable inferences about where evidence is likely to be kept, based on the nature of

12

the evidence and the type of offense." United States v. Ayers, 924 F.2d 1468, 1479

(9th Cir. 1991) (quoting United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir.

1986)). In weighing the evidence, the issuing judge may rely on the conclusions of

experienced law enforcement officers. Ayers, 924 F.2d at 1479.

With respect to the warrant for Defendants' residence, Chief Magistrate Judge

Coody had before him the affidavit of Special Agent Fitzpatrick, ATF. The affidavit

contained detailed information gathered from Customs' search of the package at the

Port of Chicago, including that the recipient of the package was Adam Robinson at his

home address, and the agent's finding that Defendant had not registered the Weihrauch

silencer or any firearm with the National Firearms Registration and Transfer Record

and was a multi-convicted felon for possession of a pistol. It also indicated, based on

the agent's experience in law enforcement since 1992, that most people who possess

firearms store them at home and possess other related items. Finally, the warrant

described the agency's plans for a controlled delivery of the package.

After careful consideration, the Court concludes that the warrant issued for the

search of Defendants' residence was supported by probable cause. The detailed

information presented in the affidavit would warrant a person of reasonable caution to

believe that a search of Defendants' residence would uncover the Weihrauch silencer

as well as other firearms. The warrant conveyed to Magistrate Judge Coody that the

Weihrauch silencer was mailed to Adam Robinson from Germany, but it was not

13

registered as required by law. It further indicated that Adam Robinson was previously convicted for possession of a pistol and that based on the agent' s experience, most people store their firearms in their home along with other items related to firearms. These facts are sufficient to support a finding of probable cause to search for the Weihrauch silencer and any firearms. Thus, issuance of the warrant to search Defendants' residence for the Weihrauch silencer and any firearms did not violate the Fourth Amendment.[13]

With respect to the warrant for Adam Robinson' s computer, Magistrate Judge Walker also reviewed another affidavit from Special Agent Fitzpatrick, ATF. The affidavit contained detailed information about Adam Robinson' s access and use of the Internet on his personal computer, the agent' s discussions with Special Agent Neil Harper, who specializes in computer forensic examinations, the items seized from Defendants' residence, which included a paper listing a German-based website, and the agent' s belief, based on his experience, that individuals who possess and manufacture firearms and explosives typically use the Internet to research and purchase firearms and related items. The affidavit also indicated that Special Agent Harper informed the affivant that the Internet has numerous website page It is unconverted that the silencer was found in a mail package, rather than" letter class mail. " s explaining

---

[13]Because the Court finds that the warrant to search Defendants' residence was supported by probable cause, it need not reach Karen Robinson's two arguments that the good faith exception does not apply in this case.

14

how to construct homemade silencers through the use of common household items as
well as destructive devices, pipe bombs, and improvised explosive devices through the
use of explosive powders.

Again, after careful consideration, the Court concludes that the warrant issued
for the search of Adam Robinson' s computer was supported by probable cause. The
detailed information presented in the affidavit would warrant a person of reasonable
caution to believe that a search of his computer would uncover evidence of the
possession or manufacture of firearms, silencers, and explosives in electronic digital
media form. The affidavit specifically described the items seized from Defendants'
residence, including six bottles of tannerite binary explosive, three homemade firearm
silencers, the Weihrauch silencer, which contained instructions referring the reader to
its website, two suspected homemade pipe bombs, one including shrapnel, a container
of pyrodex black powder, two suspected 37mm improvised explosive devices, and a
box of homemade firework devices. The affivant indicated that the Internet contains
websites which explain how to construct homemade silencers, destructive devices, pipe
bombs, and improvised explosive devices from common household items and explosive
powders, like shrapnel. Moreover, based on the agent' s experience, Special Agent
Fitzpatrick stated that people who possess and manufacture firearms and explosives
typically research and purchase related items on the Internet. He stated that the
computer was found among Adam Robinson' s personal affects. Special Agent

15

Fitzpatrick further indicated that a document found during the search of Defendants'

residence referenced a website for tracking points on one' s license and that Adam

Robinson drove a truck for a living. These facts are sufficient to support a finding of

probable cause to search the computer for evidence of the possession or manufacture of

firearms, silencers, and explosive devices in electronic digital media form. Thus,

issuance of the warrant to search Adam Robinson' s computer did not violate the

Fourth Amendment.

## CONCLUSION

_____Accordingly, it is the RECOMMENDATION of the Magistrate Judge that

Defendants' motions to suppress (Doc. #38, #40) be DENIED. It is further

ORDERED that the parties are DIRECTED to file any objections to the said

Recommendation within a period of **13 days** from the date of mailing or transmittal to

them. Any objections filed must specifically identify the findings in the Magistrate

Judge's Recommendation objected to. Frivolous, conclusive or general objections will not

be considered by the District Court. The parties are advised that this Recommendation is

not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in

the Magistrate Judge's report shall bar the party from a *de novo* determination by the

District Court of issues covered in the report and shall bar the party from attacking on

appeal factual findings in the report accepted or adopted by the District Court except upon

16

grounds of plain error or manifest injustice. Nettles v. Wainwright, 677 F.2d 404 (5th Cir.

1982). See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982). See also

Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding

precedent all of the decisions of the former Fifth Circuit handed down prior to the close of

business on September 30, 1981.

DONE this the 21st day of February, 2007.


/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE

17

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA     )
     )
VS.     )  CASE NO. 2:06cr223-MEF
     )
ADAM LAMAR ROBINSON     )

**DEFENDANT ADAM LAMAR ROBINSON'S
UNOPPOSED MOTION FOR THREE DAY EXTENSION
OF TIME TO FILE OBJECTIONS TO RECOMMENDATION**

Comes now Defendant Adam Lamar Robinson, by and through counsel, and

shows as follows:

1. The recommendation on Defendant Adam Lamar Robinson's motion to

suppress was filed on February 21, 2007. Objections to the recommendation are due on

this date. (This case is set for trial on July 9, 2007.)

2. Since February 21, 2007, the undersigned counsel has been tied down by court

proceedings and preparations in other cases. The undersigned counsel needs some

additional time to complete objections to the recommendation in this case.

3. Counsel for Defendant Adam Lamar Robinson has discussed this matter with

Verne H. Speirs, counsel for the United States of America. Mr. Speirs does not oppose

an extension until March 9, 2007 for Defendant Adam Lamar Robinson to file any

objections to the recommendation.

WHEREFORE, Defendant Adam Lamar Robinson moves this Court to allow him

until March 9, 2007 within which to file objections to the Recommendation on his motion

to suppress.



AO896-C

**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.  F

1

**s/ Thomas M. Goggans**
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery AL 36106
PH; 334.834.2511
FX: 334.834.2512
e-mail tgoggans@tgoggans.com

Attorney for Defendant
Adam Lamar Robinson

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA  )
           )
VS.          ) CASE NO. 2:06cr223-MEF
           )
ADAM LAMAR ROBINSON   )

CERTIFICATE OF SERVICE

I hereby certify that I have on this the 6th day of March, 2007, electronically filed

this document with the Clerk of the Court using the CM/ECF system which will send

notification to each of the following: Verne H. Speirs, John T. Harmon, and Richard K.

Keith.

         **s/ Thomas M. Goggans**
         Ala. S.J.I.S. GOG001
         2030 East Second Street
         Montgomery AL 36106
         PH; 334.834.2511
         FX: 334.834.2512
         e-mail tgoggans@tgoggans.com

         Attorney for Defendant
         Adam Lamar Robinson

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:06cr223-MEF |
| | ) | |
| ADAM LAMAR ROBINSON, | ) | |
| | ) | |

**ORDER ON MOTION**

On March 6, 2007, Defendant filed an Unopposed Motion for a Three-Day Extension of

Time to file Objections to a recommendation entered by the Undersigned Magistrate Judge.

(Doc. #66). Upon consideration of the motion, and for good cause, it is

ORDERED that the motion (Doc. #66) is GRANTED. Accordingly, Defendant is

granted a three-day extension until March 9, 2007, to file objections in this matter.

The Clerk of Court is DIRECTED to forward copies of this order to counsel of record via

facsimile.

DONE this 6th day of March, 2007.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE



AO88B-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.          G

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| VS. | ) CASE NO. 2:06cr223-MEF |
| | ) |
| ADAM LAMAR ROBINSON | ) |

## DEFENDANT ADAM LAMAR ROBINSON'S OBJECTION TO
## RECOMMENDATION OF MAGISTRATE JUDGE

Defendant Adam Lamar Robinson's motion to suppress relates to searches
conducted by government agents on June 1, 2006 in Chicago, Illinois; on June 15, 2006
in Deatsville, Alabama; and between August 12, 2006 and September 25, 2006 in
Chattanooga, Tennessee. The motion involves the following issues:

a. Whether a search in Chicago, Illinois of article of mail addressed to Defendant
Adam Lamar Robinson at his address in Deatsville, Alabama violated the Fourth
Amendment to the United States Constitution and 19 U.S.C. § 482.

b. Whether a search of Defendant Adam Lamar Robinson's residence was a fruit
of the aforementioned search of the article of mail and, independently, violated the
Fourth Amendment to the United States Constitution.

c. Whether a search of a personal computer seized from Defendant Adam Lamar
Robinson's residence was a fruit of the aforementioned searches and, independently,
violated the Fourth Amendment to the United States Constitution.

In his recommendation, the Magistrate Judge stated: "it is well established that
warrantless searches at international borders of the United States may be performed even
without a suspicion of criminal activity. United States v. Ramsey, 431 U.S. 606 (1977);
United States v. Haley, 743 F.2d 862, 864 (11th Cir. 1984); United States v. Hernandez

1

AO88-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.        H

Cuartes, 717 F.2d 552, 555 (11th Cir. 1983; United States v. Pringle, 576 F.2d 1114,

1116 (5th Cir. 1978)." (Doc. 61, p. 8). Within that stated framework of analysis, the

Magistrate Judge went on to conclude that a search in Chicago of an article of mail

addressed to Defendant Adam Lamar Robinson was reasonable under the Fourth

Amendment.

　　　　Defendant Adam Lamar Robinson submits that an examination of the opinion of

the Supreme Court of the United States in United States v. Ramsey, 431 U.S. 606

(1977)(hereinafter "Ramsey") indicates a different framework of analysis and warrants a

different conclusion. In Ramsey, the Supreme Court recited the following events

occurring at the "General Post Office in New York City where international air mail

landing at Kennedy International Airport is taken for routing and customs inspections",

341 U.S. at 609 n. 2,:

> a United States customs officer in New York City … inspecting a sack of
> incoming international mail from Thailand, spotted eight envelopes that
> were bulky and which he believed might contain merchandise. The
> envelopes, all of which appeared to him to have been typed on the same
> typewriter, were addressed to four different locations in the Washington,
> D. C., area. [The inspector], based on the fact that the letters were from
> Thailand, a known source of narcotics, and were "rather bulky," suspected
> that the envelopes might contain merchandise or contraband rather than
> correspondence. He took the letters to an examining area in the post office,
> and felt one of the letters: It "felt like there was something in there, in the
> envelope. It was not just plain paper that the envelope is supposed to
> contain." He weighed one of the envelopes, and found it weighed 42
> grams, some three to six times the normal weight of an airmail letter. [The
> inspector ] then opened that envelope.

341 U.S. at 609. As did the Magistrate Judge in this case, the Supreme Court referenced

19 U.S.C. § 482 and 19 C.F.R. § 145.2 (1976). 341 U.S. at 611-613. However, the

Supreme Court concluded that rather there being carte blanche authority to search

international mail, a "reasonable cause to suspect" test applied. The Supreme Court

2

stated: "The 'reasonable cause to suspect test' adopted by the statute is, we think, a

practical test which imposes a less stringent requirement than that of 'probable cause'

imposed by the Fourth Amendment as a requirement for the issuance of warrants." 341

U.S. at 612-613. The Supreme Court, utilizing a "reasonable cause to suspect" test,

concluded that the search at issue was reasonable.

In this case, however, Defendant Adam Lamar Robinson submits that there was

not reasonable cause to suspect criminality. According to an affidavit, (Doc. 40,

Attachment A), used to obtain a search warrant for Defendant Adam Lamar Robinson's

residence,

> On June 1, 2006, U.S. Customs and Border Protection (CBP) Inspector D.
> Nugent in Chicago, Illinois was assigned to work foreign mail when he
> intercepted a parcel coming from Maulberg, Germany. The package was
> destined for Adam ROBINSON at 1708 Formosa Court, Deatsville,
> Alabama, 36022 USA. The parcel was also marked declaring it as a "CO-
> 2-Set". Upon further investigation, Officer Nugent discovered the parcel
> contained an item which he believed to be a silencer for a firearm. A
> "firearm silencer" or "firearm muffler" means any device for silencing or
> muffling, or diminishing the report of a portable firearm, including any
> combination of parts, designed or redesigned, and intended for use in
> assembling or fabricating a firearm silencer or firearm muffler, and any
> part intended only for use in such assembly or fabrication. (See Title 18,
> United States Code, Section 921(a)(24)). The parcel also contained a
> document in the English and German language stating that the item was a
> Weihrauch-silencer. The documentation included installation instructions.

Nugent's suppression hearing testimony was in line with the affidavit. He did add

that an x-ray image of the package displayed a metal sphere which he said resembled a

silencer. He did testify that a CO-2 cartridge, as indicated on the marking on the

package, was similarly cylindrical. Defendant Adam Lamar Robinson submits that this

was not enough to support a finding of reasonable suspicion of criminality to support the

warrantless search of the article of mail addressed to him.

3

After this search, the article of mail was sent by federal agents in Chicago, Illinois to federal agents in Montgomery, Alabama. On June 14, 2006, federal agents in Montgomery, Alabama procured an anticipatory search warrant, (Doc. 40, Attachment B), to search Defendant Adam Lamar Robinson's residence in Deatsville, Alabama. The search warrant affidavit, (Doc. 40, Attachment A), referenced the aforementioned search in Chicago. Accordingly, the warrant to search Defendant Adam Lamar Robinson's residence was a fruit of the aforementioned warrantless search in Chicago. As such, Defendant Adam Lamar Robinson submits that its own fruits are likewise excludable. Wong Sun v. United States, 371 U.S. 471 (1963).

Apart from information derived from the aforementioned search, the search warrant affidavit information did not provide the issuing authority with a "substantial basis" for determining probable cause to believe that contraband or evidence of a crime would be found at Defendant Adam Lamar Robinson's residence. See, Illinois v. Gates, 462 U.S. 213, 238-239 (1983)(evidence presented in support of an application for a search warrant must provide issuing authority with a "substantial basis" for determining probable cause). Accordingly, the warrant does not pass muster under the Fourth Amendment.

Upon executing the search warrant at Defendant Adam Lamar Robinson's residence, federal agents and other government agents seized numerous items of evidence which the government contends are incriminating and some of which serve as the basis for the charges against Defendant Adam Lamar Robinson in this case. Among the items seized was a personal computer.

4

On August 8, 2006, federal agents procured a search warrant, (Doc. 40, Attachment D), for the personal computer seized from Defendant Adam Lamar Robinson's residence. The search warrant affidavit, (Doc. 40, Attachment C), referenced the aforementioned search in Chicago and the aforementioned search of Defendant Adam Lamar Robinson's residence. Thus, the warrant to search the personal computer was a fruit of the aforementioned warrantless search in Chicago and the search of Defendant Adam Lamar Robinson's residence. As such, Defendant Adam Lamar Robinson submits that its own fruits are likewise excludable. Wong Sun v. United States, 371 U.S. 471 (1963).

Apart from information derived from the aforementioned searches, the search warrant affidavit information did not provide the issuing authority with a "substantial basis" for determining probable cause to believe that contraband or evidence of a crime would be found in the personal computer. See, Illinois v. Gates, 462 U.S. 213, 238-239 (1983)(evidence presented in support of an application for a search warrant must provide issuing authority with a "substantial basis" for determining probable cause). Accordingly, the warrant does not pass muster under the Fourth Amendment.

The personal computer was sent by federal agents in Montgomery, Alabama to federal agents in Chattanooga, Tennessee. Upon executing the warrant to search the personal computer between August 12, 2006 and September 25, 2006, federal agents obtained information which the government contends is incriminating.

Based upon the foregoing, Defendant Adam Lamar Robinson contends that the Magistrate Judge's conclusion that aforementioned searches were not violative of the Fourth Amendment to the United States Constitution and 19 U.S.C. § 482 is erroneous.

WHEREFORE, Defendant Adam Lamar Robinson moves this Court to sustain his objections to the recommendation of the Magistrate Judge and enter an order suppressing the fruits of the searches complained of herein.

> **s/ Thomas M. Goggans**
> Ala. State Bar No. 2222-S45T
> 2030 East Second Street
> Montgomery AL 36106
> PH; 334.834.2511
> FX: 334.834.2512
> e-mail tgoggans@tgoggans.com
>
> Attorney for Defendant
> Adam Lamar Robinson

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | CASE NO. 2:06cr223-MEF |
| | ) | |
| ADAM LAMAR ROBINSON | ) | |

CERTIFICATE OF SERVICE

I hereby certify that I have on this the 9th day of March, 2007, electronically filed

this document with the Clerk of the Court using the CM/ECF system which will send

notification to each of the following: Verne H. Speirs, John T. Harmon, and Richard K.

Keith.

**s/ Thomas M. Goggans**
Ala. State Bar No. 2222-S45T
2030 East Second Street
Montgomery AL 36106
PH; 334.834.2511
FX: 334.834.2512
e-mail tgoggans@tgoggans.com

Attorney for Defendant
Adam Lamar Robinson

7

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
v.                              )        CASE NO. 2:06-cr-223-MEF
                                )
ADAM LAMAR ROBINSON             )
KAREN KILGO ROBINSON,           )
                                )
        Defendants.             )

# ORDER

After an independent review of the file, it is the ORDER, JUDGMENT and DECREE

of the Court as follows:

(1) The Recommendation of the Magistrate Judge entered on February 21, 2007 (Doc.

# 61) is ADOPTED.

(2) Adam Robinson's objections to the Recommendation of the Magistrate Judge

(Doc. # 68) are OVERRULED;

(3) Karen Robinson's objections to the Recommendation of the Magistrate Judge

(Doc. # 75) are OVERRULED;

(4) Adam Robinson's Motion to Suppress (Doc. # 40) is DENIED.

(5) Karen Robinson's Motion to Suppress (Doc. # 38) is DENIED.

DONE this the 30th day of April, 2007.


                    _____/s/ Mark E. Fuller_____
                    CHIEF UNITED STATES DISTRICT JUDGE



GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    I

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA    )
                               )
          v.              )     CR. NO. 2:06cr223-MEF
                               )
ADAM LAMAR ROBINSON        )

## PLEA AGREEMENT

DEFENSE COUNSEL:        EVERETT URECH

ASSISTANT U.S. ATTORNEY:    VERNE H. SPEIRS

### COUNT AND STATUTE CHARGED:

Count 1        18 U.S.C. § 922(g)(1)
               Felon in possession of a firearm.

Count 2        26 U.S.C. 5861(d)
               Receipt or possession of a firearm not registered
               in the National Firearms Registration and Transfer
               Record.

### COUNT PLEADING PURSUANT TO PLEA AGREEMENT:

Count 1        18 U.S.C. § 922(g)(1)

Count 2        26 U.S.C. § 5861(d)

### PENALTIES BY COUNT - MAXIMUM PENALTY:

Count 1        18 U.S.C. § 922(g)(1)
               NMT 10Y or
               NMT $250,000 or both;
               NMT 3Y SUP REL;
               $100 AF;
               VWPA.

Count 2        26 U.S.C. § 5861(d)
               NMT 10Y or
               NMT $250,000 or both;
               NMT 3Y SUP REL;
               $100 AF;
               VWPA.



AO88B-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.  J

**ELEMENTS OF THE OFFENSE:**

### 18 U.S.C. § 922(g)(1)

First:      The defendant knowingly possessed a firearm or
            ammunition in or affecting interstate commerce, as
            charged; and

Second:     Before the defendant possessed the firearm or
            ammunition, the defendant had been convicted in a
            court of a crime punishable by imprisonment for a
            term in excess of one year, that is, a felony
            offense.

### 26 U.S.C. § 5861(d)

First:      The defendant knowingly possessed the firearms
            described in the indictment;

Second      The firearms were not registered to the defendant
            in the National Firearms Registration and Transfer
            Record;

Third:      The defendant knew the feature of the firearms
            that brought them within the scope of the act.

*****************************************************************

Verne H. Speirs, Assistant United States Attorney and

Everett Urech, attorney for the Defendant, pursuant to Rules

11(c)(1)(C), Federal Rules of Criminal Procedure, as Amended,

have, with the authorization of the undersigned Defendant,

heretofore entered into discussions with a view towards reaching

a pretrial conclusion of the charges pending in the Indictment

herein and a Plea Agreement has been reached by said parties.

The plea is being submitted to the Court pursuant to Federal

Rules of Criminal Procedure 11(c)(1)(C), and the parties

understand that, if the terms of the Plea Agreement are not

2

accepted by the Court, the Defendant will be allowed to withdraw the Defendant's plea of guilty and proceed to trial.  If the Court accepts this agreement, however, and Defendant thereafter breaches this agreement, his guilty plea may not be withdrawn.

### GOVERNMENT'S PROVISIONS

1. Upon entering a plea of guilty by the Defendant to the offenses charged in Counts 1 and 2 of the Indictment, the attorney for the United States will do the following:

a.  The United States will agree that a 2-level reduction in the applicable offense level pursuant to U.S.S.G. § 3E1.1(a) for the Defendant's acceptance of responsibility is appropriate, so long as the Defendant does not obstruct justice or otherwise fail to accept responsibility for the offense conduct.  Should the United States find the Defendant assisted authorities in the investigation or prosecution of the Defendant's own misconduct by timely notifying authorities of the Defendant's intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and this Court to allocate their resources efficiently, and if Defendant otherwise qualifies, the United States will move at sentencing for a further reduction of one level, pursuant to U.S.S.G. § 3E1.1(b).  Determination of whether the Defendant met the Defendant's obligations to qualify

for the reduction pursuant to U.S.S.G. § 3E1.1 is at the sole
discretion of the United States.

      b.   The parties agree that should the defendant qualify
as an Armed Career Criminal pursuant to 18 U.S.C. 924(e), the
Defendant shall have the right to withdraw his plea and negotiate
a new plea agreement or proceed to trial.

      c.   The United States agrees that upon Defendant's
sentencing for all counts listed in the Indictment, the United
States will move to dismiss all pending federal charges against
Karen Robinson (Defendant's wife) arising from the September 7,
2006, Federal Indictment.  This provision shall have no force and
effect upon any other federal or state jurisdiction.  This
provision is expressly limited to any pending federal charges
arising from the September 7, 2006, Indictment originating from
the Middle District of Alabama.

      d.   The parties agree to the full application of the
United States Sentencing Guidelines and do not seek to limit the
application of any provision thereof.

    2.   The United States reserves the right to inform the Court
and the Probation Office of all facts pertinent to the sentencing
process, including all relevant information concerning the
offenses and the Defendant's background.

### DEFENDANT'S PROVISIONS

    3. The Defendant agrees to the following:

4

a.   To plead guilty to Counts 1 and 2 of the
     Indictment.

b.   To forfeit to the United States all firearms
     (including firearm silencers/mufflers) and
     ammunition in his possession.

c.   To forfeit to the United States any and all
     equipment, tools and substances of whatever nature
     used in the manufacture or construction of
     destructive devices, firearms, silencers/mufflers
     or any other devices the Defendant is prohibited
     from possessing by state or federal law or that
     require registration with the National Firearms
     Registration and Transfer Record.

d.   Not commit any State, local or federal offenses.

## FACTUAL BASIS

Beginning from an unknown date continuing and up to and

including June 15, 2006, in Autauga County, within the Middle

District of Alabama, ADAM LAMAR ROBINSON, defendant herein,

having been convicted of the following felonies, crimes

punishable by imprisonment for terms exceeding one year under the

laws of the Alabama, to-wit:

1)   October 16, 1980, Burglary, in the Circuit Court of
     Morgan County, Alabama - Case Number 79-0718;

2)   December 12, 1980, Felony Possession of a Pistol,
     in the Circuit Court of Morgan County, Alabama -
     Case Number 80-0594;

3)   December 17, 1980, Burglary 3rd Degree, in the
     Circuit Court of Morgan County, Alabama - Case
     Number 80-0595;

4)   September 14, 1987, Theft 2nd Degree, in the Circuit
     Court of Morgan County, Alabama - Case Number 84-
     0573;

did knowingly possess in and affecting commerce firearms, to-wit:

1)   Norinco, model Mak-90, 7.62mm rifle;

2)   Mossberg, 28 Inch Accu-Choke 12 gauge shotgun;

3)   Lorcin, model L-380, .380 caliber pistol;

4)   Remington, model 510, .22 caliber rifle;

5)   Marlin, model 110M, .22 caliber rifle;

6)   Ithaca, 12 gauge shotgun;

7)   Mossberg, model 500 AG, 12 gauge shotgun;

8)   Marlin, model 60W, .22 caliber rifle;

9)   Smith and Wesson, model 442, .38 caliber revolver

10)  SWD Derringer, model DD45, .45 caliber firearm;

11)  A Weihrauch-Sport silencer - Nur fur "F".

All in violation of Title 18, United States Code, Section 922(g)(1).

Moreover, beginning from an unknown date and continuing up to and including June 15, 2006, in Autauga County, within the Middle District of Alabama, ADAM LAMAR ROBINSON, defendant herein, did knowingly possess firearms, firearm silencers and destructive devices, to-wit:

1)   A Weihrauch-Sport silencer - Nur fur "F";

2)   A metal cylindrical device approximately 12 inches x 1 3/4 inches designed as a firearm muffler or silencer;

3)   A metal cylindrical device approximately 6 1/4 inches x 2 inches designed as a firearm muffler or silencer;

4)  A metal cylindrical device approximately 4 ½ inches x 1 ½ inches designed as a firearm muffler or silencer;

5)  A 1 ½ inch nominal diameter metal pipe measuring 6 inches in length containing a mixture of Hodgdon brand Pyrodex P and disc-shaped double base smokeless powder designed as a destructive device;

6)  A 2 inch nominal diameter metal pipe measuring 6 inches in length containing 148 grams of zinc plated BBs and approximately 189 grams of 3/8 inch steel hunting shot and a mixture of Hodgdon brand Pyrodex P and disc-shaped double base smokeless powder designed as a destructive device;

7)  A 2 inch plastic shell containing a primer and twelve 3/8 inch diameter steel hunting shot pellets and a mixture of Hodgdon brand Pyrodex P and disc-shaped double base smokeless powder designed as a destructive device;

8)  A 2 inch plastic shell containing a primer one hundred grams of zinc-plated BBs and a mixture of Hodgdon brand Pyrodex P and disc-shaped double base smokeless powder designed as a destructive device;

all not registered in the National Firearms Registration and Transfer Record. All in violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

Understanding that 18 U.S.C. § 3742 provides for appeal by a Defendant of the sentence under certain circumstances, the Defendant expressly waives any and all rights conferred by 18 U.S.C. § 3742 to appeal the sentence. Defendant further expressly waives the right to appeal the sentence on any other ground and waives the right to attack the sentence in any post-conviction proceeding.

The United States does not waive its right to appeal any order dismissing the Indictment, vacating a sentence, or otherwise terminating the prosecution at any stage of the proceedings. Further, the parties agree that nothing in this agreement shall affect the United States's right and/or duty to appeal as set forth in 18 U.S.C. § 3742(b).

### DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT

4. The Defendant, before entering a plea of guilty to Counts 1 and 2 of the Indictment as provided for herein by said Plea Agreement, advises the Court that:

a. The discussions between the attorney for the United States and the attorney for the Defendant towards reaching an agreed plea in this case have taken place with the Defendant's authorization and consent.

b. Defendant acknowledges that a breach of this federal plea agreement will not entitle him to withdraw his guilty plea in this case. Defendant understands and acknowledges that Defendant's guilty plea will remain in full force and effect upon any breach of this agreement by the Defendant.

c. The Defendant further understands that, pursuant to 18 U.S.C. § 3013, said $100.00 assessment fee is to be paid by the Defendant on the date of sentencing. The Defendant will make an honest, good faith effort to pay said fee as directed by the Financial Litigation Section of the United

8

States Attorney's Office.  The Defendant further understands that
by completing the financial statement, the Defendant is
representing that it is true and accurate to the best of the
Defendant's information, knowledge, and belief.

      d.  The Defendant understands that the Defendant
has a right to be represented by an attorney at every stage of
the proceedings against the Defendant herein and is represented
by the Defendant's undersigned attorney.

      e.  The Defendant understands that the Defendant
has the right to plead not guilty and has the right to be tried
by a jury and, at a trial thereof, has the right to the
assistance of counsel, the right to confront and cross-examine
witnesses against the Defendant, the right to call witnesses in
the Defendant's own behalf, and the right not to be compelled to
incriminate the Defendant, and that if the Defendant enters a
plea of guilty herein, there will not be a further trial of any
kind and that by the entry of such a plea, the Defendant waives
the right to a trial by jury or to a trial before the Court.

      f.  The Defendant further understands that in
entering a plea of guilty herein, the Court may ask questions
about the offense to which the plea is entered and further
understands that if the Defendant answers these questions under
oath, on the record, and in the presence of counsel, which
questions and answers would be recorded, that the answers may

later be used against the Defendant in a prosecution for perjury or false statement if the answers are not truthful.

   g. The Defendant further understands and advises the Court that the Plea Agreement as set forth herein and the plea to be entered by the Defendant as a result thereof is voluntary on the Defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement. The Defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the attorney for the United States and the attorney for the Defendant, all conducted with the Defendant's authorization, knowledge, and consent.

   h. The Defendant further advises the Court that the Defendant's understanding of this Plea Agreement is as set forth in this document.

   i. The Defendant further advises the Court that it is understood that the United States can only make a recommendation which is not binding on the Court.

   j. The Defendant further advises the Court that the Defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Indictment herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings

<div align="center">10</div>

against the Defendant.  However, the Defendant does understand
that evidence of a statement made in connection with and relevant
to a plea of guilty, later withdrawn, or an offer to plead guilty
to the crimes charged in the Indictment herein, is admissible in
a criminal proceeding for perjury or false statement when the
statement was made by the Defendant under oath, on the court
record, and in the presence of counsel.

      k.   The Defendant is satisfied that defense
counsel has been competent and effective in representing
Defendant.

      5.   The undersigned attorneys for the United States and
for the Defendant represent to the court that the foregoing Plea
Agreement is the agreement of the parties that has been reached
pursuant to the Plea Agreement procedure provided for in Rule 11,
Federal Rules of Criminal Procedure, as Amended.  The attorney
for the Defendant further advises the Court that the Defendant
has been advised of the nature of the charge to which the
foregoing described plea is to be offered, and that the Defendant
has been advised of the Defendant's right to plead not guilty and
to be tried by a jury on all issues herein; of the maximum
possible penalty provided by law; that by the entering of a plea
of guilty as aforesaid, the Defendant waives the right to be
tried by a jury or by the Court, waives the right to confront and
cross-examine witnesses against the Defendant and the right not

11

to be compelled to incriminate the Defendant; and that if the Defendant pleads guilty, there will not be a further trial of any kind.  Further, the Defendant has been advised that if the Defendant pleads guilty, the Court may ask questions about the offense to which the Defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the Defendant in a civil or criminal proceeding, but that the Defendant's answers may later be used against the Defendant in a prosecution for perjury or false statement if the answers are not truthful.

6.    The Defendant understands that the U.S. Probation Office will prepare a presentence investigation report for the Court.  The Probation Officer will consider the Defendant's conduct related to the offense to which the plea is offered, as well as the Defendant's criminal history.  The offense level or criminal history category, as calculated by the Probation Officer and determined by the court, may differ from that projected by Defendant's counsel or the U.S. Attorney.  In the event that the Court determines the Defendant's offense level or criminal history category is higher than the Defendant anticipated, the Defendant will not have the right to withdraw the plea on that basis.

7.    The Defendant understands that the United States Sentencing Guidelines are advisory.  Nevertheless, the sentencing

Court will consult and consider the United States Sentencing
Guidelines in conjunction with Title 18, United States Code,
Section 3553.  Pursuant to the Guidelines and Section 3553, the
sentencing Court will impose a sentence sufficient, but not
greater than necessary to reflect the seriousness of the offense,
to promote respect for the law, and to provide just punishment
for the offense.  The Court will impose a sentence to afford
adequate deterrence to criminal conduct, to protect the public
from further crimes of the defendant, and to provide the
defendant with the needed educational or vocational training,
medical care, or other correctional treatment in the most
effective manner.

    This 26th day of July, 2007.


                        Respectfully submitted,

                        LEURA G. CANARY
                        UNITED STATES ATTORNEY


                        Louis V. Franklin, Sr.
                        Criminal Chief


                        Verne H. Speirs
                        Assistant United States Attorney
                        One Court Square
                        Suite 201
                        Montgomery, Alabama 36104


                        13

I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL, _Everett M. Urech_.

_____
Adam Lamar Robinson/DEFENDANT

_7/24/07_____
Date

_____
Everett Urech
Attorney for the Defendant

_7/25/07_____
Date

14

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                       NORTHERN DIVISION

 4

 5   UNITED STATES OF AMERICA

 6       vs.                    CASE NO.:  2:06cr223-MEF

 7   ADAM LAMAR ROBINSON,

 8           Defendant.

 9

10

11

12                  * * * * * * * * * * *

13               CHANGE OF PLEA PROCEEDINGS

14                  * * * * * * * * * * *

15         BEFORE THE HONORABLE WALLACE CAPEL, JR., UNITED STATES

16   MAGISTRATE JUDGE, at Montgomery, Alabama, on Wednesday, July 25,

17   2007, commencing at 9:37 a.m.

18   APPEARANCES:

19   FOR THE GOVERNMENT:      Mr. Verne H. Speirs, II
                              Assistant United States Attorney
20                            OFFICE OF THE UNITED STATES ATTORNEY
                              131 Clayton Street
21                            Montgomery, Alabama  36104

22   FOR THE DEFENDANT:       Mr. Everett M. Urech, Attorney at Law
                              URECH & LIVAUDAIS, P.C.
23                            510 North Daleville Avenue
                              Daleville, Alabama  36322-2000

24
                     Proceedings reported stenographically;
25                     transcript produced by computer.
```

AO90-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.        K

```
 1        (The following proceedings were heard before the Honorable

 2        Wallace Capel, Jr., United States Magistrate Judge, at

 3        Montgomery, Alabama, on Wednesday, July 25, 2007,

 4        commencing at 9:37 a.m.:)

 5            THE COURT:  Are we ready on Mr. Robinson?

 6            MR. SPEIRS:  The government's prepared, Your Honor.

 7            THE COURT:  Mr. Speirs, good morning.

 8            MR. SPEIRS:  Good morning, sir.  How are you?

 9            THE COURT:  I'm fine.  Yourself?

10            MR. SPEIRS:  Doing well, sir.  Thank you.

11            (Defendant present)

12            THE COURT:  Calling Case Number 06-223, United States

13    of America versus Adam Lamar Robinson.  Mr. Robinson -- good

14    morning, Mr. Urech.

15            MR. URECH:  Good morning, sir.

16            THE COURT:  Mr. Robinson, I have a consent form.  It

17    indicates that you intend to plead guilty in this case; that you

18    consent to have myself, as United States Magistrate Judge,

19    conduct this proceeding as required by Rule 11 in the Federal

20    Rules of Criminal Procedure incident to making such a plea and

21    adjudicate you guilty based upon your plea of guilty.  And you

22    understand that the District Court judge to whom the case is

23    assigned would decide later whether they will accept or reject

24    the plea agreement, and that that judge will impose the

25    sentence; is that correct?
```

```
 1              THE DEFENDANT:  Yes, sir.
 2              THE COURT:  All right.
 3              THE CLERK:  Please stand and raise your right hand.
 4         (The defendant is sworn)
 5              THE COURT:  All right.  Mr. Robinson, you're now under
 6    oath, sir, and any statements you give me, if they are false or
 7    inaccurate, sir, you could be charged in a later offense for
 8    giving a false statement or perjury.  Do you understand that,
 9    sir?
10              THE DEFENDANT:  Correct.  Yes, sir.
11              THE COURT:  All right.  What is your full name?
12              THE DEFENDANT:  Adam Lamar Robinson.
13              THE COURT:  How old are you?
14              THE DEFENDANT:  Excuse me.  44.
15              THE COURT:  How far have you gone in school?
16              THE DEFENDANT:  High school.
17              THE COURT:  Have you been treated recently for any
18    mental illness or addictions to narcotic drugs of any kind?
19              THE DEFENDANT:  No, sir.
20              THE COURT:  Are you currently under the influence of
21    any drugs, medication, or alcoholic beverages?
22              THE DEFENDANT:  No, sir.
23              THE COURT:  Is there anything that would prevent you
24    from understanding what's going on here today?
25              THE DEFENDANT:  No, sir.
```

1      THE COURT:  Have you received a copy of the indictment
2  in this case, the charges against you?
3      THE DEFENDANT:  Yes, sir.
4      THE COURT:  Have you discussed this case fully with
5  Mr. Urech?
6      THE DEFENDANT:  Pretty much, yes, sir.
7      THE COURT:  Have you been able to answer and address
8  any issues with him?
9      THE DEFENDANT:  Yes, sir.
10      THE COURT:  Are you satisfied with his representation?
11      THE DEFENDANT:  Yes, sir.
12      THE COURT:  Is your willingness to plead guilty as a
13  result of the discussions that Mr. Urech has had with Mr. Speirs
14  about this case and the plea agreement that's been reached in
15  this case?
16      THE DEFENDANT:  Yes, sir.
17      THE COURT:  All right.  Have you had an opportunity to
18  read and review the plea agreement in this case prior to signing
19  it?
20      THE DEFENDANT:  Yes, sir.
21      THE COURT:  Have you been able to ask any questions
22  that you may have about that plea agreement, and have your
23  questions been answered to your satisfaction by Mr. Urech?
24      THE DEFENDANT:  Yes, sir.
25      THE COURT:  Did you understand the terms of the plea

1   agreement?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  All right.  Let's go over some of the

4   pertinent parts of it so the Court can be assured that you do

5   understand the terms of it.  Going to the government's

6   provisions in the plea agreement on page three, it indicates

7   that the -- you would be pleading guilty to Counts 1 and 2 of

8   the indictment; that the government would agree to a two-level

9   reduction of the applicable offense level, and that should the

10  United States find that you assisted authorities in the

11  investigation or the prosecution of your own misconduct, they

12  would move for an additional reduction of one level.  Is that

13  your understanding, sir?

14         THE DEFENDANT:  Yes, sir.

15         MR. URECH:  Sir, on the -- one -- if I may just make

16  one point.  Count 2 of the indictment is -- is charged as a --

17  it has an aiding and abetting language in there.  And in this

18  particular plea agreement Mr. Robinson is going to be pleading

19  guilty to possession only, and he will not be allocuting toward

20  any aiding and abetting in that portion of the indictment.  He

21  will be pleading guilty to possession only of the prohibited

22  items described in that particular indictment.

23         THE COURT:  That would be -- the penalty would remain

24  the same --

25         MR. URECH:  That's correct.

1       THE COURT:  -- regardless of whether it was aiding and

2   abetting or whether he was a principal, correct?

3       MR. SPEIRS:  That's correct, sir.

4       THE COURT:  All right.  The parties also agree that

5   should you qualify as an armed career criminal pursuant to 18

6   U.S.C., Section 924(e), that you would have the right to

7   withdraw your plea and negotiate a new plea agreement or proceed

8   to trial; is that correct?

9       MR. URECH:  Yes, Your Honor.  Our position is that he

10  has three felonies, and we think that one of the felonies is not

11  qualifying for armed career criminal.  And I think that the U.S.

12  Attorneys agreed with us -- agrees -- agrees with us on that;

13  however, if for some reason someone disagrees in the future and

14  would classify it as armed career criminal, then, yes, he would

15  have the right to withdraw his plea.

16      THE COURT:  This is prior to the sentencing, or when

17  would the determination be made whether or not?

18      MR. SPEIRS:  Your Honor, typically what happens is

19  probation will go through and they will get all of the -- the

20  relevant prior convictions.  The United States and defense

21  counsel have had numerous conversations about one particular

22  conviction, and neither of us believe that it qualifies for the

23  armed career criminal purposes.  But if somebody disagrees with

24  us or if there's something out there we don't know about, we

25  wanted to preserve that for this defendant.

1          THE COURT:  So my point is that even after trial, if

2    it's determined at a later date that he doesn't apply for it, he

3    would be allowed to withdraw the plea?

4          MR. SPEIRS:  That's correct, sir.

5          THE COURT:  All right.  That's what I wanted to

6    understand.

7          MR. SPEIRS:  Yes, sir.

8          THE COURT:  All right.  It also indicates under the

9    government's provisions that the United States would agree that

10   upon your sentencing, all charges against Karen Robinson arising

11   from this -- from the September 7, 2006 indictment would be

12   dismissed; is that correct?

13         THE DEFENDANT:  Yes.

14         MR. SPEIRS:  That is correct, sir.

15         THE COURT:  And that would remain into effect whether

16   or not -- again, on this armed career criminal thing, even if

17   this plea was later withdrawn, this would still remain into

18   effect?

19         MR. SPEIRS:  Yes, sir.

20         THE COURT:  All right.  It also says the parties agree

21   to the full application of the sentencing guidelines and do not

22   seek to limit the application in any way, and the United States

23   reserves the right to tell the Court and the probation office of

24   all facts pertinent to the sentencing process.

25         Mr. Robinson, is that your understanding of what the

```
 1   government's requirements are in this case?

 2              THE DEFENDANT:  Yes, sir.

 3              THE COURT:  All right.  Now, under yours, it says that

 4   you would plead guilty to Counts 1 and 2 of the indictment; that

 5   you would forfeit to the United States all firearms, including

 6   firearm silencers, mufflers, and ammunition in your possession;

 7   and you would forfeit to the United States all equipment, tools,

 8   and substances of whatever nature used in the manufacture or

 9   construction of destructive devices, firearms, silencers,

10   mufflers, or any other device that you would be prohibited from

11   possessing by state or federal law or that require registration

12   with the National Firearms Registration and Transfer Record and

13   not commit any federal, state, or local offenses.  Is that all

14   correct?

15              THE DEFENDANT:  Correct.

16              THE COURT:  All right.  Now, let's turn to page seven

17   where it indicates defendant's waiver of appeal or collateral

18   rights.  It says that -- provides for an appeal.  That you

19   understand that 18 U.S.C., Section 3742, provides for an appeal

20   of the sentence under certain circumstances, but you would waive

21   your right to appeal the sentence on any other ground in this

22   case except for prosecutorial misconduct, correct, or

23   ineffective assistance of counsel, although you would be

24   preserving the issue of -- he would be preserving for appeal the

25   issue of the -- if it's found -- well, he would be allowed to
```

 1    withdraw it, so he doesn't even need to worry about that for the

 2    appeal in terms of the armed career criminal.  So he would be

 3    giving up his right to appeal for anything other than

 4    ineffective assistance of counsel or prosecutorial misconduct,

 5    correct?

 6             MR. SPEIRS:  That is correct, sir.

 7             THE COURT:  All right.  Is that right, Mr. Robinson?

 8             THE DEFENDANT:  Yes, sir.

 9             THE COURT:  All right.  That appears to be the

10    pertinent parts of the plea agreement.

11             Now, has anyone made any other promises to you or

12    assurances, sir, about what would happen other than what's

13    contained within this plea agreement?

14             THE DEFENDANT:  No, sir.

15             THE COURT:  All right.  Do you understand, sir, if the

16    court chooses not to follow the terms of the plea agreement,

17    then the court would give you an opportunity to withdraw your

18    plea.  And if you chose not to withdraw your plea, the court can

19    impose a more severe sentence --

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  -- without being bound by the plea

22    agreement?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  All right.  Has anyone attempted to force

25    you to plead guilty in any way, sir?

```
 1              THE DEFENDANT:  No, sir.

 2              THE COURT:  Are you pleading guilty of your own free

 3   will?

 4              THE DEFENDANT:  Yes, sir.

 5              THE COURT:  All right.  Now, sir, the Sentencing Reform

 6   Act of 1984, the Sentencing Commission has issued guidelines

 7   about -- for judges to follow in determining the sentence.  The

 8   Supreme Court has ruled that those guidelines are not mandatory,

 9   but that the Court should follow them and consider them when

10   a -- when determining a sentence.  Do you understand that?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  All right.  Do you also understand that the

13   Court will not be able to determine the guideline sentence for

14   your case until after the presentence report has been concluded

15   and yourself and the government have had an opportunity to

16   challenge the reported facts and the application of the

17   guidelines recommended to the probation officer, and that the

18   sentence imposed could be different than the estimates given to

19   you by your attorney?

20              THE DEFENDANT:  Yes, sir, I'm aware of that.

21              THE COURT:  All right.  Do you understand that after

22   your guideline range has been determined, the Court will have

23   the authority to consider all relevant circumstances in

24   exercising its discretion to depart from the guidelines and

25   impose a sentence that's more severe or less severe than the one
```

1    called for by the probation department?

2         THE DEFENDANT:  Yes, sir, I'm aware of that.

3         THE COURT:  All right.  Do you also understand that

4    parole has been abolished and that if you are sentenced to

5    prison, there would be no opportunity for parole?

6         THE DEFENDANT:  Yes, I'm aware of that.

7         THE COURT:  All right.  We've already gone over the

8    appeal waiver that you would be doing in this case.

9         Now, do you understand that you have a right to plead

10   not guilty to the offenses charged against you, and that if you

11   persist in that plea, you would have a right to a trial by jury?

12        THE DEFENDANT:  Yes, I'm aware of that.

13        THE COURT:  And have you discussed with Mr. Urech what

14   a trial by jury is, sir?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  Do you understand that at a trial by jury,

17   you would be presumed innocent and the government would have the

18   right -- would have the burden to prove you guilty by proof

19   beyond a reasonable doubt, and that burden never shifts to you?

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  Do you also understand you would have the

22   following rights at the time of that trial?  The right to

23   assistance of counsel for your defense; the right to see and

24   hear all witnesses and have them cross-examined in your

25   defense.  You would have the right to testify on your own behalf

1  or choose not to testify if you decided to do so.  You would

2  have the right to the issuance of subpoenas or compulsory

3  process to compel the attendance of witnesses to testify in your

4  defense.  And should you decide not to testify or put on any

5  evidence, then those facts could not be used against you in any

6  way.  No one could presume you were guilty because you failed to

7  testify or present any type of a case.  Do you understand that?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  All right.  Do you also understand that if

10  you plead guilty in this case and if the plea is accepted, there

11  will be no trial and you will have waived, or given up, the

12  rights to trial that I've just explained to you?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  All right.  Mr. Speirs, could you advise

15  the Court of the essential elements of the offense in this case,

16  please?

17          MR. SPEIRS:  Yes, sir, Your Honor.

18          Your Honor, the defendant has been charged under 18

19  U.S.C., 922(g)(1).  The first element is that the defendant

20  knowingly possessed a firearm or ammunition in and affecting

21  interstate commerce, as charged, and that before the defendant

22  possessed the firearm or ammunition, he had been convicted in a

23  court of a crime punishable by imprisonment for a term exceeding

24  one year; that is, a felony offense.  Those are the elements for

25  18 U.S.C., 922(g)(1).

```
 1              Second, under 26 U.S.C., 5861(d), first, that the
 2   defendant knowingly possessed the firearms described in the
 3   indictment, the firearms were not registered to the defendant in
 4   the National Firearms Registration and Transfer Record.
 5              And third and finally, Your Honor, that the defendant
 6   knew of the features of the firearms that brought them within
 7   the scope of the act.
 8              THE COURT:  Mr. Urech, could you inquire of your client
 9   what it is that he feels he did that makes him guilty of these
10   offenses?
11              MR. URECH:  Yes, sir.  Yes.
12              Mr. Robinson, concerning Count 1 of the indictment, did
13   you have these felonies as listed in the indictment?
14              THE DEFENDANT:  Did I have them?
15              MR. URECH:  Yes.
16              THE DEFENDANT:  Yes.
17              MR. URECH:  Okay.  And did you possess the -- did you
18   knowingly -- in other words, did you know that you possessed the
19   firearms and articles described in Count 1 of the indictment?
20              THE DEFENDANT:  Yes.
21              MR. URECH:  All right.  And on Count 2 --
22              MR. SPEIRS:  Your Honor, before we move to Count 2, the
23   government would prove at trial that the 11 firearms listed in
24   the indictment traveled in interstate commerce.  That would be
25   an essential element of the crime.
```

```
 1              THE COURT:  Okay.
 2              MR. URECH:  And do you agree that those firearms would
 3    have traveled in interstate commerce?
 4              THE DEFENDANT:  I don't -- I don't --
 5              THE COURT:  In other words, that those firearms had not
 6    been manufactured in Alabama, and they probably would have had
 7    to travel --
 8              THE DEFENDANT:  I don't know where they were
 9    manufactured.
10              MR. URECH:  Do you --
11              THE COURT:  Do you agree that the government could
12    probably establish that they weren't?
13              THE DEFENDANT:  I don't know that.
14              MR. URECH:  Well --
15              THE DEFENDANT:  I can't tell you where they were made.
16    I didn't make them.
17              THE COURT:  That's not what I'm asking, Mr. Robinson.
18    The government is saying that they would be able to move -- that
19    in order to establish it, they would have to show that these
20    firearms moved in interstate commerce.  They would be able --
21    they would present that evidence at trial if there was a trial.
22    Do you agree that they would probably be able to establish that
23    at trial, yes or no?
24              THE DEFENDANT:  I guess so.  Yes, sir.
25              MR. URECH:  All right.  On Count 2, did you knowingly
```

```
 1   possess the firearms and firearm silencers and destructive
 2   devices described in the indictment in Count 2?
 3              THE DEFENDANT:  Yes.
 4              MR. URECH:  And did you know that those devices that
 5   you possessed were not registered in the National Firearms
 6   Register and Transfer Record?
 7              THE DEFENDANT:  Correct.
 8              MR. URECH:  And did you --
 9              I think that's -- that would be all.
10              THE COURT:  All right.  Mr. Robinson, did all this take
11   place in the Middle District of Alabama, sir?
12              THE DEFENDANT:  Correct.
13              THE COURT:  Mr. Speirs, are you satisfied that the
14   elements of the offenses have been established, sir?
15              MR. SPEIRS:  The government is satisfied, Your Honor.
16              THE COURT:  Mr. Urech, are you also satisfied?
17              MR. URECH:  I am, Your Honor.
18              THE COURT:  All right.  Mr. Robinson, do you understand
19   that if you plead guilty, a presentence report will be prepared
20   and the Court will then consider whether or not to accept the
21   plea agreement?  If the Court decides to reject the plea
22   agreement, you will have the opportunity to withdraw your plea
23   and change it to not guilty and proceed to trial, sir?
24              THE DEFENDANT:  Correct.  Yes, sir.
25              THE COURT:  All right.  How do you plead to the charge,
```

1  then, sir?

2          THE DEFENDANT:  Guilty, sir.

3          THE COURT:  All right.  It is the finding of the Court

4  in the case of United States of America versus Adam Robinson

5  that the defendant is fully competent and capable of entering an

6  informed plea, that the defendant is aware of the nature of the

7  charges and the consequences of the plea, and that the plea is

8  supported by an -- that the plea is a knowing and voluntary plea

9  supported by an independent basis in fact containing each of the

10  essential elements of the offense.  The plea is therefore

11  accepted, and the defendant is now adjudged guilty of the

12  offenses.

13          Mr. Robinson, there's going to be a presentence report

14  that's going to be prepared in this case that will assist the

15  judge in sentencing.  You will be asked to give information for

16  the purposes of that report, and your attorney can be present at

17  the time of that hearing.  The Court will allow you and your

18  counsel to review that presentence report prior to the time of

19  the sentencing in case you have any challenges to the facts

20  contained within that report or the estimates of the sentencing

21  guideline ranges.  You would also have an opportunity at the

22  time of sentencing to speak on your own behalf and have your

23  counsel speak on your behalf if you wish.  Do you understand

24  that, sir?

25          THE DEFENDANT:  Correct.  Yes, sir.

17

1      THE COURT:  All right.  You will be referred, then, to

2  the probation office for a presentence investigation and

3  report.  The district court judge will set the sentencing date,

4  sir.

5      He's currently detained; is that correct?

6      MR. SPEIRS:  That is correct, sir.

7      THE COURT:  All right.  We will continue with that.

8  Anything else on this case?

9      MR. SPEIRS:  No, sir.

10      THE COURT:  All right.  Thank you very much.

11      MR. SPEIRS:  Thank you, Your Honor.

12    (Proceedings concluded at 9:55 a.m.)

13              * * * * * * * * * * *

14              TRANSCRIBER'S CERTIFICATE

15      I certify that the foregoing is a true and correct

16  transcript, to the best of my ability, from the stenographic

17  notes provided to me by Official Court Reporter Risa L.

18  Entrekin.

19      This 27th day of December, 2007.

20

21                          /s/ Patricia G. Starkie
                            Registered Diplomate Reporter
22                          Certified Realtime Reporter
                            Official Court Reporter
23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                     NORTHERN DIVISION

4

5    UNITED STATES OF AMERICA

6         vs.              CASE NO.: 2:06-cr-223-MEF

7    ADAM LAMAR ROBINSON,

8         Defendant.

9

10           *  *  *  *  *  *  *  *  *  *  *  *  *  *

11                     SENTENCING

12           *  *  *  *  *  *  *  *  *  *  *  *  *  *

13       BEFORE THE HONORABLE MARK E. FULLER, UNITED STATES

14   DISTRICT JUDGE, at Montgomery, Alabama, on Tuesday, October 30,

15   2007, commencing at 11:15 a.m.

16                     APPEARANCES

17   FOR THE GOVERNMENT:      Mr. Verne H. Speirs
                              Mr. John T. Harmon
18                           Assistant United States Attorney
                              OFFICE OF THE UNITED STATES ATTORNEY
19                           131 Clayton Street
                              Montgomery, Alabama  36104
20
     FOR THE DEFENDANT:       Mr. Everett M. Urech
21                           URECH & LIVAUDAIS, P.C.
                              510 N. Daleville Ave.
22                           Daleville, AL  36322-2000

23
              Proceedings reported stenographically;

              transcript produced by computer

AO88B-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.         L

1          (The following proceedings were heard before the
2    Honorable Mark E. Fuller, United States District Judge at
3    Montgomery, Alabama, on Tuesday, October 30, 2007, commencing at
4    11:15 a.m.)
5          THE COURT:  We'll next take up the case of the United
6    States of America versus Adam Lamar Robinson.
7          Would you like a minute with your client before we
8    begin?
9          MR. URECH:  Just a very short time.
10          (Brief pause)
11          THE COURT:  United States ready, Mr. Speirs?
12          MR. SPEIRS:  United States is prepared, Your Honor.
13          THE COURT:  For the record, the Court calls the case of
14    United States of America versus Adam Lamar Robinson, case number
15    06cr223, in the United States District Court for the Middle
16    District of Alabama, Northern Division.
17          Mr. Robinson, today the Court will determine a
18    reasonable sentence in your case by considering the United
19    States Sentencing Guidelines, which were promulgated pursuant to
20    the Sentencing Reform Act of 1984 and which are now advisory,
21    and by considering the factors set forth in 18 United States
22    Code Section 3553(a).
23          It appears that there has been a plea agreement that
24    has been reached between you and the United States pursuant to
25    Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure,

1   which this Court commonly refers to as a binding plea

2   agreement.  If, in fact, that is the case, I would ask either

3   counsel for the United States or your counsel to recite the

4   terms of the plea agreement for the benefit of the Court.

5          MR. SPEIRS:  Your Honor, the United States will assist

6   the Court in going over the plea agreement.

7          Your Honor, it is an 11(c)(1)(C) plea agreement wherein

8   the defendant is charged with being a felon in possession of a

9   firearm.  In addition, he's charged with possessing firearms not

10  registered in the National Firearms Registration and Transfer

11  Record.

12         According to the plea agreement, Your Honor, the

13  government would file a two -- agrees that the defendant would

14  get acceptance of responsibility, a two-level reduction, and

15  that the United States would move for the third level for

16  acceptance of responsibility, which the United States has done

17  in this case, Your Honor.

18         In addition, the parties agree that should the

19  defendant qualify as an armed career criminal pursuant to 18

20  U.S.C. 924(e), that the defendant should have the right to

21  withdraw from the plea agreement, negotiate a new plea, or

22  proceed to trial.

23         The United States agrees that upon the defendant's

24  sentencing for all counts listed in the indictment that the

25  government would dismiss its case against Karen Robinson arising

```
 1   from the September 7, 2006 federal indictment in which she is
 2   named.
 3           The defendant has agreed, Your Honor, to plead guilty
 4   to Counts 1 and 2 of the indictment, forfeit to the United
 5   States all firearms and ammunition in his possession, and to
 6   forfeit to the United States any and all equipment, tools, or
 7   substances that were used to make the explosive or destructive
 8   devices that were seized in this case, Your Honor.  The
 9   defendant has --
10           THE COURT:  Does that also include the silencers and
11   the other weapons that were recovered?
12           MR. SPEIRS:  Yes, sir.  Everything that is listed in
13   the indictment, Your Honor.
14           The defendant would then have -- has agreed to waive
15   appeal and collateral attack except for prosecutorial misconduct
16   or ineffective assistance of counsel.
17           THE COURT:  Mr. Urech, is there anything that has been
18   stated that you wish to either add to or to correct?
19           MR. URECH:  Your Honor, there is one issue.  In the
20   plea agreement it was agreed that if the habitual offender
21   statute was to be applied that Mr. Robinson would have a right
22   to withdraw from the plea agreement.
23           THE COURT:  The armed career criminal statute?
24           MR. URECH:  I'm sorry.  The armed career criminal
25   statute, Your Honor.  If the government is urging the armed
```

career criminal statute in this case, then we would object and move for the Court to determine the application of that. But I had discussed with Mr. Robinson the issue in -- since the armed career criminal statue has been raised and may be applied in this case, he informs me that he still desires to go on with the plea agreement; however, I would ask the issue about appeal. It appears to me that the issue of appeal of the -- that particular area of whether or not the armed career criminal statute is applicable should be preserved and not waived by Mr. Robinson in order to get the plea agreement.

THE COURT: Let me ask counsel to approach, if you would.

(Bench conference held off the record.)

THE COURT: Let me know when you're ready, Mr. Urech.

MR. URECH: We're ready, Your Honor.

THE COURT: You may approach.

First of all, Mr. Robinson, let me say that as required by Rule 11 of the Federal Rules of Criminal Procedure, particularly Rule 11(c)(1)(C), because this is a binding plea agreement, the Court must inform you of its intention to either follow the terms of the plea agreement and sentence you consistently with the plea agreement you've negotiated with the United States or to reject the plea agreement and to give you an opportunity to withdraw your plea of guilty. I find the plea agreement is reasonable, and I intend to sentence you consistent

1    with the plea agreement that you have negotiated with the United

2    States.  And with that said, I will accept the plea agreement

3    and sentence you in accordance with the terms of the plea

4    agreement that you've negotiated with the United States.

5           Now pending before the Court is the United States'

6    motion for reduction for acceptance of responsibility.  And for

7    the record, that is document number 118.  That motion is

8    granted.

9           Mr. Robinson, have you and your attorney had an

10   opportunity to review the presentence report before today's

11   date?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Do you have any objections to any of the

14   content of the presentence report?  And I do note that there is

15   an objection to the application of the probation officer's

16   determination that the armed career criminal statute or Armed

17   Career Criminal Act would apply.

18          I have had a discussion with counsel at sidebar, and I

19   will state for the record that I have considered your prior

20   convictions, most notably your convictions as a youthful

21   offender some years ago.  I find that those convictions are

22   distinguishable from the line of cases, to include the *Wilks*

23   case out of the Eleventh Circuit, which are used to invoke the

24   Armed Career Criminal Act, and I would find in this case that

25   your convictions do not qualify as convictions necessary to

1  trigger the Armed Career Criminal Act, and I intend not to apply

2  that in this case.  I do intend to write specifically as to my

3  rationale in more detail than what I'm articulating on the

4  record.  And I'll give counsel for the United States an

5  opportunity to preserve your objections at the appropriate time,

6  or now if you wish to do so, and counsel for the defense

7  likewise would have an opportunity to voice any objections.  It

8  is the Court's findings as a matter of law that the Armed Career

9  Criminal Act would not apply in this case, but I will

10  substitute -- or supplement this finding with a written opinion

11  and give the government an opportunity if it would like to file

12  a written objection.

13          MR. SPEIRS:  Yes, Your Honor.  Just so that it's clear

14  for the record, I think the government has somewhat of an

15  obligation to object to a finding that the Armed Career Criminal

16  Act is not applied.  It is the government's position that -- and

17  although counsel for the government is not an expert on the

18  youthful offender statute within the state of Alabama -- the

19  defendant would have had to have applied for youthful offender

20  status.  By virtue of applying for that status and being

21  considered for it, he then waived certain rights that would have

22  been afforded to him as a juvenile.  Those rights would have

23  guaranteed the right to a trial, the right to cross examination

24  and other constitutional rights.  He applied for youthful

25  offender status, and that is what distinguishes in the

```
 1   government's mind why it ought to apply in this case, because it
 2   was something that he sought out.  That would be the basis of
 3   the government's objection, Your Honor.
 4            THE COURT:  I don't mean to say that this is not a
 5   close call that I didn't struggle with, and I have done the best
 6   that I could under the circumstances to research what case law
 7   there is out there.  I have not been able to find any definitive
 8   case law, at least out of the Eleventh Circuit, that
 9   specifically articulates on point youthful offender convictions
10   in the state of Alabama and the Armed Career Criminal Act.  But
11   to the extent that I would have that obligation in this case, I
12   find that it doesn't apply, although it's a close call, and I
13   will write to that and supplement my findings of fact and
14   conclusions of law with a written supplement and give the
15   government an opportunity to appeal using that as my basis for
16   the findings of fact and conclusions of law that I make.
17            Anything from the defense as to the Armed Career
18   Criminal Act?
19            MR. URECH:  No, Your Honor.
20            THE COURT:  With that finding, Mr. Urech, do you or
21   your client have any objections to any of the content of the
22   presentence report?
23            MR. URECH:  There is none, Your Honor.
24            THE COURT:  Mr. Robinson, having made the findings as
25   to the Armed Career Criminal Act and its application, and
```

1    without there being any other objections raised to the

2    presentence report, the Court adopts the factual statements

3    contained in the presentence report.

4         Since the Armed Career Criminal Act under Title 18

5    United States Code Section 924(e) does not apply in your case,

6    the Court finds that the offense level is 25; criminal history

7    category is I; the guideline range is from 57 months to 71

8    months; the supervised release period is from three to five

9    years, and the fine range is from $10,000 to $100,000.

10        Mr. Robinson, do either you or your attorney have

11   anything to say in mitigation or otherwise before the Court

12   pronounces its sentence in this case?

13        MR. URECH:  No, Your Honor.

14        THE COURT:  The sentence will now be stated, but you'll

15   have a final chance to make any legal objections before the

16   sentence is imposed.  Based upon the advisory guideline range

17   and the applicable statutory factors, it is the judgment of this

18   Court that you, Mr. Adam Lamar Robinson, be committed to the

19   custody of the Federal Bureau of Prisons to be imprisoned for a

20   total term of 64 months.  Based upon your inability to pay, the

21   Court waives the imposition of a fine.  However, you shall pay

22   to the United States District Court Clerk a special assessment

23   fee of $100, which is due immediately.

24        Let me correct myself since there are two counts.  You

25   shall pay to the United States District Court Clerk a special

```
1    assessment fee of $200, which is due immediately.
2              The Court finds that there is no identifiable victim
3    who incurred a financial loss as a result of this offense.
4              Upon release from imprisonment, you shall be placed on
5    supervised release for a term of three years.  This term
6    consists of three years in Count 1 and three years --
7              Let me go off the record.
8              (Brief discussion off the record)
9              THE COURT:  Back on the record.
10             Mr. Robinson, let me go back and state --
11             PROBATION OFFICER:  Your Honor, I was going to say that
12   with the ruling, that does not qualify -- not more than three.
13             THE COURT:  Not more than three?
14             PROBATION OFFICER:  Yes, sir.
15             THE COURT:  Mr. Robinson, upon release from
16   imprisonment, you shall be released on supervised release for a
17   term of three years.  This term consists of three years on Count
18   1 and three years on Count 2, all such terms to run
19   concurrently.
20             Within 72 hours of release from custody, you shall
21   report to the probation office in the district to which you are
22   released.
23             While on supervised release, you shall comply with the
24   mandatory and standard conditions of supervised release on file
25   with this Court.
```

1          The Court also orders the following special

2    conditions.  You shall participate in a program of drug testing

3    administered by the United States Probation Office.  You shall

4    cooperate in the collection of DNA.  You shall submit to a

5    search of your person, your residence, your office or your

6    vehicle pursuant to the search policy of this Court.  The Court

7    finds that the sentence that has been imposed is a reasonable

8    sentence and has been imposed to reflect the seriousness of the

9    offense and to promote respect for the law and to provide just

10    punishment for the offense, to afford adequate deterrence for

11    criminal conduct, and to protect the public from any further

12    crimes of you, Mr. Robinson, and to provide you with the needed

13    educational or vocational training, medical care, or other

14    correctional treatment in the most effective manner available to

15    this Court.  The Court further finds that any lesser sentence

16    would be insufficient to accomplish the purposes set forth in 18

17    United States Code Section 3553 Subsection (a)(2).

18          Are there any objections to the sentence or to the

19    manner in which this Court has pronounced it?  For example, do

20    you have any objections to the Court's ultimate findings of fact

21    or conclusions of law?

22          MR. URECH:  None for the defense, Your Honor.

23          THE COURT:  Any from the United States?

24          MR. SPEIRS:  Your Honor, just the same objections that

25    the government already put on the record.

1          THE COURT:  As to the Armed Career Criminal Act?

2          MR. SPEIRS:  That's it, Your Honor.

3          MR. HARMON:  Your Honor, if I might.  On August 13th of

4    this year, the Court entered a preliminary order of forfeiture

5    for the firearms involved in the offense.  At this time, the

6    United States would ask the Court to make that order of

7    forfeiture final as to this defendant, make the forfeiture part

8    of its oral pronouncement of sentence, and direct the clerk to

9    include the forfeiture upon the written judgment.

10          THE COURT:  Is that as to the firearms and all other

11   illegal --

12          MR. HARMON:  No, sir.  The silencer and the other

13   destructive devices are contraband per se, and accordingly they

14   should not be forfeited.  We would have to advertise them.  No

15   one can own those items, Your Honor.

16          THE COURT:  Okay.  So it's the firearms that you're

17   seeking?

18          MR. HARMON:  That's correct, Your Honor.

19          THE COURT:  Any objection?

20          MR. URECH:  No objection, Your Honor.

21          THE COURT:  All right.  Without objection, I will

22   include that as my -- as part of my final judgment in this case,

23   the final order of forfeiture as to the firearms.

24          Mr. Robinson, the sentence is ordered imposed as

25   stated, and I'll now address your rights regarding appeal.

1      You have a right to appeal your sentence. In order for

2  your appeal to be timely, you may need to file your notice of

3  appeal as soon as 10 days after the Court enters its written

4  judgment in this case. If you cannot afford the cost of an

5  appeal, you may petition this court for leave to appeal in forma

6  pauperis. Pursuant to the plea agreement that you have reached

7  with the United States, you have waived some if not all of your

8  rights regarding appeal. Such waivers are generally

9  enforceable, but if you believe that your waiver is not

10 enforceable, I encourage you to present that theory to the

11 appropriate appellate court. I'm not encouraging you to appeal

12 or not to appeal, Mr. Robinson. It's my policy in every case to

13 afford each defendant their rights regarding appeal to the

14 extent that those rights remain. Do you understand your

15 rights?

16      THE DEFENDANT: Yes, sir.

17      THE COURT: Do you have any question regarding your

18 rights?

19      THE DEFENDANT: No, sir.

20      THE COURT: Is there anything else that we need to take

21 up before we adjourn these proceedings?

22      MR. SPEIRS: No, sir, not on behalf of the government.

23      THE COURT: Anything from the defense?

24      MR. URECH: No, Your Honor.

25      THE COURT: Mr. Robinson, I wish you the best of luck.

1    You're remanded to the custody of the marshal.

2            MR. URECH:  May I be excused, Your Honor?

3            THE COURT:  Yes.

4            MR. URECH:  Appreciate that.

5        (Proceedings concluded at 11:35 a.m.)

6                * * * * * * * * * * * * * *

7                COURT REPORTER'S CERTIFICATE

8            I certify that the foregoing is a correct transcript

9    from the record of the proceedings in the above-entitled matter.

10           This 27th day of December 2007.

11

12                                /s/ Patricia G. Starkie
                                   Registered Diplomate Reporter
13                                 Certified Realtime Reporter
                                   Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
          Sheet 1

# UNITED STATES DISTRICT COURT

| __MIDDLE__ | District of | __ALABAMA__ |

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **JUDGMENT IN A CRIMINAL CASE** |
| **V.** | |
| **ADAM LAMAR ROBINSON** | |

Case Number:    **2:06CR223-MEF-01**

USM Number:    **12040-002**

**Everett M. Urech**
Defendant's Attorney

## THE DEFENDANT:

X pleaded guilty to count(s)    **1 and 2 of the Indictment on 7/25/2007**

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| **18:922(g)(1)** | **Felon in Possession of a Firearm** | **6/15/2006** | **1** |
| **26:5841,5861(d) and 5871** | **Registration of Firearms** | **6/15/2006** | **2** |

    The defendant is sentenced as provided in pages 2 through ____7____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is    ☐ are    dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**October 30, 2007**
Date of Imposition of Judgment

Signature of Judge

**MARK E. FULLER, CHIEF U.S. DISTRICT JUDGE**
Name and Title of Judge

_1 November 2007_
Date

AO886-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.    M

AO 245B    (Rev. 06/05) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ____2____ of ____7____

DEFENDANT:        **ADAM LAMAR ROBINSON**
CASE NUMBER:    **2:06CR223-MEF-01**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**Sixty four (64) months with each Count to run concurrently.**

☐ The court makes the following recommendations to the Bureau of Prisons:

X The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐    at _____    ☐ a.m.   ☐ p.m.    on _____ .

☐    as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐    before 2 p.m. on _____ .

☐    as notified by the United States Marshal.

☐    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
       Sheet 3 — Supervised Release

Judgment—Page   3   of    7

DEFENDANT:    **ADAM LAMAR ROBINSON**
CASE NUMBER:    **2:06CR223-MEF-01**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

**Three (3) years.  This term consists of 3 years on Count 1 and 3 years on Count 2, all such terms to run concurrently.**

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  (Check, if applicable.)

X    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  (Check, if applicable.)

X    The defendant shall cooperate in the collection of DNA as directed by the probation officer.  (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer.  (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence.  (Check, if applicable.)  .

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3C --- Supervised Release

Judgment—Page ___4___ of ___7___

DEFENDANT:        **ADAM LAMAR ROBINSON**
CASE NUMBER:      **2:06CR223-MEF-01**

## SPECIAL CONDITIONS OF SUPERVISION

**Defendant shall participate in a program of drug testing administered by the United States Probation Office.**

**Defendant shall submit to a search of his person, residence, office or vehicle pursuant to the search policy of this Court.**

Judgment — Page ___5___ of ___7___

DEFENDANT:    **ADAM LAMAR ROBINSON**
CASE NUMBER:  **2:06CR223-MEF-01**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $  200.00 | $ 0 | $ 0 |

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ 0 | $ 0 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐  the interest requirement is waived for the    ☐ fine   ☐ restitution.

   ☐  the interest requirement for the    ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

| | |
|---|---|
| DEFENDANT: | **ADAM LAMAR ROBINSON** |
| CASE NUMBER: | **2:06CR223-MEF-01** |

Judgment — Page ___6___ of ___7___

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**     X     Lump sum payment of $ ___200.00___ due immediately, balance due

      ☐     not later than _____ , or
      X     in accordance     ☐  C,     ☐  D,     ☐  E, or     X  F below; or

**B**     ☐     Payment to begin immediately (may be combined with     ☐ C,     ☐ D, or     ☐ F below); or

**C**     ☐     Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**     ☐     Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

**E**     ☐     Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**     X     Special instructions regarding the payment of criminal monetary penalties:

      **Criminal monetary payments shall be made payable to the Clerk, U.S. District Court, Middle District of Alabama, P.O.
      Box 711, Montgomery, AL 36101.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐     Joint and Several

      Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
      and corresponding payee, if appropriate.

☐     The defendant shall pay the cost of prosecution.

☐     The defendant shall pay the following court cost(s):

X     The defendant shall forfeit the defendant's interest in the following property to the United States:
      **Norinco, model Mak-90, 7.62mm rifle, bearing serial number 53074; Mossberg, 28 Inch Accu-Choke 12 gauge shotgun,
      bearing serial number L071845; Lorcin, model L-380, .380 caliber pistol, bearing serial number 033079;**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Judgment—Page ___7___ of ___7___

DEFENDANT:         **ADAM LAMAR ROBINSON**
CASE NUMBER:       **2:06CR223-MEF-01**

## ADDITIONAL FORFEITED PROPERTY

**Remington, model 510, .22 caliber rifle, no serial number; Marlin, model 1 10M, .22 caliber rifle, bearing serial number 72430804; Ithaca, 12 gauge shotgun, bearing serial number 191691; Mossberg, model 500 AG, 12 gauge shotgun, bearing serial number J190660; Marlin, model 60W, .22 caliber rifle, bearing serial number 04249700; Smith and Wesson, model 442, .38 caliber revolver, bearing serial number BUA1311; and, SWD Derringer, model DD45, .45 caliber firearm, no serial number.**